No. 23-50312

# In the United States Court of Appeals for the Fifth Circuit

UNITED STATES OF AMERICA,
Plaintiff–Appellant,

v.

PAOLA CONNELLY,
Defendant–Appellee.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
NO. 22-CR-229-2 (Hon. Kathleen Cardone)

## UNITED STATES' RENEWED OPPOSED MOTION TO STAY PROCEEDINGS

Pursuant to Federal Rule of Appellate Procedure 27 and Fifth Circuit Rule 27.1.3, the United States files this renewed motion to stay further proceedings in this case pending a decision in *United States v. Rahimi*, No. 22-915, and disposition of the government's petition for a writ of certiorari in *United States v. Daniels*, No. 22-60596 (5th Cir.) by the Supreme Court. In support of its motion, the government states as follows:

1.     On December 28, 2021, officers with the El Paso Police Department were called to defendant-appellee Paola Connelly's home because of a conflict

1

between Connelly's husband and a neighbor. ROA.15-16. Connelly told officers that her husband and the neighbor had been using cocaine and crack cocaine and that her husband smoked marijuana. ROA.16. She also admitted that she used marijuana on a "regular basis." ROA.16. During a search of Connelly's home, officers found multiple grams of marijuana, THC extract, THC edibles, psilocybin (hallucinogenic mushroom), and drug paraphernalia. ROA.16-17. Officers also found seven guns and ammunition scattered throughout the house. ROA.17.

A grand jury in the Western District of Texas returned a superseding indictment charging Connelly with possessing a firearm as an unlawful user of controlled substances, in violation of 18 U.S.C. § 922(g)(3); and providing firearms to an unlawful user of controlled substances, in violation of 18 U.S.C. § 922(d)(3). ROA.79-82. Connelly moved to dismiss the indictment, arguing that both statutes violated the Second Amendment facially and as applied to her. ROA.122-143. The district court denied her motion, concluding that circuit precedent foreclosed Connelly's arguments. ROA.186-187.

This Court subsequently held in *United States v. Rahimi*, 61 F.4th 443 (5th Cir. 2023), *cert. granted*, No. 22-915, 2023 WL 4278450 (June 30, 2023), that the Supreme Court's decision in *New York State Rifle and Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), rendered pre-existing precedent "obsolete" and

that 18 U.S.C. § 922(g)(8), which prohibits persons subject to domestic-violence protective orders from possessing firearms, violated the Second Amendment on its face. The government filed a petition for a writ of certiorari of that decision, which the Supreme Court granted. The Court will hear oral argument in *Rahimi* on November 7, 2023. *See United States v. Rahimi*, No. 22-915.

Following *Rahimi*, Connelly filed a motion for reconsideration arguing that Sections 922(g)(3) and 922(d)(3) violate the Second Amendment facially and as applied to her. ROA.195-196. The district court granted Connelly's motion. ROA.215-246. The court reasoned, based on *Rahimi*, that *Bruen* rendered pre-existing Second Amendment precedent obsolete and, adopting much of the reasoning in *Rahimi*, held that Sections 922(g)(3) and 922(d)(3) facially violate the Second Amendment. The government filed a timely notice of appeal. ROA.247.

While its appeal was pending, this Court held in *United States v. Daniels*, 77 F.4th 337 (5th Cir. 2023), that Section 922(g)(3) is unconstitutional as applied to a defendant who used marijuana "approximately fourteen days out of the month." *Id.* at 340.[1] This Court emphasized the "narrowness" of its decision,

---

[1] While *Daniels* was pending, the government filed a motion to hold this case in abeyance pending a decision in that case. This Court issued its opinion in *Daniels* two days later and denied the government's motion to stay proceedings in this case.

limiting it only to Daniels and his circumstances, *id*. at 355, but otherwise did not identify any characteristics of Daniels's that would limit its application to him. On October 5, 2023, the government filed a petition for a writ of certiorari in *Daniels*, a copy of which is attached.

2.    Given the overlapping issues in *Rahimi*, *Daniels*, and this case, the government requests a stay of proceedings in this appeal. The district court here relied on *Rahimi* to revisit its order denying Connelly's motion to dismiss. ROA.219-221. And both *Daniels* and the district court here adopted the reasoning in, and repeatedly cited to, *Rahimi* to hold that Section 922(g)(3) violates the Second Amendment: both courts relied on *Rahimi* in rejecting the argument that the Second Amendment only protects law-abiding, responsible citizens, *see* ROA.221-223, 233-236, *Daniels*, 77 F.4th at 342-43; both courts relied on *Rahimi* in identifying the type of historical evidence that the government must produce to establish a gun regulation's constitutionality, *see* ROA.224, *Daniels*, 77 F.4th at 344, 351-52; and both courts relied on *Rahimi* in rejecting reliance on the English tradition of disarming dangerous individuals, *see* ROA.236-239, *Daniels*, 77 F.4th at 353, among other things. Indeed, Judge Higginson concurred in *Daniels* "with the caveat that the Supreme Court has granted certiorari in [*Rahimi*]." *Daniels*, 77 F.4th at 358 (Higginson, J., concurring). He considered it "likely" that the Supreme Court's decision in

*Rahimi* "will resolve some of [the methodological] questions" raised by *Daniels*, *id.* at 361, and which this Court will be required to resolve in this case.

In light of the above, the government requests a stay of this case pending a decision in *Rahimi* and disposition of the government's petition for a writ of certiorari in *Daniels*. A stay would promote the fair and efficient resolution of this case. And a stay would not prejudice Connelly, who currently has no federal indictment pending against her and is not in the custody of the Bureau of Prisons.

*   *   *

For these reasons, the government respectfully requests that this Court vacate the briefing schedule in this case and stay further proceedings pending a decision in *United States v. Rahimi*, No. 22-915, and disposition of the government's petition for a writ of certiorari in *United States v. Daniels*, No. 22-60596 (5th Cir.) by the U.S. Supreme Court.

October 10, 2023                    Respectfully submitted,

/s/ Mahogane D. Reed
MAHOGANE D. REED
Criminal Division, Appellate Section
U.S. Department of Justice
950 Pennsylvania Ave., N.W.
Washington, DC 20530
(202) 615-1170
Mahogane.Reed@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on October 10, 2023, I electronically filed the foregoing with the Clerk of Court using the appellate CM/ECF system. I certify that counsel in this case is a registered CM/ECF user and that service will be accomplished by filing.

/s/ Mahogane D. Reed
MAHOGANE D. REED

# CERTIFICATE OF COMPLIANCE

1.    This document complies with the type-volume limitations of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 923 words.

2.    This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point type Calisto MT font.

/s/ Mahogane D. Reed
MAHOGANE D. REED

**Exhibit A**
Petition for a Writ of Certiorari
*United States v. Daniels*, No. 22-60596 (5th Cir.)

**No.**

# In the Supreme Court of the United States

---

UNITED STATES OF AMERICA, PETITIONER

*v.*

PATRICK DARNELL DANIELS, JR.

---

*ON PETITION FOR A WRIT OF CERTIORARI*
*TO THE UNITED STATES COURT OF APPEALS*
*FOR THE FIFTH CIRCUIT*

---

**PETITION FOR A WRIT OF CERTIORARI**

---

ELIZABETH B. PRELOGAR
  *Solicitor General*
    *Counsel of Record*
NICOLE M. ARGENTIERI
  *Acting Assistant Attorney*
  *General*
BRIAN H. FLETCHER
  *Deputy Solicitor General*
VIVEK SURI
  *Assistant to the Solicitor*
  *General*
PAUL T. CRANE
  *Attorney*

  *Department of Justice*
  *Washington, D.C. 20530-0001*
  *SupremeCtBriefs@usdoj.gov*
  *(202) 514-2217*

**QUESTION PRESENTED**

Whether 18 U.S.C. 922(g)(3), which prohibits the possession of firearms by a person who "is an unlawful user of or addicted to any controlled substance," *ibid.*, violates the Second Amendment.

(I)

**RELATED PROCEEDINGS**

United States District Court (S.D. Miss.):

*United States* v. *Daniels*, No. 22-cr-58 (July 8, 2022)

United States Court of Appeals (5th Cir.):

*United States* v. *Daniels*, No. 22-60596
     (Aug. 9, 2023)

**TABLE OF CONTENTS**

Page

Opinions below ................................................................ 1

Jurisdiction .................................................................... 1

Constitutional and statutory provisions involved .................... 2

Statement ..................................................................... 2

Reasons for granting the petition ...................................... 4

    A.  The court of appeals erred in holding Section
        922(g)(3) unconstitutional as applied to respondent ...... 5

        1.  Congress may disarm unlawful drug users
            because they are not law-abiding, responsible
            citizens ........................................................ 6

        2.  The court of appeals' contrary analysis is
            flawed ...................................................... 13

    B.  The decision below has significant practical
        consequences ............................................... 18

    C.  This Court should hold this certiorari petition
        pending the resolution of *Rahimi* ............................... 19

Conclusion .................................................................. 21

Appendix A — Court of appeals opinion (Aug. 9, 2023) ........ 1a

Appendix B — District court memorandum opinion and
                  order (July 8, 2022) ................................. 50a

Appendix C — Constitutional and statutory provisions ..... 61a

**TABLE OF AUTHORITIES**

Cases:

    *Andrus* v. *Texas*, 140 S. Ct. 1875 (2020) ............................... 8

    *Bell* v. *Cone*, 535 U.S. 685 (2002) ........................................... 8

    *Buford* v. *United States*, 532 U.S. 59 (2001) ........................ 8

    *Dickerson* v. *New Banner Institute, Inc.*,
      460 U.S. 103 (1983) ................................................... 12

    *District of Columbia* v. *Heller*,
      554 U.S. 570 (2008) .................................................. 3, 12, 17

(III)

IV

Cases—Continued:                                  Page

*Florence* v. *Board of Chosen Freeholders*,
566 U.S. 318 (2012) ................................................................ 7

*Harmelin* v. *Michigan*, 501 U.S. 957 (1991) .................... 7-10

*Iancu* v. *Brunetti*, 139 S. Ct. 2294 (2019) ............................ 19

*Johnson* v. *United States*, 576 U.S. 591 (2015) ................... 10

*Kendall* v. *Ewert*, 259 U.S. 139 (1922) ................................ 16

*McDonald* v. *City of Chicago*, 561 U.S. 742 (2010) ............ 12

*Michigan* v. *Summers*, 452 U.S. 692 (1981) ......................... 9

*Muscarello* v. *United States*, 524 U.S. 125 (1998) .............. 10

*NYSRPA* v. *Bruen*, 142 S. Ct. 2111 (2022) ........... 3, 9, 13, 14

*National Treasury Employees Union* v.
*Von Raab*, 489 U.S. 656 (1989) .......................................... 11

*Ramirez* v. *Collier*, 142 S. Ct. 1264 (2022) ........................... 8

*Range* v. *Attorney General United States*,
69 F.4th 96 (3d Cir. 2023) .................................................. 20

*Rehaif* v. *United States*, 139 S. Ct. 2191 (2019) ................. 18

*Richards* v. *Wisconsin*, 520 U.S. 385 (1997) ...................... 10

*Rosemond* v. *United States*, 572 U.S. 65 (2014) ................. 10

*Smith* v. *Texas*, 543 U.S. 37 (2004) ....................................... 8

*Smith* v. *United States*, 508 U.S. 223 (1993) .................. 4, 10

*United States* v. *Augustin*, 376 F.3d 135
(3d Cir. 2004) ......................................................................... 5

*United States* v. *Bowens*, 938 F.3d 790
(6th Cir. 2019), cert. denied, 140 S. Ct. 814,
and 140 S. Ct. 2572 (2020) .................................................. 5

*United States* v. *Carter*, 750 F.3d 462 (4th Cir.),
cert. denied, 574 U.S. 907 (2014) .................................. 9, 10

*United States* v. *Cook*, 970 F.3d 866 (7th Cir. 2020) ........... 5

*United States* v. *Dugan*, 657 F.3d 998
(9th Cir. 2011) ...................................................................... 10

*United States* v. *Marceau*, 554 F.3d 24 (1st Cir.),
cert. denied, 556 U.S. 1275 (2009) ...................................... 5

V

Cases—Continued:                                                           Page

*United States* v. *McCowan*, 469 F.3d 386
(5th Cir. 2006) ........................................................................ 5

*United States* v. *Patterson*, 431 F.3d 832
(5th Cir. 2005), cert. denied, 547 U.S. 1138 (2006) ........... 10

*United States* v. *Purdy*, 264 F.3d 809
(9th Cir. 2001) ........................................................................ 5

*United States* v. *Rahimi*:

61 F.4th 443 (5th Cir.), cert. granted,
143 S. Ct. 2688 (2023) ................................................ 3

143 S. Ct. 2688 (2023) ............................................. 4, 5, 21

*United States* v. *Seay*, 620 F.3d 919
(8th Cir. 2010), cert. denied, 562 U.S. 1191 (2011) ........... 10

*United States* v. *Skoien*, 614 F.3d 638
(7th Cir. 2010), cert. denied, 562 U.S. 1303 (2011) ............. 6

*United States* v. *Yancey*, 621 F.3d 681
(7th Cir. 2010) ........................................................... 9, 10, 12

*Wong* v. *Belmontes*, 558 U.S. 15, (2009) ................................. 8

Constitution and statutes:

U.S. Const.:

Amend. II ...................................... 2, 4-6, 12-15, 19, 20, 61a

Amend. IV ................................................................. 11

Act of Mar. 30, 1876, ch. 40, § 8, 19 Stat. 10 ....................... 16

Controlled Substances Act, 21 U.S.C. 801 *et seq* ................. 6

21 U.S.C. 802(6) ........................................................ 6, 61a

21 U.S.C. 812(c), Schedule I(c)(10) ......................... 6, 62a

21 U.S.C. 844(a) ................................................................ 6

18 U.S.C. 922(g) ...................................................... 12, 18, 20

18 U.S.C. 922(g)(1) ......................................................... 18, 20

18 U.S.C. 922(g)(3) ............................... 2-7, 11-15, 18, 21, 61a

VI

Statutes—Continued:          Page

18 U.S.C. 922(g)(8) .................................................. 19

Act of Apr. 12, 1827, § 1,
1827 Mich. Terr. Laws 584-585 ......................... 16

Act of Mar. 3, 1853, ch. 89, § 1, 1853 N.J. Acts 237 ........... 16

Act of Apr. 30, 1855, §§ 1-2, *in* 2 *The General Laws of
the State of California, from 1850 to 1864, inclusive*
1076-1077 (Theodore H. Hitchell ed., 1865) .................... 17

Act of Feb. 7, 1856, ch. 26, § 1,
1855-1856 N.M. Terr. Laws 94 (1856) ............................. 16

Act of Mar. 27, 1857, ch. 184, § 9, 1857 N.Y. Laws,
Vol. 1, at 431 ........................................................ 16

Act of Mar. 5, 1860, ch. 386, §§ 6-7,
1860 Md. Laws 607-608 ............................................ 16

Act of Feb. 1, 1866, No. 11, § 10, 1866 Pa. Laws 10 ........... 16

Act of Mar. 2, 1868, ch. 60, § 5, *in The General
Statutes of the State of Kansas* 553
(John M. Price et al. eds., 1868) ......................... 16

Act of Mar. 17, 1870, ch. 131, § 1,
1870 Wis. Gen. Laws 197 ........................................ 16

Act of Apr. 1, 1870, ch. 426, § 2,
1869-1870 Cal. Stat. 585-586 ................................. 16

Act of Jan. 5, 1871, § 1, 68 *Ohio General and Local
Laws and Joint Resolutions* 6 (1871) ...................... 16

Act of Feb. 21, 1872, § 1, 1872 Ill. Laws 477 ................. 16

Act of Mar. 28, 1872, ch. 996, §§ 10-11,
1872 Ky. Acts, Vol. 2, at 523-524 ........................... 16

Act of Mar. 31, 1873, ch. 57, §§ 1, 3,
1873 Miss. Laws 61-62 ........................................... 16

Act of July 25, 1874, ch. 113, § 1,
1874 Conn. Pub. Acts 256 ...................................... 16

Act of Aug. 18, 1876, ch. 112, § 147,
1876 Tex. Gen. Laws 188 ....................................... 16

VII

Statutes—Continued:                                    Page

Act of June 18, 1885, ch. 339, §§ 1-3,
    1885 Mass. Acts 790.................................................... 16

Act of May 1, 1890, ch. 42, § 1, 1890 Iowa Acts 67.............. 16

Act of July 8, 1890, No. 100, § 1, 1890 La. Acts 116 .......... 16

Ala. Code § 13A-11-72(b) .............................................. 11, 17

Ark. Code Ann.:

    § 5-73-309(7)(A).................................................... 11

    § 5-73-309(8)(A).................................................... 17

Ark. Rev. Stat., ch. 78, § 1, at 456 (William McK. Ball
    & Sam C. Roane eds., 1838) ...................................... 16

Cal. Penal Code § 29800(a)(1).......................................... 11

Colo. Rev. Stat. Ann.:

    § 18-12-203(1)(e) .................................................. 17

    § 18-12-203(1)(f).................................................. 11

Del. Code Ann. tit. 11, § 1448(a)(3) .................................. 11

D.C. Code § 7-2502.03(a)(4)(A)........................................ 11

Fla. Stat. Ann.:

    § 790.06(2)(e)-(f).................................................. 11

    § 790.06(2)(f) ...................................................... 17

Ga. Code Ann.:

    § 16-11-129(b)(2)(I)-(J)............................................ 11

    § 16-11-129(b)(2)(J) .............................................. 17

Ga. Code Pt. 2, Tit. 2, Ch. 3, Art. 2, § 1803, at 358
    (R. H. Clark et al. eds., 1861)...................................... 16

10 Guam Code Ann.:

    § 60109.1(b)(5)-(6)................................................ 11

    § 60109.1(b)(6).................................................... 17

Haw. Rev. Stat. § 134-7(c)(1)....................................... 11, 17

Idaho Code Ann. § 18-3302(11)(e) .................................... 12

720 Ill. Comp. Stat. § 5/24-3.1(a)(3)................................... 12

Ind. Code § 35-47-1-7(5) ............................................ 12, 17

VIII

Statutes—Continued:                                                    Page

    Kan. Stat. Ann.:

        § 21-6301(a)(10) .................................................................. 12

        § 21-6301(a)(13) .................................................................. 17

    Ky. Rev. Stat. Ann.:

        § 237.110(4)(d) .................................................................... 12

        § 237.110(4)(e) .................................................................... 17

    Md. Code Ann., Public Safety:

        § 5-133(b)(4) ........................................................................ 17

        § 5-133(b)(5) ........................................................................ 12

    Mass. Gen. Laws ch. 140, § 131(d)(iii)(A) ..................... 12, 17

    Minn. Stat. § 624.713(10)(iii) ............................................. 12

    Minn. Terr. Rev. Stat. ch. 67, § 12 (1851) ........................... 16

    Mo. Rev. Stat. § 571.070.1(2) ......................................... 12, 17

    Nev. Rev. Stat. § 202.360.1(f) ............................................. 12

    N.J. Stat. Ann. § 2C:58-3.c.(3) ....................................... 12, 17

    N.Y. Penal Law § 400.00.1(e) ............................................. 12

    N.C. Gen. Stat. § 14-415.12(b)(5) ................................... 12, 17

    6 N. Mar. I. Code § 10610(a)(3) .......................................... 12

    Ohio Rev. Code § 2923.13(A)(4) ..................................... 12, 17

    P.R. Laws Tit. 25, § 462a(a)(3) ....................................... 12, 17

    R.I. Gen. Laws § 11-47-6 .................................................... 12

    S.C. Code Ann. § 16-23-30(A)(1) ................................... 12, 17

    S.D. Codified Laws § 23-7.7.1(3) ................................... 12, 17

    Utah Code Ann. § 76-10-503(1)(b)(iv) ................................ 12

    V.I. Code tit. 23, § 456a(a)(3) ............................................. 12

    W. Va. Code:

        § 61-7-7(a)(2) ...................................................................... 17

        § 61-7-7(a)(3) ...................................................................... 12

IX

Miscellaneous:                                          Page

1 William Blackstone, *Commentaries on the Laws of England* (1765) .................................................................. 17

Bureau of Justice Statistics, Office of Justice Programs, U.S. Dep't of Justice:

    Jennifer Bronson et al., *Special Report—Drug Use, Dependence, and Abuse Among State Prisoners and Jail Inmates, 2007-2009* (rev. Aug. 10, 2020) ..................................... 8, 10

    *Drugs & Crime Data—Fact Sheet: Drug-Related Crime* (Sept. 1994) ......................................... 9

Edward Coke, *The First Part of the Institutes of the Lawes of England, or, A Commentarie upon Littleton* (1628)............................................................. 17

Crim. Justice Info. Servs. Div., Fed. Bureau of Investigation, U.S. Dep't of Justice:

    *Federal Denials—Reasons Why the NICS Section Denies, November 30, 1998–August 31, 2023* .................................................. 18

    *National Instant Criminal Background Check System Operational Report 2020-2021* (Apr. 2022)................................................. 18

H.R. Doc. No. 407, 89th Cong., 2d Sess. (1966) .................... 7

H.R. Rep. No. 1486, 89th Cong., 2d Sess. (1966)................. 8

National Academies of Sciences, Engineering, and Medicine, *The Health Effects of Cannabis and Cannabinoids: The Current State of Evidence and Recommendations for Research* (2017) ........................ 7, 9

Office of National Drug Control Policy, Executive Office of the President, *ADAM II—2013 Annual Report, Arrestee Drug Abuse Monitoring Program II* (2014) ............................................................ 10

X

Miscellaneous—Continued:                                    Page

Carrie B. Oser et al., *The Drugs-Violence Nexus*
  *Among Rural Felony Probationers*,
  24 J. Interpersonal Violence 1285 (Aug. 2009) .................. 9
S. Rep. No. 1667, 89th Cong., 2d Sess. (1966) ...................... 8

# In the Supreme Court of the United States

———————

No.

UNITED STATES OF AMERICA, PETITIONER

*v.*

PATRICK DARNELL DANIELS, JR.

———————

*ON PETITION FOR A WRIT OF CERTIORARI
TO THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT*

———————

**PETITION FOR A WRIT OF CERTIORARI**

———————

The Solicitor General, on behalf of the United States, respectfully petitions for a writ of certiorari to review the judgment of the United States Court of Appeals for the Fifth Circuit in this case.

### OPINIONS BELOW

The opinion of the court of appeals (App., *infra*, 1a-50a) is reported at 77 F.4th 337.  The memorandum opinion and order of the district court (App., *infra*, 51a-60a) is reported at 610 F. Supp. 3d 892.

### JURISDICTION

The judgment of the court of appeals was entered on August 9, 2023.  The jurisdiction of this Court is invoked under 28 U.S.C. 1254(1).

(1)

2

## CONSTITUTIONAL AND STATUTORY PROVISIONS INVOLVED

Pertinent constitutional and statutory provisions are reproduced in the appendix. App., *infra*, 61a-62a.

## STATEMENT

1. In April 2022, law-enforcement officers stopped respondent Patrick Daniels for driving without a license plate. App., *infra*, 2a. An officer approached the car and recognized the smell of marijuana. *Ibid.* A search of the car uncovered several marijuana cigarette butts in an ashtray, a loaded pistol, and a loaded rifle. *Id.* at 2a-3a. Daniels admitted in an interview that he had used marijuana since high school and that he smoked marijuana "approximately fourteen days out of a month." *Id.* at 3a.

A federal grand jury in the Southern District of Mississippi indicted Daniels for possessing a firearm as an unlawful user of a controlled substance, in violation of 18 U.S.C. 922(g)(3). App., *infra*, 3a, 51a. The district court denied Daniels' motion to dismiss the indictment, rejecting his contention that Section 922(g)(3) violated the Second Amendment as applied to him. *Id.* at 51a-60a. The court observed that several courts had upheld Section 922(g)(3) under "standards of history and tradition," and it stated that it agreed with those courts' decisions. *Id.* at 58a; see *id.* at 56a-60a.

Daniels was convicted after a jury trial. Judgment 1. The district court sentenced him to 46 months of imprisonment, to be followed by three years of supervised release. Judgment 2-3.

2. The Fifth Circuit reversed. App., *infra*, 1a-50a. The court held that Section 922(g)(3) violated the Second Amendment "as applied to Daniels." *Id.* at 34a.

3

The court of appeals first determined that, because Daniels is among "'the people,'" he has "a presumptive right to bear arms." App., *infra*, 7a (citation omitted). The court acknowledged that, in *District of Columbia* v. *Heller*, 554 U.S. 570 (2008), and *NYSRPA* v. *Bruen*, 142 S. Ct. 2111 (2022), this Court described the right to possess arms as a right of "law-abiding, responsible citizens." App., *infra*, 8a (citation omitted). But the court attached little significance to what it described as "the Supreme Court's chosen epithet." *Ibid.* Instead, relying on its own decision in *United States* v. *Rahimi*, 61 F.4th 443 (5th Cir.), cert. granted, 143 S. Ct. 2688 (2023) (oral argument scheduled for Nov. 7, 2023), the court determined that Daniels presumptively had a right to possess arms regardless of whether he was a law-abiding, responsible citizen. App., *infra*, 8a-9a.

The court of appeals then concluded that Section 922(g)(3) is not "consistent with our tradition of gun regulation." App., *infra*, 9a. "Because there was little regulation of drugs" at the Founding, the court viewed "intoxication via alcohol" as the "next-closest comparator." *Id.* at 12a. The court asserted that, while some jurisdictions in the 19th century had prohibited "carrying weapons while under the influence, none barred gun possession by regular drinkers." *Id.* at 13a. The court concluded that history and tradition could at most support "a ban on gun possession while an individual is *presently* under the influence," not a ban on gun possession based on "a pattern of drug use." *Id.* at 20a.

The court of appeals rejected the government's reliance on "the tradition of disarming the mentally ill." App., *infra*, 20a. The court determined that such a tradition "could justify disarming a citizen only while he is in a state comparable to lunacy," and could not support

4

"disarming a sober citizen who is not currently under an impairing influence." *Id.* at 22a.

Finally, the court of appeals rejected the argument that Section 922(g)(3) complies with the Second Amendment because "Congress can limit gun possession by those 'dangerous' to public peace or safety." App., *infra*, 23a. The court stated that the government had identified "no class of persons at the Founding (or even at Reconstruction) who were 'dangerous' for reasons comparable to [drug] users." *Id.* at 32a.

Judge Higginson concurred. He stated that "courts, operating in good faith, are struggling at every stage of the *Bruen* inquiry." App., *infra*, 41a. He expressed hope that this Court would provide further guidance about how to apply *Bruen* in *United States* v. *Rahimi*, cert. granted, 143 S. Ct. 2688 (2023) (No. 22-915) (oral argument scheduled for Nov. 7, 2023). App., *infra*, 47a.

**REASONS FOR GRANTING THE PETITION**

"[D]rugs and guns are a dangerous combination." *Smith* v. *United States*, 508 U.S. 223, 240 (1993). The physiological effects of illegal drugs may impair drug users' ability to handle firearms safely. Drug users also often use firearms to commit crimes that fund their drug habit, to engage in violence in the course of drug deals, to endanger police officers who are investigating their drug crimes, and to commit suicide.

In Section 922(g)(3), Congress sought to address those problems by disarming regular drug users and drug addicts. That prohibition lasts only as long as a person remains a regular user or addict; an individual can regain his ability to possess firearms by stopping his illegal drug abuse. The Fifth Circuit, however, concluded that Section 922(g)(3) violates the Second Amendment. Although the court stated that it had in-

5

validated the statute only as applied to Daniels, the concurrence understood the court's reasoning to imply that "most, if not all, applications of § 922(g)(3) will likewise be deficient." App., *infra*, 39a-40a (Higginson, J., concurring).

That holding was profoundly mistaken. The Second Amendment allows Congress to disarm persons who are not law-abiding, responsible citizens, and Section 922(g)(3) falls comfortably within that principle. This Court should not leave the court of appeals' contrary decision in place. But because the Court is already considering closely related Second Amendment issues in *United States* v. *Rahimi*, cert. granted, 143 S. Ct. 2688 (2023) (No. 22-915) (oral argument scheduled for Nov. 7, 2023), plenary review is not warranted at this time. The Court should instead hold the petition for a writ of certiorari pending its decision in *Rahimi*, and then dispose of the petition as appropriate.

### A. The Court Of Appeals Erred In Holding Section 922(g)(3) Unconstitutional As Applied To Respondent

Section 922(g)(3) makes it a crime for a person to possess a firearm if he "is an unlawful user" of "any controlled substance." 18 U.S.C. 922(g)(3). The courts of appeals that have considered the issue have uniformly agreed that the word "user" refers to someone who engages in the regular use of a controlled substance.[1] And a "controlled substance" is a drug or other substance

---

[1] See *United States* v. *Marceau*, 554 F.3d 24, 30 (1st Cir.), cert. denied, 556 U.S. 1275 (2009); *United States* v. *Augustin*, 376 F.3d 135, 138-139 (3d Cir. 2004); *United States* v. *McCowan*, 469 F.3d 386, 392 (5th Cir. 2006); *United States* v. *Bowens*, 938 F.3d 790, 793-794 (6th Cir. 2019), cert. denied, 140 S. Ct. 814, and 140 S. Ct. 2572 (2020); *United States* v. *Cook*, 970 F.3d 866, 874 (7th Cir. 2020); *United States* v. *Purdy*, 264 F.3d 809, 812 (9th Cir. 2001).

6

that is listed in one of the schedules of the Controlled
Substances Act, 21 U.S.C. 801 *et seq.* See 18 U.S.C.
922(g)(3); 21 U.S.C. 802(6). Marijuana, the drug at issue
here, is a controlled substance. See 21 U.S.C. 812(c),
Schedule I(c)(10). Simple possession of marijuana is a
misdemeanor, and possession after a previous convic-
tion for a drug offense is a felony. See 21 U.S.C. 844(a).
The Second Amendment allows Congress to disarm the
unlawful drug users covered by Section 922(g)(3), in-
cluding Daniels.

### 1. *Congress may disarm unlawful drug users because they are not law-abiding, responsible citizens*

a. The government's brief in *Rahimi* explains that
the Second Amendment allows Congress to disarm per-
sons who are not law-abiding, responsible citizens. See
Gov't Br. at 10-27, *Rahimi, supra* (No. 22-915). That
category includes persons whose possession of firearms
would endanger themselves or others. See *id.* at 27.
English law before the Founding allowed the disarma-
ment of dangerous individuals; an influential Second
Amendment precursor contemplated the disarmament
of individuals who posed a "real danger of public in-
jury"; 19th-century sources recognized legislatures'
power to disarm individuals whose possession of arms
would endanger the public; and American legislatures
have been disarming such individuals since the 17th
century. See *id.* at 27-28.

In exercising that power, Congress need not require
case-by-case findings of dangerousness. Congress may
make categorical judgments about responsibility;
"[t]hat *some* categorical limits are proper is part of the
original meaning" of the Second Amendment. *United
States* v. *Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en
banc), cert. denied, 562 U.S. 1303 (2011). For example,

7

past legislatures enacted laws categorically disarming loyalists, see Gov't Br. at 22, *Rahimi, supra* (No. 22-915); minors, see *id.* at 24 & n.16; and vagrants, see *id.* at 25 & n.18—each time without requiring case-by-case findings of dangerousness or irresponsibility.

b. Section 922(g)(3) is consistent with that tradition of imposing categorical limits on the right to keep and bear arms. Armed drug users endanger society in multiple ways.

First, drug users may mishandle firearms—or use firearms to commit crimes—because of "drug-induced changes in physiological functions, cognitive ability, and mood." *Harmelin* v. *Michigan*, 501 U.S. 957, 1002 (1991) (Kennedy, J., concurring in part and concurring in the judgment); see *Florence* v. *Board of Chosen Freeholders*, 566 U.S. 318, 332 (2012) ("The use of drugs can embolden [individuals] in aggression."). The effects of marijuana intoxication, for example, include an altered "perception of time," "decreased short-term memory," and "impaired perception and motor skills." National Academies of Sciences, Engineering, and Medicine, *The Health Effects of Cannabis and Cannabinoids: The Current State of Evidence and Recommendations for Research* 53 (2017) (*Health Effects*).

Second, illegal drug users often "commit crime in order to obtain money to buy drugs"—and thus pose a danger of using firearms to facilitate such crime. *Harmelin*, 501 U.S. at 1002 (Kennedy, J., concurring in part and concurring in the judgment). In the years before Section 922(g)(3)'s enactment, President Lyndon B. Johnson and both Houses of Congress recognized that drug use often motivates crime.[2] This Court's cases are

---

[2] See H.R. Doc. No. 407, 89th Cong., 2d Sess. 7 (1966) (presidential message) ("Drug addiction  * * *  drives its victims to commit

8

likewise replete with examples of crimes motivated by drug habits.[3]  And in one study, around 20% of state inmates—and nearly 40% of state inmates who were incarcerated for property crimes—stated that they committed their crimes in order to obtain drugs or money for drugs.  See Jennifer Bronson et al., Bureau of Justice Statistics, Office of Justice Programs, U.S. Dep't of Justice, *Special Report—Drug Use, Dependence, and Abuse Among State Prisoners and Jail Inmates, 2007-2009*, at 6 (rev. Aug. 10, 2020) (*Drug Use*).

Third, "violent crime may occur as part of the drug business or culture."  *Harmelin*, 501 U.S. at 1002 (Kennedy, J., concurring in part and concurring in the judgment).  That violence can involve not only drug dealers, but also their customers.  For example, violence may result from "disputes and ripoffs among individuals in-

---

untold crimes to secure the means to support their addiction."); H.R. Rep. No. 1486, 89th Cong., 2d Sess. 8 (1966) ("Narcotic addicts in their desperation to obtain drugs often turn to crime in order to obtain money to feed their addiction."); S. Rep. No. 1667, 89th Cong., 2d Sess. 13 (1966) (observing that drug users can be driven "to commit criminal acts in order to obtain money with which to purchase illegal drugs").

[3] See, *e.g.*, *Ramirez* v. *Collier*, 142 S. Ct. 1264, 1296 (2022) (Thomas, J., dissenting) ("the brutal slaying of a working father during a robbery spree to supply a drug habit"); *Andrus* v. *Texas*, 140 S. Ct. 1875, 1877 (2020) (per curiam) ("To fund a spiraling drug addiction, [she] turned to prostitution" and "began selling drugs."); *Wong* v. *Belmontes*, 558 U.S. 15, 15-16 (2009) (per curiam) ("bludgeoned [the victim] to death, * * * stole [her] stereo, sold it for $100, and used the money to buy beer and drugs"); *Smith* v. *Texas*, 543 U.S. 37, 41 (2004) (per curiam) ("regularly stole money from family members to support a drug addiction"); *Bell* v. *Cone*, 535 U.S. 685, 703 (2002) ("In an apparent effort to fund this growing drug habit, he committed robberies."); *Buford* v. *United States*, 532 U.S. 59, 62 (2001) ("robberies had been motivated by her drug addiction").

9

volved in the illegal drug market." Bureau of Justice Statistics, Office of Justice Programs, U.S. Dep't of Justice, *Drugs & Crime Data—Fact Sheet: Drug-Related Crime* 3 (Sept. 1994); see, *e.g.*, Carrie B. Oser et al., *The Drugs-Violence Nexus Among Rural Felony Probationers*, 24 J. Interpersonal Violence 1285, 1288 (Aug. 2009) ("A drug deal gone wrong may frequently progress to victimization and violence."). Guns increase both the likelihood and the lethality of such drug violence.

Fourth, armed drug users endanger the police. "[D]ue to the illegal nature of their activities, drug users and addicts would be more likely than other citizens to have hostile run-ins with law enforcement officers," and such encounters "threaten the safety" of the officers "when guns are involved." *United States* v. *Carter*, 750 F.3d 462, 469 (4th Cir.) (citation omitted), cert. denied, 574 U.S. 907 (2014); see *Michigan* v. *Summers*, 452 U.S. 692, 702 (1981) ("[T]he execution of a warrant to search for narcotics is the kind of transaction that may give rise to sudden violence.").

Fifth, armed drug users endanger themselves. Most gun deaths in the United States result from suicide, not homicide. See *NYSRPA* v. *Bruen*, 142 S. Ct. 2111, 2164 (2022) (Breyer, J., dissenting) (noting that 61% of gun deaths are suicides and 37% are homicides). And drug users, including marijuana users, pose a higher risk of suicide than ordinary citizens. See *Health Effects* 311.

c. "Studies bear out these possibilities." *Harmelin*, 501 U.S. at 1003 (Kennedy, J., concurring in part and concurring in the judgment); see *United States* v. *Yancey*, 621 F.3d 681, 686 (7th Cir. 2010) (per curiam) ("Ample academic evidence confirms the connection between drug use and violent crime."). In one study, "over

10

60 percent of adult male arrestees * * * tested positive for some drug in their system at the time of arrest," and "a large portion of those arrestees tested positive for marijuana." Office of National Drug Control Policy, Executive Office of the President, *ADAM II—2013 Annual Report, Arrestee Drug Abuse Monitoring Program II*, at 38 (Jan. 2014). In another, 42% of state prisoners stated that they were drug users at the time of their crimes. *Drug Use* 6.

Judicial decisions, too, acknowledge the dangers posed by armed drug users. Many of this Court's decisions describe "drugs and guns" as a "dangerous combination."[4] And multiple courts of appeals have recognized that drug users are likelier than ordinary citizens to misuse firearms.[5]

---

[4] *Rosemond* v. *United States*, 572 U.S. 65, 75 (2014) (citation omitted); see *Muscarello* v. *United States*, 524 U.S. 125, 132 (1998); *Smith*, 508 U.S. at 240; see also *Johnson* v. *United States*, 576 U.S. 591, 642 (2015) (Alito, J., dissenting) ("Drugs and guns are never a safe combination."); *Harmelin*, 501 U.S. at 1003 (Kennedy, J., concurring in part and concurring in the judgment) ("[There is a] direct nexus between illegal drugs and crimes of violence."); *Richards* v. *Wisconsin*, 520 U.S. 385, 391 n.2 (1997) ("This Court has encountered before the links between drugs and violence.").

[5] See *Carter*, 750 F.3d at 470 (4th Cir.) ("[D]rug use, including marijuana use, frequently coincides with violence."); *United States* v. *Patterson*, 431 F.3d 832, 836 (5th Cir. 2005) ("[U]nlawful users of controlled substances pose a risk to society if permitted to bear arms."), cert. denied, 547 U.S. 1138 (2006); *Yancey*, 621 F.3d at 685 (7th Cir.) ("[H]abitual drug abusers * * * are more likely to have difficulty exercising self-control, making it dangerous for them to possess deadly firearms."); *United States* v. *Seay*, 620 F.3d 919, 925 (8th Cir. 2010) ("[I]n passing § 922(g)(3), Congress expressed its intention to 'keep firearms out of the possession of drug abusers, a dangerous class of individuals.'") (citation omitted), cert. denied, 562 U.S. 1191 (2011); *United States* v. *Dugan*, 657 F.3d 998, 999 (9th

11

In particular, this Court's decision in *National Treasury Employees Union* v. *Von Raab*, 489 U.S. 656 (1989), supports Section 922(g)(3)'s constitutionality. That case involved a claim that suspicionless drug testing as a condition of promotion to certain federal jobs violated the Fourth Amendment. *Id.* at 659-663. The Court upheld the drug-testing requirement as applied to those who sought jobs that required them to carry firearms. See *id.* at 664. The Court emphasized "the extraordinary safety * * * hazards that would attend the promotion of drug users to positions that require the carrying of firearms." *Id.* at 674.[6] Similar hazards justify Section 922(g)(3).

Congress was not alone in disarming drug users and drug addicts. At least 32 States and territories have adopted similar laws.[7] That legislative consensus con-

---

Cir. 2011) ("[W]e see the same amount of danger in allowing habitual drug users to traffic in firearms as we see in allowing felons and mentally ill people to do so.").

[6] See, *e.g.*, *Treasury Employees*, 489 U.S. at 670 ("The public interest * * * demands effective measures to prevent the promotion of drug users to positions that require the incumbent to carry a firearm."); *ibid.* ("[E]ven a momentary lapse in attention [by an employee carrying a firearm] can have disastrous consequences."); *id.* at 671 ("[T]he public should not bear the risk that employees who may suffer from impaired perception and judgment will be promoted to positions where they may need to employ deadly force."); *id.* at 679 ("The Government's compelling interests in preventing the promotion of drug users to positions where they might endanger * * * the life of the citizenry outweigh the privacy interests of those who seek promotion to these positions.").

[7] See Ala. Code § 13A-11-72(b); Ark. Code Ann. § 5-73-309(7)(A); Cal. Penal Code § 29800(a)(1); Colo. Rev. Stat. Ann. § 18-12-203(1)(f); Del. Code Ann. tit. 11, § 1448(a)(3); D.C. Code § 7-2502.03(a)(4)(A); Fla. Stat. Ann. § 790.06(2)(e)-(f); Ga. Code Ann. § 16-11-129(b)(2)(I)-(J); 10 Guam Code Ann. § 60109.1(b)(5)-(6); Haw. Rev. Stat. § 134-

12

firms that drug users are not, in fact, among the law-abiding, responsible citizens protected from disarmament by the Second Amendment. It also distinguishes Section 922(g)(3) from the outlier gun laws found unconstitutional in *District of Columbia* v. *Heller*, 554 U.S. 570 (2008), *McDonald* v. *City of Chicago*, 561 U.S. 742 (2010), and *Bruen*. See Gov't Br. at 34-36, *Rahimi*, *supra* (No. 22-915).

d. Finally, Section 922(g)(3) disarms a person only if he "*is* an unlawful user of or addicted to any controlled substance." 18 U.S.C. 922(g)(3) (emphasis added); see *Dickerson* v. *New Banner Institute, Inc.*, 460 U.S. 103, 116 (1983) (discussing the significance of the verb tenses in Section 922(g)). The disqualification thus applies "only so long as [a person] abuses drugs"; a user can "regain his right to possess a firearm simply by ending his drug abuse." *Yancey*, 621 F.3d at 686-687. That limit makes Section 922(g)(3)'s constitutionality particularly clear. The Second Amendment protects the right to possess arms, but it does not entitle anyone "to simultaneously choose both gun possession and drug abuse." *Id.* at 687.

---

7(c)(1); Idaho Code Ann. § 18-3302(11)(e); 720 Ill. Comp. Stat. § 5/24-3.1(a)(3); Ind. Code § 35-47-1-7(5); Kan. Stat. Ann. § 21-6301(a)(10); Ky. Rev. Stat. Ann. § 237.110(4)(d); Md. Code Ann., Public Safety § 5-133(b)(5); Mass. Gen. Laws ch. 140, § 131(d)(iii)(A); Minn. Stat. § 624.713(10)(iii); Mo. Rev. Stat. § 571.070.1(2); Nev. Rev. Stat. § 202.360.1(f); N.J. Stat. Ann. § 2C:58-3.c.(3); N.Y. Penal Law § 400.00.1(e); N.C. Gen. Stat. § 14-415.12(b)(5); 6 N. Mar. I. Code § 10610(a)(3); Ohio Rev. Code § 2923.13(A)(4); P.R. Laws Tit. 25, § 462a(a)(3); R.I. Gen. Laws § 11-47-6; S.C. Code Ann. § 16-23-30(A)(1); S.D. Codified Laws § 23-7.7.1(3); Utah Code Ann. § 76-10-503(1)(b)(iv); V.I. Code tit. 23, § 456a(a)(3); W. Va. Code § 61-7-7(a)(3).

### 2. *The court of appeals' contrary analysis is flawed*

a. The court of appeals reasoned that "a general notion of 'dangerousness'" could not justify Section 922(g)(3). App., *infra*, 31a. The court instead required the government to show that Section 922(g)(3) is comparable to a "particular" "historical danger-based disarmament"—*i.e.*, to identify a "class of persons at the Founding * * * who were 'dangerous' for reasons comparable to [drug] users." *Id.* at 31a-32a. That analysis is unsound on multiple levels.

As an initial matter, the court of appeals erred in reducing the inquiry into the Second Amendment's original meaning to a search for a specific historical analogue. The test set forth in this Court's cases "requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding." *Bruen*, 142 S. Ct. at 2131. That inquiry into original meaning "will often involve reasoning by analogy" to historical statutes, but it need not always do so. *Id.* at 2132. The government has provided extensive evidence apart from historical statutes—for example, parliamentary and congressional debates, precursors to the Second Amendment, treatises, and commentaries—showing that the Amendment allows Congress to disarm persons who are not law-abiding, responsible citizens. See Gov't Br. at 13-22, *Rahimi*, *supra* (No. 22-915). That body of historical evidence establishes that Section 922(g)(3) complies with the Second Amendment regardless of whether the statute mirrors a "particular" "historical danger-based disarmament." App., *infra*, 31a.

Moreover, even when the government defends a modern law by invoking historical statutes, it need only cite a "historical *analogue*, not a historical *twin*."

14

*Bruen*, 142 S. Ct. at 2133. In judging whether a modern law is "analogous enough" to "historical precursors" to "pass constitutional muster," a court should ask whether the laws "impose a comparable burden" and are "comparably justified." *Ibid*. The government has identified many historical laws that impose the same type of burden as Section 922(g)(3) (disqualifying someone from possessing arms) for the same type of reason (the person is not responsible enough to be trusted with arms). See Gov't Br. at 22-27, *Rahimi*, *supra* (No. 22-915). To demand a closer match is effectively to demand a historical twin.

The court of appeals' approach is especially inapt because Section 922(g)(3) addresses "novel modern conditions." *Bruen*, 142 S. Ct. at 2134 (citation omitted). As the Fifth Circuit itself acknowledged, the Founding generation was "not familiar" with modern drugs and thus "had no occasion to consider" whether to disarm illegal drug users. App., *infra*, 10a. Because this case "implicate[s] unprecedented societal concerns," it requires "a more nuanced approach" than that applied by the court of appeals. *Bruen*, 142 S. Ct. at 2132.

b. The court of appeals acknowledged that "history and tradition may support some limits on an intoxicated person's right to carry a weapon." App., *infra*, 2a. More specifically, it stated that the tradition of prohibiting gun possession by persons intoxicated with alcohol and by persons with mental illnesses could support laws disarming drug users who are "currently under an impairing influence." *Id.* at 22a. The court concluded, however, that the Second Amendment does not permit disarming a drug user "between periods" of drug intoxication. *Id.* at 23a. That, too, is incorrect.

15

The danger to society posed by an armed drug user extends beyond the risk that he will mishandle firearms while under the influence of the drug. As explained above, drug users use firearms to commit crimes that fund their drug habit, to engage in violence as part of the drug business or culture, to attack police officers who are investigating their drug crimes, and to commit suicide. See pp. 7-9, *supra*. Those risks justify disarming drug users even "between periods" of drug intoxication. App., *infra*, 23a.

Even if a court considers only the risk that a person will misuse firearms while under the influence of drugs, Section 922(g)(3) would still comply with the Second Amendment. Drug users who possess firearms are apt to retain possession while under the influence. They are unlikely to put their guns away before using drugs and to retrieve them only after regaining sobriety. In this case, for example, the law-enforcement officers who found Daniels in possession of two firearms also detected the smell of marijuana in his car and saw marijuana cigarette butts in his ashtray. App., *infra*, 2a-3a. Although the government did not "administer a drug test," *id.* at 3a, the facts strongly suggest that Daniels possessed firearms while under the influence of drugs—vindicating Congress's judgment that persons such as Daniels cannot be trusted to carry arms responsibly in the first place.

The analogy between drug use and alcohol use does not support the court of appeals' contrary decision. Drinking was legal at the Founding and thus did not pose the same types of dangers as the use of illegal drugs does today. States, in any event, have long done more than ban gun possession while drunk. In the 19th century, many States enacted statutes allowing "habit-

16

ual drunkards" to be committed to asylums or placed under guardians in the same manner as "'lunatics.'" *Kendall* v. *Ewert*, 259 U.S. 139, 146 (1922) (citation omitted).[8]  The Fifth Circuit recognized that, because "'lunatics'" "could be wholly deprived of their liberty and property, the government could necessarily take away their firearms," App., *infra*, 21a, but the same is true of "drunkards."  In addition, at least one State in the mid-19th century specifically disarmed "common

---

[8]  See, *e.g.*, Act of Mar. 30, 1876, ch. 40, § 8, 19 Stat. 10 (District of Columbia); Ark. Rev. Stat., ch. 78, § 1, at 456 (William McK. Ball & Sam C. Roane eds., 1838); Act of Apr. 1, 1870, ch. 426, § 2, 1869-1870 Cal. Stat. 585-586; Act of July 25, 1874, ch. 113, § 1, 1874 Conn. Pub. Acts 256; Ga. Code Pt. 2, Tit. 2, Ch. 3, Art. 2, § 1803, at 358 (R. H. Clark et al. eds., 1861); Act of Feb. 21, 1872, § 1, 1872 Ill. Laws 477; Act of May 1, 1890, ch. 42, § 1, 1890 Iowa Acts 67; Act of Mar. 2, 1868, ch. 60, § 5, *in The General Statutes of the State of Kansas* 553 (John M. Price et al. eds., 1868); Act of Mar. 28, 1872, ch. 996, §§ 10-11, 1872 Ky. Acts, Vol. 2, at 523-524; Act of July 8, 1890, No. 100, § 1, 1890 La. Acts 116; Act of Mar. 5, 1860, ch. 386, §§ 6-7, 1860 Md. Laws 607-608; Act of June 18, 1885, ch. 339, §§ 1-3, 1885 Mass. Acts 790; Act of Apr. 12, 1827, § 1, 1827 Mich. Terr. Laws 584-585; Minn. Terr. Rev. Stat. ch. 67, § 12, at 278 (1851); Act of Mar. 31, 1873, ch. 57, §§ 1, 3, 1873 Miss. Laws 61-62; Act of Mar. 3, 1853, ch. 89, § 1, 1853 N.J. Acts 237; Act of Feb. 7, 1856, ch. 26, § 1, 1855-1856 N.M. Terr. Laws 94 (1856); Act of Mar. 27, 1857, ch. 184, § 9, 1857 N.Y. Laws, Vol. 1, at 431; Act of Jan. 5, 1871, § 1, 68 *Ohio General and Local Laws and Joint Resolutions* 6 (1871); Act of Feb. 1, 1866, No. 11, § 10, 1866 Pa. Laws 10; Act of Aug. 18, 1876, ch. 112, § 147, 1876 Tex. Gen. Laws 188; Act of Mar. 17, 1870, ch. 131, § 1, 1870 Wis. Gen. Laws 197.

17

drunkards,"[9] and many States and territories today prohibit firearm possession by alcoholics.[10]

Nor does the analogy between drug use and mental illness support the court of appeals' decision. It has long been understood that a person with a mental illness does not necessarily exhibit symptoms all the time. Blackstone thus defined a "lunatic" as "one that hath lucid intervals; sometimes enjoying his senses, and sometimes not." 1 William Blackstone, *Commentaries on the Laws of England* 294 (1765). And Coke defined a "[l]unatique" as a person "that hath sometime his understanding, and sometime not." Edward Coke, *The First Part of the Institutes of the Lawes of England, or, A Commentarie upon Littleton* § 405, at 247 (1628). This Court has nonetheless approved "longstanding prohibitions on the possession of firearms by * * * the mentally ill"; it has never suggested that the validity of such laws fluctuates with the remission and relapse of a person's symptoms. *Heller*, 554 U.S. at 626. Just as Congress may disarm persons with mental illnesses

---

[9] See Act of Apr. 30, 1855, §§ 1-2, *in* 2 *The General Laws of the State of California, from 1850 to 1864, inclusive* 1076-1077 (Theodore H. Hitchell ed., 1865).

[10] See Ala. Code § 13A-11-72(b); Ark. Code Ann. § 5-73-309(8)(A); Colo. Rev. Stat. Ann. § 18-12-203(1)(e); Fla. Stat. Ann. § 790.06(2)(f); Ga. Code Ann. § 16-11-129(b)(2)(J); 10 Guam Code Ann. § 60109.1(b)(6); Haw. Rev. Stat. § 134-7(c)(1); Ind. Code § 35-47-1-7(5); Kan. Stat. Ann. § 21-6301(a)(13); Ky. Rev. Stat. Ann. § 237.110(4)(e); Md. Code Ann., Public Safety § 5-133(b)(4); Mass. Gen. Laws ch. 140, § 131(d)(iii)(A); Mo. Rev. Stat. § 571.070.1(2); N.J. Stat. Ann. § 2C:58-3.c.(3); N.C. Gen. Stat. § 14-415.12(b)(5); Ohio Rev. Code § 2923.13(A)(4); P.R. Laws Tit. 25, § 462a(a)(3); S.C. Code Ann. § 16-23-30(A)(1); S.D. Codified Laws § 23-7.7.1(3); W. Va. Code § 61-7-7(a)(2).

18

even during their lucid intervals, it may disarm drug users even during their sober intervals.

### B. The Decision Below Has Significant Practical Consequences

The court of appeals' decision has significant practical consequences. Section 922(g) "is no minor provision." *Rehaif* v. *United States*, 139 S. Ct. 2191, 2201 (2019) (Alito, J., dissenting). It "probably does more to combat gun violence than any other federal law." *Ibid.* And Section 922(g)(3) is one of the most frequently applied of Section 922(g)'s disqualifications. Since the creation of the federal background-check system in 1998, it has resulted in more than 217,000 denials of firearms transactions. See Crim. Justice Info Servs. Div., Fed. Bureau of Investigation, U.S. Dep't of Justice, *Federal Denials—Reasons Why the NICS Section Denies, November 30, 1998 – September 30, 2023*. In 2021, the most recent year for which statistics are available, Section 922(g)(3) resulted in more than 15,000 denials—more than any other provision apart from Section 922(g)(1), which disarms convicted felons. See Crim. Justice Info. Servs. Div., Fed. Bureau of Investigation, U.S. Dep't of Justice, *National Instant Criminal Background Check System Operational Report 2020-2021*, at 19 (Apr. 2022).

Although the court of appeals held Section 922(g)(3) invalid "only as applied to Daniels," App., *infra*, 34a, its analysis did not turn on any distinctive characteristics of Daniels's conduct. The full scope of the court's holding remains unclear, but the concurrence found it "hard" to "avoid the conclusion that most, if not all, applications of § 922(g)(3) will likewise be deficient" under the court's reasoning. *Id.* at 39a-40a (Higginson, J., concurring).

19

### C. This Court Should Hold This Certiorari Petition Pending The Resolution Of *Rahimi*

The decision below, which held an important Act of Congress unconstitutional, would ordinarily warrant this Court's review. See, *e.g.*, *Iancu* v. *Brunetti*, 139 S. Ct. 2294, 2298 (2019) (noting that this Court's "usual" approach is to grant review "when a lower court has invalidated a federal statute"). But the Court has already granted review in *Rahimi* to decide the constitutionality of 18 U.S.C. 922(g)(8), the statute that disarms individuals who are subject to domestic-violence protective orders. See Pet. at I, *Rahimi*, *supra* (No. 22-915). The Court should therefore hold this petition for a writ of certiorari until it decides *Rahimi*. Once *Rahimi* is resolved, the Court could determine how best to dispose of this petition and other petitions raising related issues that are filed while *Rahimi* is pending.

That course is appropriate because *Rahimi* and this case substantially overlap. Both cases concern Congress's authority to prohibit a category of individuals from possessing firearms. In each case, the government argues that the Second Amendment allows Congress to disarm individuals who are not law-abiding, responsible citizens. In each, the government relies on statements in *Heller*, *McDonald*, and *Bruen* that the right to keep and bear arms belongs to law-abiding, responsible citizens; on Second Amendment precursors that express a similar understanding; and on 19th-century laws prohibiting unfit persons from possessing arms. See pp. 6-7, *supra*; Gov't Br. at 10-27, *Rahimi*, *supra* (No. 22-915). Each case also raises similar methodological questions about how to apply the historical test set forth in *Bruen*.

20

The court of appeals' opinion and Judge Higginson's concurrence confirm the overlap between *Rahimi* and this case. The court repeatedly relied on its previous decision in *Rahimi*—in rejecting the argument that the Second Amendment protects only law-abiding, responsible citizens, see App., *infra*, 8a-9a; in identifying the type of historical evidence that the government must produce in order to establish a gun regulation's constitutionality, see *id.* at 12a, 30a; in rejecting reliance on the English tradition of disarming dangerous individuals, see *id.* at 27a-28a; and in rejecting reliance on precursors to the Second Amendment, see *id.* at 29a. Judge Higginson concurred in the court's analysis "with the caveat that [this] Court has granted certiorari in [*Rahimi*]." *Id.* at 41a (emphasis omitted). He also considered it "likely" that this Court's decision in *Rahimi* "will resolve some of [the methodological] questions" raised by this case. *Id.* at 47a.

This Court should also hold this petition because it will receive multiple petitions this Term concerning the constitutionality of status-based disqualifications in Section 922(g). On the same day that the government is filing this petition, it is also filing a petition in a case in which the Third Circuit invalidated 18 U.S.C. 922(g)(1), the provision disarming convicted felons. See *Range* v. *Attorney General United States*, 69 F.4th 96 (2023) (en banc). Petitions concerning other status-based disqualifications could also come before this Court. Holding such petitions for *Rahimi* would be more efficient than granting multiple overlapping petitions over the course of the Term.

For all those reasons, this Court should hold this petition for *Rahimi*. After deciding *Rahimi*, the Court should either (1) grant this petition, vacate the court of

21

appeals' judgment, and remand the case for reconsideration in light of *Rahimi* or (2) grant plenary review in this case or in another case that provides an appropriate vehicle for resolving Section 922(g)(3)'s constitutionality.

## CONCLUSION

This Court should hold the petition for a writ of certiorari pending the disposition of *United States* v. *Rahimi*, cert. granted, 143 S. Ct. 2688 (2023) (No. 22-915) (oral argument scheduled for Nov. 7, 2023), and then dispose of the petition as appropriate.

Respectfully submitted.

ELIZABETH B. PRELOGAR
  *Solicitor General*
NICOLE M. ARGENTIERI
  *Acting Assistant Attorney*
  *General*
BRIAN H. FLETCHER
  *Deputy Solicitor General*
VIVEK SURI
  *Assistant to the Solicitor*
  *General*
PAUL T. CRANE
  *Attorney*

OCTOBER 2023

# APPENDIX

## TABLE OF CONTENTS

Page

Appendix A  —  Court of appeals opinion
(Aug. 9, 2023) ........................................... 1a

Appendix B  —  District court memorandum opinion and
order denying defendant's motion
to dismiss (July 8, 2022) ....................... 50a

Appendix C  —  Constitutional and statutory provisions:
U.S. Const. Amend. II ......................... 61a
18 U.S.C. 922(g)(3) ............................... 61a
21 U.S.C. 802(6) ................................... 61a
21 U.S.C. 812(c), Schedule I(c)(10) ...... 62a

**APPENDIX A**

UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

———

No. 22-60596

UNITED STATES OF AMERICA, PLAINTIFF-APPELLEE

*v.*

PATRICK DARNELL DANIELS, JR.,
DEFENDANT-APPELLANT

———

[Filed:    Aug. 9, 2023]

———

Appeal from the United States District Court
for the Southern District of Mississippi
USDC No. 1:22-CR-58-1

———

Before SMITH, HIGGINSON, and WILLETT, *Circuit Judges*.

JERRY E. SMITH, *Circuit Judge*:

Title 18 U.S.C. § 922(g)(3) bars an individual from possessing a fire-arm if he is an "unlawful user" of a controlled substance. Patrick Daniels is one such "unlawful user"—he admitted to smoking marihuana multiple days per month.   But the government presented no evidence that he was intoxicated at the time of arrest, nor did it identify when he last had used marihuana.   Still, based on his confession to regular usage, a jury convicted Daniels of violating § 922(g)(3).

(1a)

2a

The question is whether Daniels's conviction violates his right to bear arms. The answer depends on whether § 922(g)(3) is consistent with our nation's "historical tradition of firearm regulation." *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2126 (2022). It is a close and deeply challenging question.

Throughout American history, laws have regulated the combination of guns and intoxicating substances. But at no point in the 18th or 19th century did the government disarm individuals who used drugs or alcohol at one time from possessing guns at another. A few states banned carrying a weapon while actively under the influence, but those statutes did not emerge until well after the Civil War. Section 922(g)(3)—the first federal law of its kind—was not enacted until 1968, nearly two centuries after the Second Amendment was adopted.

In short, our history and tradition may support some limits on an intoxicated person's right to carry a weapon, but it does not justify disarming a sober citizen based exclusively on his past drug usage. Nor do more generalized traditions of disarming dangerous persons support this restriction on nonviolent drug users. As applied to Daniels, then, § 922(g)(3) violates the Second Amendment. We reverse the judgment of conviction and render a dismissal of the indictment.

## I.

In April 2022, two law enforcement officers pulled Daniels over for driving without a license plate. One of the officers—an agent with the Drug Enforcement Administration ("DEA")—approached the vehicle and recognized the smell of marihuana. He searched the cabin and found several marihuana cigarette butts in the ash-

tray.   In addition to the drugs, the officers found two loaded firearms:   a 9mm pistol and a semi-automatic rifle.   Daniels was taken into custody and transported to the local DEA office.

At no point that night did the DEA administer a drug test or ask Daniels whether he was under the influence; nor did the officers note or testify that he appeared intoxicated.   But after Daniels was Mirandized at the station, he admitted that he had smoked marihuana since high school and was still a regular user.   When asked how often he smoked, he confirmed he used marihuana "approximately fourteen days out of a month."

Based on his admission, Daniels was charged with violating 18 U.S.C. § 922(g)(3), which makes it illegal for any person "who is an unlawful user of or addicted to any controlled substance . . . to . . . possess . . . any firearm."   An "unlawful user" is someone who uses illegal drugs regularly and in some temporal proximity to the gun possession.   *See United States v. McCowan*, 469 F.3d 386, 392 (5th Cir. 2006).

While Daniels was under indictment, the Supreme Court decided *Bruen*.   It clarified that firearms regulations are unconstitutional unless they are firmly rooted in our nation's history and tradition of gun regulation. *See* 142 S. Ct. at 2129-30.   Daniels immediately moved to dismiss the indictment, claiming that § 922(g)(3) is unconstitutional under that new standard.

The district court denied the motion.   *See United States v. Daniels*, 610 F. Supp. 3d 892, 892 (S.D. Miss. 2022).   It expressed some doubt that Daniels was part of "the people" whom the Second Amendment protects, as Daniels was not a "law abiding, responsible citizen[]." *Id.* at 894.   Nevertheless, assuming that Daniels had a

4a

right to bear arms, the court found that § 922(g)(3) was a longstanding gun regulation. *See id.* at 895. It compared § 922(g)(3) to laws disarming felons and the mentally ill that *Heller* called "presumptively lawful." *Id.* at 895 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 627 n.26 (2008)). Congress passed § 922(g)(3) in 1968, only after many states had similarly banned habitual drug abusers from possessing guns. *Id.* at 896. The district court placed great weight on that regulatory tradition. It engaged with few historical sources from the Founding or Reconstruction, but it relied on statements from other courts—notably all predating *Bruen*—that § 922(g)(3) was supported by the historical practice of disarming those who "exhibit a dangerous lack of self-control." *Id.* at 897.

A jury found Daniels guilty. He was sentenced to nearly four years in prison and three years of supervised release. By nature of his § 922(g)(3) felony, Daniels is also barred for life from possessing a firearm. *See* 18 U.S.C. § 922(g)(1).

Daniels appeals his conviction, reasserting the Second Amendment challenge that he raised before trial.[1] As with all constitutional questions, we consider the issue *de novo*. *United States v. Perez-Macias*, 335 F.3d 421, 425 (5th Cir. 2003).

## II.

The Second Amendment protects the right of individuals to "keep and bear" firearms for their self-defense.

---

[1] Daniels also contends that § 922(g)(3) is unconstitutionally vague and that there was insufficient evidence for a reasonable jury to convict. Because we hold that § 922(g)(3) is unconstitutional as applied to Daniels, we need not address his additional challenges.

5a

U.S. CONST. amend. II; *see Heller*, 554 U.S. at 595.    But even fundamental rights have limits.    *See Bruen*, 142 S. Ct. at 2128.    Before *Bruen*, our circuit evaluated the legality of gun restrictions using the familiar standards of scrutiny.    *See United States v. McGinnis*, 956 F.3d 747, 753-54 (5th Cir. 2020).    If legislation infringed on the historical right to bear arms, we asked whether the government had a sufficiently strong interest and whether its firearm regulation was sufficiently tailored. If a law breached the core of the Second Amendment liberty, we applied strict scrutiny; if not, we applied intermediate scrutiny.    *Id.* at 754.

*Bruen*, 142 S. Ct. at 2129-31, decisively rejected that kind of analysis. In place of means-end balancing, *Bruen* "requires" us to interpret the Second Amendment in light of its original public meaning.    *Id.* at 2126, 2131. As the Court explained, the Second Amendment codified a "*pre-existing* right" with pre-existing limits.    *Id.* at 2127 (quoting *Heller*, 554 U.S. at 592).    To ascertain those limits, history is our heuristic.    Because historical gun regulations evince the kind of limits that were well-understood at the time the Second Amendment was ratified, a regulation that is inconsistent with those limits is inconsistent with the Second Amendment.    *Id.*

To determine whether a modern firearms law is unconstitutional, we now proceed in two steps.    *First*, we ask whether the Second Amendment applies by its terms. *Id.* at 2129-30.    "[W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct."    *Id.* at 2126.    *Second*, we ask whether a given gun restriction is "consistent with the Nation's historical tradition of firearm regulation."    *Id.* at 2130.    The government bears the

6a

burden of demonstrating a tradition supporting the challenged law. *Id.* at 2130. Only by showing that the law does not tread on the historical scope of the right can the government "justify its regulation." *Id.*

The second step requires both close attention to history and analogical reasoning. *Bruen* did not forswear all legislative innovation. To the contrary, "the Constitution can, and must, apply to circumstances beyond those the Founders specifically anticipated." *Id.* at 2132. What we are looking for is a "tradition"—well-accepted limits on the right to bear arms manifested by a tangible practice of comparable gun regulations. But how do we know whether an older regulatory practice is "comparable"?

*Bruen* helpfully gave us two conceptual pathways. If the modern regulation addresses "a general societal problem that has persisted since the 18th century," then "the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Id.* at 2131. But if a modern law addresses "unprecedented societal concerns or dramatic technological changes," it calls for a "more nuanced approach." *Id.* at 2132. We must reason by analogy to determine whether older regulations are "relevantly similar" to the modern law. *Id.*

*Bruen* acknowledged the difficulty of determining whether two laws are "relevantly similar." *Id.* *Bruen* clarified that two laws are "relevantly similar" if they share a common "why" and "how"; they must both address a comparable problem (the "why") and place a comparable burden on the rightsholder (the "how"). *Id.* at 2132-33.

7a

In all of that, *Bruen* reminded us that we are looking for a "representative historical analogue, not a historical twin." *Id.* at 2133 (emphasis removed). It is not a death knell to the government that the challenged regulation did not previously exist. What matters is whether a conceptual fit exists between the old law and the new. Deciding whether there is a match between historical and modern regulations requires the exercise of both analogical reasoning and sound judgment. Nevertheless, we hew closely to *Bruen*'s own reasoning and hold the government to its heavy burden.

## A.

We begin with the threshold question: whether the Second Amendment even applies to Daniels.

The right to bear arms is held by "the people." U.S. CONST. amend. II. That phrase "unambiguously refers to all members of the political community, not an unspecified subset." *Heller*, 554 U.S. at 580. Indeed, the Bill of Rights uses the phrase "the people" five times. In each place, it refers to all members of our political community, not a special group of upright citizens. *Id.* (citing *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990)). Based on that consistent usage, *Heller* concluded that "the Second Amendment right is exercised individually and belongs to *all* Americans." *Heller*, 554 U.S. at 581 (emphasis added).

Even as a marihuana user, Daniels is a member of our political community. Therefore, he has a presumptive right to bear arms. By infringing on that right, § 922(g)(3) contradicts the plain text of the Second Amendment.

8a

True, *Heller* described the Second Amendment as applying to "law-abiding, responsible citizens." *Heller*, 554 U.S. at 635. And *Bruen* used the phrase "law-abiding" fourteen times, including in the opening sentence, where it says that the Second Amendment "protect[s] the right of an ordinary, *law-abiding* citizen to possess a handgun." 142 S. Ct. at 2122 (emphasis added). The government seizes on that language and insists that the Second Amendment does not extend to Daniels because he is a criminal.

But we cannot read too much into the Supreme Court's chosen epithet. More than just "model citizen[s]" enjoy the right to bear arms. *United States v. Rahimi*, 61 F.4th 443, 453 (5th Cir. 2023), *cert. granted*, No. 22-915, 2023 WL 4278450 (June 30, 2023). Indeed, *Rahimi* held that citizens accused of domestic violence still had Second Amendment rights. It reasoned that when *Heller* and *Bruen* used the phrase "law-abiding," it was just "short-hand" to "exclude from the  . . .  discussion" the mentally ill and felons, people who were historically "stripped of their Second Amendment rights." *Id.* at 452. All others are presumptively included in the Second Amendment's ambit. Because Daniels is not a felon or mentally ill, *Rahimi*'s treatment of the "law-abiding" moniker suggests that he has presumptive Second Amendment rights as well.

Still, *Heller*'s and *Bruen*'s emphasis on "law-abiding" citizens hints that Congress and state legislatures have greater latitude to limit the gun liberties of the lawless. But, as a general rule, limitations on the Second Amendment come from the traditionally understood restrictions on the right to bear arms, not because ordinary cit-

9a

izens are categorically excluded from the privilege. *See Rahimi*, 61 F.4th at 453.[2]

Once we conclude that Daniels has presumptive Second Amendment rights, the focus shifts to step two of the *Bruen* analysis: whether history and tradition support § 922(g)(3).

## B.

Before we decide whether § 922(g)(3) is consistent with our tradition of gun regulation, we must first ask a methodological question: What kind of similarity are we looking for? "Distinct" similarity or a less precise "relevant" similarity? *See Bruen*, 142 S. Ct. at 2131-32. That depends on whether § 922(g)(3) "addresses a general societal problem that has persisted since the 18th century" or an "unprecedented societal concern[]" that the Founding generation did not experience. *Id.* at 2131-32.

*Bruen* does not require more than "relevant" similarity here. It is true that the Founding generation was familiar with intoxication via alcohol,[3] and it was famil-

---

[2] That accords with the holding in *Range v. Att'y General United States of America*, 69 F.4th 96, 101–03 (3d Cir. 2023) (en banc), where the court held that a man convicted of a false statement was part of "the people" and had Second Amendment rights, even though he was not "law-abiding." Range relied in part on then-Judge Barrett's dissent in *Kanter v. Barr*, 919 F.3d 437, 452 (7th Cir. 2019), in which she reasoned that "all people have the right to keep and bear arms," but "history and tradition support Congress's power to strip certain groups of that right."

[3] W.J. RORABAUGH, THE ALCOHOLIC REPUBLIC: AN AMERICAN TRADITION 10 (1981) ("[I]n 1770 the annual per capita intake of alcohol from all sources was 3.5 gallons. In the years following the Revolution the amount declined. . . . But after 1800, as the quan-

10a

iar with marihuana plants.[4]    But the Founders grew
hemp to make rope.[5]    They were not familiar with wide-
spread use of marihuana as a narcotic, nor the modern
drug trade.[6]    Thus, though intoxication generally was a
persistent social problem, *see Bruen* 142 S. Ct. at 2131,
the Founding generation had no occasion to consider the
relationship between firearms and intoxication via canna-
bis.[7]    Although marihuana might be comparable in some

---

[4]   *See, e.g.*, BENJAMIN FRANKLIN, A MODEST INQUIRY INTO THE
NATURE AND NECESSITY OF A PAPER CURRENCY (1729), *reprinted
in* 2 THE WORKS OF BENJAMIN FRANKLIN 253, 275 (Boston, Hilli-
ard, Gray & Co. 1836) (claiming that America was "very capable" of
growing hemp).    George Washington himself cultivated hemp.    1
THE DIARIES OF GEORGE WASHINGTON 1748-1799, at 213 (John C.
Fitzpatrick ed., 1925).

[5]   *See* THOMAS PAINE, COMMON SENSE (1776), *in* 1 The Political
Writings of Thomas Paine 15, 52 (Charlestown, George Davidson
1824) ("Hemp flourishes even to rankness, so that we need not want
cordage.").

[6]   Some post-colonial books and newspapers noted that people in
the Middle East used hemp as an intoxicant. *See, e.g.*, 3 C.S. SONINI,
TRAVELS IN UPPER AND LOWER EGYPT:   UNDERTAKEN BY ORDER
OF THE OLD GOVERNMENT OF FRANCE 92 (Henry Hunter trans.,
London 1807).    But the novelty of those reports from faraway lands
demonstrates the absence of marihuana intoxication in America at
the Founding.

[7]   *See* David F. Musto, *The American Experience with Stimulants
and Opiates*, 2 PERSPS. ON CRIME & JUST. 51, 51 (1998) ("[M]ost
[non-alcoholic] drugs were not familiar products early in the 19th
century.   . . .   "); *see also* Richard J. Bonnie & Charles H. White-
bread, II, *The Forbidden Fruit and the Tree of Knowledge:   An In-
quiry into the Legal History of American Marijuana Prohibition*,
56 VA. L. REV. 971, 985-87, 1010-11 (1970) (describing how American
society gradually realized the social effects of narcotics in the late

ways to alcohol or tobacco, merely by making the comparison we have moved past the hunt for a distinctly similar law and are engaged in analogical reasoning.

Indeed, *Bruen*'s discussion of "distinct" and "relevant" similarity seems aimed at interpreting historical silence. That is, when the historical record reveals no regulations of a particular kind, we could interpret that silence in one of two ways. We could say that it means nothing (i.e., neither approval nor disapproval), or we could count silence as evidence that the public did not approve of such a regulation. *Bruen* says we should make the latter inference, at least when the public experienced the harm the modern-day regulation attempts to address. *Bruen*, 142 S. Ct. at 2131. By contrast, when the ratifying public did not confront a particular harm, its failure to regulate it says little about whether it approved such regulation.

In that case, we look instead for analogues—similar harms that the Founding generation did confront and the regulations they used to address them. *Id.* at 2132. Just as Founding-era prohibitions on firearms in "sensitive places" can extend to "*new* and analogous sensitive places," *id.* at 2133, we can compare the Founders' treatment of one problem to new problems that the Founders could not have anticipated.

Even so, the government has the burden to find and explicate the historical sources that support the consti-

---

1800s and began regulating them at the turn of the century); *see also id.* at 1011 ("[From 1914–31], we can find no evidence of public concern for, or understanding of, marijuana, even in those states that banned it. . . . Observers in the middle and late 1930's agreed that marijuana was . . . a very new phenomenon on the national scene.").

12a

tutionality of § 922(g)(3). *Rahimi*, 61 F.4th at 455 (citing *Bruen*, 142 S. Ct. at 2132-33). Here, the government's proffered analogues fall into three general buckets: (1) statutes disarming intoxicated individuals, (2) statutes disarming the mentally ill or insane, and (3) statutes disarming those adjudged dangerous or disloyal.[8] Each deserves independent consideration.

1.

Because there was little regulation of drugs (related to guns or otherwise) until the late-19th century,[9] intoxication via alcohol is the next-closest comparator. Throughout the colonial period and into the 19th century, Americans drank alcohol—and lots of it.[10] Common sense indicates that individuals who are impaired

---

[8] We limit ourselves to the record amassed by the district court, the parties, and the *amici* who offered additional historical materials in response to this court's order on June 6, 2023. *See Bruen*, 142 S. Ct. at 2130 n.6 ("*Heller*'s text-and-history test . . . [requires] resolv[ing] *legal* questions presented in particular cases or controversies. . . . Courts are thus entitled to decide a case based on the historical record compiled by the parties."). Still, notable repositories of historical gun laws—such as the database maintained by the Duke Center for Firearms Law—do not reveal additional probative statutes. *See Repository of Historical Gun Laws*, DUKE CTR. FOR FIREARMS L., https://firearmslaw.duke.edu/repository/ (last visited July 20, 2023).

[9] *See* Bonnie & Whitebread, *supra* note 7, at 985-86.

[10] John Adams claimed that Americans "exceed all other and millions of people in the world in this degrading, beastly vice of intemperance." Letter from John Adams to William Willis (Feb. 21, 1819), in 10 THE WORKS OF JOHN ADAMS, SECOND PRESIDENT OF THE UNITED STATES 365, 365 (Charles Francis Adams ed., Boston, Little, Brown & Co. 1856); *see also* Musto, *supra* note 7, at 52 (finding that "[i]n the early Republic," there was "an extremely high level of alcohol consumption (chiefly, distilled spirits)").

13a

by alcohol lack the self-restraint to handle deadly weapons safely.   So it is unsurprising to find historical laws dealing with guns and alcohol.   Such rules are relevant to our history and tradition of gun regulation.

Unfortunately for the government, that regulatory tradition is sparse and limited during the relevant time periods.   Despite the prevalence of alcohol and alcohol abuse, neither the government nor *amici* identify any restrictions at the Founding that approximate § 922(g)(3).   Although a few states after the Civil War prohibited carrying weapons while under the influence, none barred gun possession by regular drinkers.

### a.

Founding-era statutes concerning guns and alcohol were few.   They were also limited in scope and duration.   The laws that did exist had two primary concerns:   (1) the misuse of weapons while intoxicated and (2) the discipline of state militias.

Consider the first group of statutes.   In 1656, Virginia banned "shoot[ing] any gunns at drinkeing." [11] But in historical context, that was not a disarming regu-

---

[11] Acts of Mar. 10, 1655-56, Act 12, *reprinted in* 1 THE STATUTES AT LARGE; BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA, FROM THE FIRST SESSION OF THE LEGISLATURE IN THE YEAR 1619, at 401, 401-02 (William Waller Hening ed., New York, R. & W. & G. Bartow 1823).   As a historical note, some old statutes are dated with dual years because, until 1752, the British colonies dated the new year from March 25 (the Feast of the Annunciation). Thus, a law marked "1655" between January 1 and March 24 was actually passed in 1656 according to the New Style (Gregorian) Calendar. *See Colonial Records & Topics*, CONN. STATE LIBR., https://libguides.ctstatelibrary.org/hg/colonialresearch/calendar (last visited July 9, 2023).

14a

lation like § 922(g)(3).   Virginia was a brand-new colony at the time.   The 1656 statute was explicitly passed to conserve gunpowder, which was at a premium, and because ill-timed gunshots might be mistaken for a signal that local Indians were attacking.[12]   Not only was the statute enacted for a different purpose, but it did not even ban gun possession or carry—it only prevented the colonists from misusing the guns they did have during bouts of drinking.

Another law, passed by New York in 1771, prohibited citizens from firing guns from December 31 to January 2 because of the "great Damages" done by those "intoxicated with Liquor" during New Year's celebrations.[13]   The statute had a similar purpose as § 922(3) does—preventing public harm by individuals under the influence.   Nevertheless, the law was strikingly narrow. It applied on only three days out of the year; it only prevented firing guns (not possessing them); and it applied only to those under the influence, not habitual drinkers.

---

[12] According to the statute, the misuse of weapons while intoxicated furthered "that beastly vice[:]   spending much powder in vaine" instead of "reserve[ing] [it] against the comon enemie," "the Indians." Acts of Mar. 10, 1655-56, Act 12, *reprinted in* 1 THE STATUTES AT LARGE, *supra* note 11, at 401.   Plus, "[t]he only means for the discovery of [Indian] plotts is by allarms, of which no certainty can be had in respect of the frequent shooting of gunns in drinking." *Id.* at 401.   The 1656 law was a descendant of a 1632 law, which prevented "spend[ing] powder unnecessaril[y]   . . .   in dringinge or enterteynments."   Acts of Feb. 24, 1631-32, Act 50, *reprinted in* 1 THE STATUTES AT LARGE, *supra* note 11, at 155, 173.

[13] Act of Feb. 16, 1771, ch. 1501, *reprinted in* 5 THE COLONIAL LAWS OF NEW YORK FROM THE YEAR 1664 TO THE REVOLUTION 244, 244-245 (Albany, James B. Lyon 1894).

15a

Beyond that duet of colonial regulations—separated by over a century—the government identifies no Founding-era law or practice of disarming ordinary citizens for drunkenness, even if that intoxication was routine.

Instead, the government points to a second group of statutes regulating militia service. For example, a soldier could be "disarm[ed]" if he showed up for militia service in New Jersey "disguised in Liquor."[14]  Pennsylvania did the same in 1780.[15]  For related reasons, dram shops were prohibited from selling to local soldiers.[16]

---

[14] Act of May 8, 1746, ch. 200, § 3, *reprinted in* ACTS OF THE GENERAL ASSEMBLY OF THE PROVINCE OF NEW-JERSEY 140, 140-41 (Samuel Allison ed., Burlington, Isaac Collins 1776).

[15] Act of Mar. 20, 1780, ch. 902, § 45, *reprinted in* 2 MILITARY OBLIGATION:  THE AMERICAN TRADITION, pt. 11, at 75, 97 (Arthur Vollmer ed., 1947) ("[I]f any non-commissioned officer or private shall . . . be found drunk . . . he shall be disarmed . . . until the company is dismissed. . . . ").  Later, some states excluded "common drunkards" from militia service.  *See, e.g.*, An Act to regulate the Militia, § 1, *reprinted in* PUBLIC LAWS OF THE STATE OF RHODE-ISLAND AND PROVIDENCE PLANTATIONS 501, 503 (Providence, Knowles & Vose 1844).

[16] *See, e.g.*, Act of May 22, 1756, *reprinted in* 2 MILITARY OBLIGATION, *supra* note 15, pt. 5, at 83, 93 (Arthur Vollmer ed., 1947) (Maryland statute); Act of May 8, 1703, § 19, *reprinted in* 2 MILITARY OBLIGATION, *supra* note 15, pt. 13, at 8, 13 (South Carolina statute). It is not clear how strictly those laws were enforced, however. Founding-era militias were notorious for imbibing heavily.  One officer wrote that it was "the universal custom, in all regiments of the militia . . . for the officers, on every muster day, to get gloriously drunk in their country's service."  *See* Reminiscences of a Retired Militia Officer:  No. IV, *reprinted in* 3 THE NEW-ENGLAND MAGAZINE 110, 111 (Boston, J. T. & E. Buckingham 1832).

16a

Those laws, however, are even less probative. For one thing, their purpose is different. They exist to ensure a competent military—a service-member cannot perform his duties if he is impaired. Furthermore, the limitations applied only to the militia; none of the laws spoke to the ability of militiamen to carry outside of their military service. At the Founding, as today, restrictions on the liberties of servicemen tell us little about the limits acceptable for the general public.

Given the prevalence of drinking at the Founding, that handful of laws puts the government on shaky footing. The government has failed to identify any relevant tradition at the Founding of disarming ordinary citizens who consumed alcohol.

b.

The government's Reconstruction-era evidence, though stronger, still falls short of the history and tradition that could validate § 922(g)(3).

Between 1868 and 1883, three states prohibited carrying firearms while intoxicated: Kansas, Missouri, and Wisconsin.[17] Missouri's law was challenged under

---

[17] Art. 9, § 282, *in* THE GENERAL STATUTES OF THE STATE OF KANSAS 378, 378 (Lawrence, John Speer 1868) ("[A]ny person under the influence of intoxicating drink . . . who shall be found . . . carrying on his person a pistol . . . or other deadly weapon, shall be subject to arrest. . . . "); Act of Mar. 5, 1883, § 1, *reprinted in* LAWS OF MISSOURI PASSED AT THE SESSION OF THE THIRTY-SECOND GENERAL ASSEMBLY 76, 76 (Jefferson City, State J. Co. 1883) ("If any person . . . shall have or carry any [firearms] upon or about his person when intoxicated or under the influence of intoxicating drinks . . . he shall [be punished]."); Act of Apr. 3, 1883, ch. 329, § 3, *reprinted in* 1 THE LAWS OF WISCONSIN 290, 290 (Madison, Democrat Printing Co. 1883) ("It shall be unlawful for any per-

17a

the state constitution but was upheld by the Missouri Supreme Court. *State v. Shelby*, 2 S.W. 468 (Mo. 1886). The opinion acknowledged that the state constitution "secure[d] to the citizen the right to bear arms in the defense of his home, person, and property." *Id.* at 469. But the court reasoned that if the state could regulate the "manner in which arms may be borne," there is "no good reason . . . why the legislature may not do the same thing with reference to the condition of the person who carries such weapons." *Id.* The ban on intoxicated carry was therefore "in perfect harmony with the constitution." *Id.*

Those laws come closer to supporting § 922(g)(3), but they are notably few. The *Bruen* Court doubted that three colonial-era laws could suffice to show a tradition, let alone three laws passed eighty to ninety years after the Second Amendment was ratified. *See* 142 S. Ct. at 2142.

---

son in a state of intoxication, to go armed with any pistol or revolver."). Oklahoma Territory banned all public carry of pistols in 1890 and specifically prohibited public officers from carrying while intoxicated. *See Bruen*, 142 S. Ct. at 2154; Art. 47, § 4, *in* The Statutes of Oklahoma 495, 495 (Will T. Little et al. eds., Guthrie, State Capital Printing Co. 1891).

In a similar vein (but less relevant here), Mississippi limited the *sale* of small firearms to people who were actively intoxicated. Ch. 77, § 2986, *in* The Revised Code of the Statute Laws of the State of Mississippi 776, 776 (J.A.P. Campbell ed., Jackson, J.L. Power 1880). And in 1899, South Carolina prohibited the "*discharge* [of] any gun, pistol, or other firearm . . . within fifty yards of any public road" while "under the influence[] of intoxicating liquors." Ch. 12, § 252, *in* 2 Code of Laws of South Carolina, 1902, at 318, 318 (1902) (emphasis added).

18a

More fatally, § 922(g)(3) is substantially broader than the postbellum intoxication laws. On *Bruen*'s two axes of relevant similarity, the postbellum laws and § 922(g)(3) share a common "why": preventing public harm by individuals who lack self-control and carry deadly weapons.[18] But the "how" is different. At most, the postbellum statutes support the banning the *carry* of firearms *while under the influence*. Section 922(g)(3) bans all possession, and it does so for an undefined set of "user[s]," even if they are not under the influence.

As applied to Daniels, § 922(g)(3) is a significantly greater restriction of his rights than were any of the 19th-century laws. Although the older laws' bans on "carry" are likely analogous to § 922(g)(3)'s ban on "possess[ion],"[19] there is a considerable difference between someone who is actively intoxicated and someone who is an "unlawful user" under § 922(g)(3). The statutory term "unlawful user" captures regular users of marihuana, but its temporal nexus is vague—it does not specify how recently an individual must "use" drugs to qual-

---

[18] *Compare Shelby*, 2 S.W. at 469 (acknowledging the obvious "mischief to be apprehended from an intoxicated person going abroad with fire-arms"), *with Dickerson v. New Banner Inst., Inc.*, 460 U.S. 103, 112 n.6 (1983) ("Congress' intent in enacting [§ 922(g)] was to keep firearms out of the hands of presumptively risky people.").

[19] Possession for the purposes of § 922(g)(3) includes either "direct physical control" over a weapon or "'dominion or control' over the thing itself or the area in which it was found." *United States v. Jones*, 484 F.3d 783, 787 (5th Cir. 2007). Though that is not coextensive with the concept of "carry," it is analogous, at least here, where Daniels was in the same vehicle as his firearms.

ify for the prohibition.[20]    Daniels himself admitted to smoking marihuana fourteen days a month, but we do not know how much he used at those times, and the government presented no evidence that Daniels was intoxicated at the time he was found with a gun.    Indeed, under the government's reasoning, Congress could ban gun possession by anyone who has multiple alcoholic drinks a week from possessing guns based on the postbellum intoxicated carry laws.    The analogical reasoning *Bruen* prescribed cannot stretch that far.

A further problem with the Reconstruction-era statutes is precisely that they emerged during and after Reconstruction.    *Bruen* did not discount the relevance of late-19th-century history, but it insisted that the Second Amendment's "meaning is fixed according to the understandings of those who ratified it."    *Bruen*, 142 S. Ct. at 2132.    A tradition cannot inform the original meaning of the Bill of Rights if it emerges one hundred years later.    *Id.*; *see also id.* at 2162-63 (Barrett, J., concurring).    When 19th-century practice is inconsistent with the categorical protection of the Second Amendment, the "*text* controls."    *Id.* at 2137 (emphasis added).

Admittedly, there is an "ongoing scholarly debate" about whether the right to bear arms acquired new meaning in 1868 when it was incorporated against the states.    *Id.* at 2137-38; *see also McDonald v. City of*

---

[20] According to the implementing rules for § 922(g)(3), "[a] person may be an unlawful current user of a controlled substance even though the substance is not being used at the precise time the person  .  .  .  possesses a firearm."    27 C.F.R. § 478.11.    An inference of "current use" can even be drawn from "a conviction for use or possession of a controlled substance *within the past year*."    *Id.* (emphasis added).

20a

*Chicago*, 561 U.S. 742, 750 (2010) (incorporating the Second Amendment against the states via the Fourteenth Amendment). But the instant case involves a federal statute and therefore implicates the Second Amendment, not the Fourteenth. Even if the public understanding of the right to bear arms *did* evolve, it could not change the meaning of the Second Amendment, which was fixed when it first applied to the federal government in 1791.[21]

And even if late-century practice sheds some dim light on Founding-era understandings,[22] the most the Reconstruction-era regulations support is a ban on gun possession while an individual is *presently* under the influence. By regulating citizens like Daniels based on a pattern of drug use, § 922(g)(3) goes further. Our history and tradition do not support the leap.

2.

As an alternative, the government posits that the tradition of dis-arming the mentally ill supports § 922(g)(3). To quote *Heller*'s now-famous caveat, "longstanding prohibitions on the possession of firearms by  . . .

---

[21] *See Bruen*, 142 S. Ct. at 2137 ("[W]e have generally assumed that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791."); *see also* Lawrence B. Solum, *The Fixation Thesis: The Role of Historical Fact in Original Meaning*, 91 NOTRE DAME L. REV. 1, 15 (2015).

[22] *See Bruen*, 142 S. Ct. at 2137 (calling 19th-century commentary "secondary," and "mere confirmation" of what Founding-era sources reveal) (quotation omitted).

21a

the mentally ill" are still "presumptively lawful."[23]    Obviously, mental illness and drug use are not the same thing. But there is an intuitive similarity:    Those who are "briefly mentally infirm as a result of intoxication" are similar to those "permanently mentally infirm" because of illness or disability.[24]

We note at the outset that there is not a clear set of positive-law statutes concerning mental illness and firearms.    In fact, the federal ban on gun possession by those judged mentally ill was enacted in 1968, the same year as § 922(g)(3).    *See* 18 U.S.C. § 922(g)(4); *United States v. Skoien*, 614 F.3d 638, 641 (7th Cir. 2010).    But scholars have suggested that the tradition was implicit at the Founding because, "in eighteenth-century America, justices of the peace were authorized to 'lock up' 'lunatics' who were 'dangerous to be permitted to go abroad.'"[25]    In other words, the greater restriction included the lesser.    If the insane could be wholly deprived of their liberty and property, the government could necessarily take away their firearms.

Of course, the practice of institutionalizing so-called "lunatics" does not give clear guidance about which lesser impairments are serious enough to warrant the loss of

---

[23] 554 U.S. at 626, 627 n.26; *see also Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., concurring) (quoting that portion of *Heller*); *McDonald*, 561 U.S. at 786 (quoting the same).

[24] Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda*, 56 U.C.L.A. L. Rev. 1443, 1535 (2009).

[25] *United States v. Yancey*, 621 F.3d 681, 685 (7th Cir. 2010) (per curiam) (quoting Carlton F.W. Larson, *Four Exceptions in Search of a Theory:*    District of Columbia v. Heller *and Judicial Ipse Dixit*, 60 Hastings L.J. 1371, 1377 (2009)).

22a

constitutional freedoms. But we can assume that intoxication with marihuana is analogous to short-term mental illness. Dr. Benjamin Rush—who signed the Declaration of Independence—said a "temporary fit of madness" was a symptom of drunkenness.[26] And in an influential treatise on constitutional law, Thomas Cooley described drunkenness as a form of "temporary insanity."[27] The same could be said of intoxication via marihuana.

Still, that comparison could justify disarming a citizen only while he is in a state comparable to lunacy. Just as there was no historical justification for disarming a citizen of sound mind, there is no tradition that supports disarming a sober citizen who is not currently under an impairing influence.

Indeed, it is helpful to compare the tradition surrounding the insane and the tradition surrounding the intoxicated side-by-side. The Founders purportedly institutionalized the insane and stripped them of their guns; but they allowed alcoholics to possess firearms while sober. We must ask, in *Bruen*-style analogical reasoning, which is Daniels more like: a categorically "insane" person? Or a repeat alcohol user? Given his periodic marihuana usage, Daniels is firmly in the latter camp. If and when Daniels uses marihuana, he may be

---

[26] Benjamin Rush, An Inquiry into the Effects of Ardent Spirits upon the Human Body and Mind 6 (8th ed., Boston, James Loring 1823).

[27] Thomas M. Cooley, A Treatise on the Constitutional Limitations Which Rest upon the Legislative Power of the States of the American Union 660 n.1 (2d ed., Boston, Little Brown & Co. 1871). He suggests that some states prohibited intoxicated people from voting on that basis. *Id.*

23a

comparable to a mentally ill individual whom the Founders would have disarmed. But while sober, he is like the repeat alcohol user in between periods of drunkenness.

In short, neither the restrictions on the mentally ill nor the regulatory tradition surrounding intoxication can justify Daniels's conviction. Perhaps the government could show that the drugs Daniels used were so powerful that anyone who uses them is permanently impaired in a way that is comparable to ongoing mental illness. Or the government could demonstrate that Daniels's drug use was so regular and so heavy that he was continually impaired. Here, it has shown evidence of neither.

### 3.

Finally, the government asserts that Congress can limit gun possession by those "dangerous" to public peace or safety. It contends that principle was well understood when the Second Amendment was ratified. And it posits that Daniels—a repeat marihuana user—was presumptively dangerous enough to be disarmed. Although there is some historical evidence for the government's underlying principle, the historical examples of danger-based disarmament do not justify § 922(g)(3)'s application here.

### a.

As Justice Barrett detailed when she was a judge on the Seventh Circuit, history supports the intuitive proposition that the government can keep deadly firearms away from dangerous people. *Kanter*, 919 F.3d at 451

(Barrett, J., dissenting).[28]   Even the *amici* who believe
that Daniels should prevail on his Second Amendment
challenge suggest that the government *can* disarm the
dangerous, even under *Bruen*'s history-and-tradition
test.[29]

That said, no one piece of historical evidence sug-
gests that when the Founders ratified the Second
Amendment, they authorized Congress to disarm any-
one it deemed dangerous.   Instead, the government
collects different statutes disarming discrete classes of
persons at various points in history.   Those laws sug-
gest an abstract belief that an individual's right to bear
arms could be curtailed if he was legitimately dangerous
to the public.

The government's examples fall into two general
buckets.   *First*, states barred political dissidents from
owning guns during periods of conflict.   Many Ameri-
can states, for instance, disarmed those who failed to
take an oath of allegiance during the Revolutionary
War.[30]   *Second*, both British and American govern-

---

[28] *See also Folajtar v. Att'y Gen. of U.S.*, 980 F.3d 897, 913-15 (3d
Cir. 2020) (Bibas, J., dissenting) (urging the same); *see generally*
Joseph G.S. Greenlee, *Disarming the Dangerous:   The American
Tradition of Firearm Prohibitions*, 16 DREXEL L. REV. (forthcom-
ing 2023), available at https://papers.ssrn.com/sol3/papers.cfm?
abstract_id=4317000 (collecting historical regulations).

[29] Brief of *Amicus Curiae* Scholars of Second Amendment Law
and the Independence Institute at 9 ("Dangerousness should be the
key feature for firearms prohibitors, and a person whose conduct
is never dangerous may not be disarmed."); Brief of *Amici Curiae*
Firearms Policy Coalition and FPC Action Foundation at 30 ("The
only historical justification for disarmament is dangerousness.").

[30] *See, e.g.*, Act of June 13, 1777, ch. 756, § 3, *reprinted in* 9 The
Statutes at Large of Pennsylvania from 1682 to 1801, at 110, 112-

25a

ments disarmed religious minorities—especially Catholics.[31]

---

13 (Wm. Stanley Ray ed., 1903) (allowing local law enforcement to freeze the assets and "disarm[]" those who did not take a loyalty oath); Act of May 1, 1776, ch. 21, *reprinted in* 5 The Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay 479, 479 (Boston, Wright & Potter Printing Co. 1886) (ordering those "notoriously disaffected to the cause of America" to be "disarmed" and their weapons given to the Continental Army); Act of June 1776, *reprinted in* 7 Records of the Colony of Rhode Island and Providence Plantations in New England 566, 567 (John Russell Bartlett ed., Providence, A. Crawford Greene 1862) (permitting county sheriffs to take the "arms, ammunition[,] and warlike stores" of those refusing to take loyalty oaths and transfer the weapons to the local militia).

[31] During the English Interregnum, Oliver Cromwell's government disarmed "all known Popish and dangerous or seditious persons." Council: Day's Proceedings (Feb. 15, 1654-55), *reprinted in* 8 CALENDAR OF STATE PAPERS, DOMESTIC SERIES, 1655, at 42, 43-44 (Mary Anne Everett Green ed., London, Longmans & Co. et al. 1881). Several American states disarmed Catholics as well. *See, e.g.*, Act of March 25, 1756, ch. 4, *reprinted in* 7 STATUTES AT LARGE; BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA FROM THE FIRST SESSION OF THE LEGISLATURE IN THE YEAR 1619, at 9, 35-36 (William Waller Hening ed., Richmond, Franklin Press 1820) (disarming "Papists" because it was "dangerous at this time to permit [them] to be armed").

But disarmament was not limited to Catholics. The civil government disarmed fifty-eight supporters of John Wheelwright, a clergyman who was expelled from Massachusetts for his religious views around the same time as Anne Hutchinson. *See* James F. Cooper, Jr., *Anne Hutchinson and the "Lay Rebellion" Against the Clergy*, 61 N. Eng. Q. 381, 391 (1988). Quakers and other pacifist sects were also perceived to be Tory sympathizers or traitors because they refused to support the American Revolution. Jim Wedeking, *Quaker State: Pennsylvania's Guide to Reducing the Friction for Religious Outsiders Under the Establishment Clause*, 2 N.Y.U. J.L. & LIBERTY 28, 51-52 (2006).

26a

Each of those laws was generally based on concerns for the safety of the polity, but each disarmament also had its own unique political or social motivations. Almost all the laws disarming dissidents were passed during wartime or periods of unprecedented political turmoil. Indeed, Founding-era governments did not disarm Loyalists because they were thought to lack self-control; it was because both were viewed as potential threats to the integrity of the state.[32] The same was true of religious minorities—the perceived threat was as much political as it was religious.[33]

Independent of those class-based restrictions, the government relies heavily on the Militia Act of 1662, which allowed the Crown to disarm those whom he judged "dangerous to the Peace of the Kingdome." 14 Car. 2 c. 3, § 13 (1662). That is the most direct support

---

[32] Greenlee, *supra* note 288, at 42-43.

[33] *Id.* at 38-40. Although the government does not mention it, perhaps the most categorical firearm restrictions at the Founding were the discriminatory gun bans applicable to blacks and Indians. *See* Stephen P. Halbrook, *To Bear Arms for Self-Defense: A "Right of the People" or a Privilege of the Few?*, 21 FEDERALIST SOC'Y REV. 46, 53 (2020); Joseph Blocher & Caitlan Carberry, *Historical Gun Laws Targeting "Dangerous" Groups and Outsiders*, *in* NEW HISTORIES OF GUN RIGHTS AND REGULATION: ESSAYS ON THE PLACE OF GUNS IN AMERICAN LAW AND SOCIETY (Joseph Blocher et al. eds., forthcoming) (manuscript at 4-5), available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3702696. Americans feared that slaves, free blacks, and Indians would stage violent attacks or revolts. Greenlee, *supra* note 28, at 28, 31. Although those laws are also examples of danger-based disarmament, we need not build our history and tradition on repugnant laws that today would be struck down as unconstitutional. There are plenty of examples at the Founding of states' disarming citizens who were considered a violent threat to society.

27a

for the government's principle that the legislature could prophylactically disarm any citizen who could potentially be dangerous.

But *Rahimi* held that the Militia Act was not incorporated into American law. After all, the Act was the justification for the widespread disarming of political opponents by Charles II and James II. *Rahimi*, 61 F.4th at 456. After the Glorious Revolution, the 1689 English Bill of Rights expanded the right to bear arms in order to curtail the Militia Act's reach and limit the Crown's "politically motivated disarmaments." *Id.* Our Second Amendment is a direct descendant of that latter guarantee. *Id.* (citing *Heller*, 554 U.S. at 593). If anything, our constitutional right to bear arms was purposefully broader than its English ancestor. *See* WILLIAM RAWLE, A VIEW OF THE CONSTITUTION OF THE UNITED STATES OF AMERICA 122-23 (Philadelphia, H.C. Carey & I. Lea 1825). Although some historians maintain that the Militia Act was still frequently used after the Glorious Revolution,[34] its limitations likely did not survive the categorical command of the Second Amendment. *See Rahimi*, 61 F.4th at 456.

Finally, the government posits that Congress can disarm dangerous citizens because the idea was dis-

---

[34] *See* Patrick J. Charles, *"Arms For Their Defense"?: An Historical, Legal, and Textual Analysis of the English Right to Have Arms and Whether the Second Amendment Should Be Incorporated in* McDonald v. City of Chicago, 57 CLEVE. STATE L. REV. 351, 376 (2009) (noting that "the 1662 Militia Act's seizure of arms provision was not only frequently used" after the English Bill of Rights, "but it was also supported by both Houses of Parliament"); *see also* Diarmuid F. O'Scannlain, *Glorious Revolution to American Revolution: The English Origin of the Right to Keep and Bear Arms*, 95 NOTRE DAME L. REV. 397, 405-06 (2019).

28a

cussed during the ratification of the Constitution. Samuel Adams, for example, proposed an amendment at the Massachusetts ratifying convention that would have limited the right to bear arms to "peaceable citizens."[35] At the Pennsylvania ratifying convention, the dissenting minority suggested several constitutional amendments, including one that would have protected the right to bear arms "unless for crimes committed, or real danger of public injury from individuals."[36] *Heller* described the Pennsylvania proposal as an "influential" precursor to our Second Amendment, 554 U.S. at 604, as many of the Pennsylvania minority's suggestions ended up in our current Bill of Rights.[37]

Again, however, we must pause. The predecessors of the Second Amendment gave concrete language to possible limits on the right to bear arms. Yet that language was not adopted. Instead, the People ratified the unqualified directive: "shall not be infringed." U.S. CONST. amend. II. Usually, when the relevant lawmaking body does not adopt language in a draft, we presume that the stricken language was not intended. *See Skoien*, 614 F.3d at 648 (Sykes, J., dissenting). Indeed, *Rahimi* also considered those Second Amendment precursors and concluded that the unadopted language

---

[35] Convention Journal (Feb. 6, 1788), *reprinted in* 6 THE DOCU-MENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION 1452, 1453 (J. Kaminski et al. eds. 2000).

[36] The Address and Reasons of Dissent of the Minority of the Convention of the State of Pennsylvania to their Constituents (1787), *reprinted in* 2 DOCUMENTARY HISTORY OF THE RATIFICATION, *supra* note 35, at 618, 624.

[37] *See* Address and Reasons of Dissent, *supra* note 36, at 623–24.

29a

could not supplant the Amendment's enacted text. *Rahimi*, 61 F.4th at 457.

That said, there is an undeniable throughline in all those historical sources: Founding-era governments took guns away from persons perceived to be dangerous. Even if the disarming of Loyalists and Catholics was limited to exigent historical contexts, no party identifies "disputes regarding the lawfulness of such prohibitions" at the time. *Bruen*, 142 S. Ct. at 2133. Indeed, some states such as Pennsylvania disarmed dissident citizens while their state constitutions guaranteed a right to bear arms.[38] And even if the Founders repudiated the Militia Act and rejected the Second Amendment precursors, the language of those documents says something about the outer limit of the right to bear arms in the English tradition.

Perhaps the Second Amendment was meant to do away with all those restrictions of liberty, and we can chalk such restrictions up to reactionary excess during the birth of a nation. On the other hand, we cannot completely discount the sheer number of disarming statutes at the time of the Founding. Together, they suggest a public understanding that when a class of individuals was thought to pose a grave danger to public peace, it could be disarmed.

b.

Assuming the Second Amendment encodes some government power to disarm the dangerous, the question becomes: At what level of generality may we implement that principle? *Bruen* requires us to interrogate

---

[38] *Compare* PA. CONST., Decl. of Rights, § XIII (1776), *with* Act of June 13, 1777, *supra* note 30.

30a

the historical record for "relevantly" similar regula-
tions. It does not allow us to enforce unenacted policy
goals lurking behind the Second Amendment.

Indeed, any ability to implement a "dangerousness
principle" is fenced in by at least two strictures in the
applicable caselaw. On the one hand, the legislature
cannot have unchecked power to designate a group of
persons as "dangerous" and thereby disarm them.
Congress could claim that immigrants, the indigent, or
the politically unpopular were presumptively "danger-
ous" and eliminate their Second Amendment rights
without judicial review. That would have "no true lim-
iting principle," *Rahimi*, 61 F.4th at 454, and would ren-
der the Second Amendment a dead letter.

On the other hand, we cannot inspect a legislature's
judgment of dangerousness using traditional standards
of scrutiny. *Bruen* forbids us from balancing a law's
justifications against the burden it places on rightshold-
ers. 142 S. Ct. at 2127, 2129. Imagine, for example,
that a state legislature disarms all men, citing statistics
that men commit more violent crimes than do women.[39]
Before *Bruen*, we would have considered whether the
evidence supporting male dangerousness was substan-
tial enough—and whether the law was sufficiently
tailored—to justify such a categorical restriction on gun
rights. But *Bruen* forswears that kind of review.
*Bruen*, 142 S. Ct. at 2129. Similarly, imagine that the
government bars all convicted cybercriminals from own-

---

[39] In 2012, approximately 80% of offenders arrested for violent
crimes were men. *Crime in the United States 2012*, FED. BUREAU
INVEST. (2012), https://ucr.fbi.gov/crime-in-the-u.s/2012/crime-in-
the-u.s.-2012/tables/42tabledatadecoverviewpdf/table_42_arrests_
by_sex_2012.xls.

ing guns, referencing the "dangerousness" of cyber-crime. Cyber-crime is assuredly dangerous, but in a different way than is violent crime. Applying a standard of scrutiny, we might have interrogated whether Congress had adequately demonstrated that someone who spreads ransomware or pirates television shows is likely to be dangerous with a firearm. Again, *Bruen* heads that analysis off at the pass. *Id.*[40]

How, then, do we square the post-*Bruen* circle? To remain faithful to *Bruen*, the solution is to analogize to particular regulatory traditions instead of a general notion of "dangerousness." The government must show that a historical danger-based disarmament is analogous to the challenged regulation. We must use *Bruen*'s "why" and "how" analysis to assess whether the Founding-era restriction is relevantly similar to the modern one.[41] We must ask: *Why* was the group considered dangerous at the Founding and therefore disarmed? And *why* does the modern law classify a person as presumptively dangerous? Is the comparison supported by the record? Furthermore, *how* did the

---

[40] Indeed, when then-Judge Barrett wrote in *Kanter* that danger-based disarmament was consistent with the original understanding of the Second Amendment, *Bruen* had not yet been decided. 919 F.3d at 451 (Barrett, J., dissenting). So she explicitly relied on means-end scrutiny to cabin the government's modern-day determinations that a particular group is too dangerous to possess guns. *Id.* at 465. But post-*Bruen*, that judicial check is no longer available to us. *Bruen*, 142 S. Ct. at 2129-30.

[41] *Bruen*, 142 S. Ct. at 2133 n.7 ("[C]ourts may [not] engage in independent means-end scrutiny under the guise of an analogical inquiry. . . . Analogical reasoning requires judges to apply faithfully the balance struck by the founding generation to modern circumstances, . . . not . . . revise that balance through means-end scrutiny.").

32a

historical regulation limit the rights of the dangerous class?    And *how* does the modern regulation do so?[42]

c.

Applying *Bruen*'s framework to the proffered analogues, it follows that the government's theory of danger-based disarmament falls apart.    The government identifies no class of persons at the Founding (or even at Reconstruction) who were "dangerous" for reasons comparable to marihuana users.    Marihuana users are not a class of political traitors, as British Loyalists were perceived to be.    Nor are they like Catholics and other religious dissenters who were seen as potential insurrectionists.    And even if we consider the racially discriminatory laws at the Founding, Daniels is not like the minorities who the Founders thought threatened violent revolt.

The government suggests that, in the spirit of the drafts of the Second Amendment and the Militia Act, marihuana users threaten the public "peace."    But at the time of the Founding, that notion referred specifically to violence or rebellion, not generalized public

---

[42] The en banc Third Circuit recently followed that approach in *Range*, 69 F.4th at 104-05.    Facing a challenge to § 922(g)(1), the felon-in-possession statute, the court acknowledged Founding-era evidence for disarming the dangerous.    But it required the government to "analogize [historically disarmed] groups to [the defendant] and his individual circumstances."    *Id.*    "That Founding-era governments disarmed groups they dis-trusted like Loyalists, Native Americans, Quakers, Catholics, and Blacks does nothing to prove that [a defendant] is part of a similar group today."    *Id*. at 105. The Third Circuit ultimately held that § 922(g)(1) was unconstitutional as applied to a non-violent felon.    *Id*. at 106.

harm.[43]    And § 922(g)(3) is not limited to those with a
history of violent behavior—not all members of the set
of "drug users" are violent.    As applied in this case, the
government has not shown how Daniels's marihuana use
predisposes him to armed conflict or that he has a his-
tory of drug-related violence.

Furthermore, even as the Founders were disarming
Catholics and politically disaffected citizens, they left
ordinary drunkards unregulated.    The government has
no meaningful response to the fact that neither Con-
gress nor the states disarmed alcoholics, the group most
closely analogous to marihuana users in the 18th and
19th centuries.    As with the government's analogy to
mental illness, we must ask:    Which are marihuana us-
ers more like: British Loyalists during the Revolution?
Or repeat alcohol users?    The answer is surely the lat-
ter.

The government asks us to set aside the particulars
of the historical record and defer to Congress's modern-
day judgment that Daniels is presumptively dangerous
because he smokes marihuana multiple times a month.
But that is the kind of toothless rational basis review
that *Bruen* proscribes.    Absent a comparable regula-
tory tradition in either the 18th or 19th century,

---

[43] *See* Joseph G.S. Greenlee, *The Historical Justification for Pro-
hibiting Dangerous Persons from Possessing Arms*, 20 WYO. L.
REV. 249, 266 (2020); *Folajtar*, 980 F.3d at 915 (Bibas, J., dissenting).
Indeed, to the extent the Militia Act is probative, it was primarily
used to disarm religious minorities and "disaffected persons," nei-
ther of which is comparable to Daniels.    *See* O'Scannlain, *supra*
note 34, at 405-06.    The Militia Act of 1661 had also permitted law
enforcement to disarm and detain "Disturbers of the Peace," but
that statute was similarly targeted at insurrectionists.    *See* 13 Car.
2. c. 6, § 2.

34a

§ 922(g)(3) fails constitutional muster under the Second Amendment.[44]

## III.

Daniels's § 922(g)(3) conviction is inconsistent with our "history and tradition" of gun regulation. *Bruen*, 142 S. Ct. at 2128. We conclude only by emphasizing the narrowness of that holding. We do not invalidate the statute in all its applications, but, importantly, only as applied to Daniels. Nor do we suggest that a robust Second Amendment is incompatible with other reasonable gun regulations.[45] Such statutes just need to be consonant with the limits the Founding generation understood to be permissible when they ratified the Second Amendment. The government has failed to demonstrate that here.

The judgment of conviction is therefore REVERSED, and a judgment dismissing the indictment is RENDERED.

---

[44] Irrespective of any historical analysis, the government also asks us to side with the many district courts around the country that have upheld § 922(g)(3) in the face of constitutional challenges. Of those, however, the vast majority relied reflexively on pre-*Bruen* caselaw or the same loose analogies that the government advances in this case. We decline to follow those decisions for the reasons detailed above. The district courts that have engaged carefully with the historical sources and the strictures of *Bruen* have found that § 922(g)(3) violates the Second Amendment. *See, e.g., United States v. Harrison*, No. CR-22-00328, 2023 WL 1771138, at *24-25 (W.D. Okla. Feb. 3, 2023); *United States v. Connelly*, No. EP-22-CR-229(2), 2023 WL 2806324, at *12 (W.D. Tex. Apr. 6, 2023).

[45] *Bruen*, 142 S. Ct. at 2133; *cf. Heller*, 554 U.S. at 635 (leaving open the constitutionality of further "regulations of the right").

35a

STEPHEN A. HIGGINSON, *concurring*:

In the fifteen years since the Supreme Court first found in the Second Amendment an individual right to keep and bear arms to defend the home, *See District of Columbia v. Heller*, 554 U.S. 570, 595, 636 (2008); *McDonald v. City of Chicago*, 561 U.S. 742, 750 (2010) (incorporating this right against the states), historians and legal scholars have continued to question this interpretation,[1] while the nation has continued to look for constitutionally permissible safeguards against gun violence and gun-related death rates that outstrip those of almost every other country.[2]

---

[1] See, e.g., Richard A. Epstein, *A Structural Interpretation of the Second Amendment: Why* Heller *is (Probably) Wrong on Originalist Grounds*, 59 SYRACUSE L. REV. 171 (2008); Paul Finkelman, *It Really Was About a Well Regulated Militia*, 59 Syracuse L. Rev. 267 (2008); Saul Cornell, Heller, *New Originalism, and Law Office History: "Meet the New Boss, Same as the Old Boss,"* 56 UCLA L. REV. 1095 (2009); Patrick J. Charles, *The Second Amendment in Historiographical Crisis: Why the Supreme Court Must Reevaluate the Embarrassing "Standard Model" Moving Forward*, 39 FORDHAM URB. L.J. 1727 (2012); Lee Epstein & David T. Konig, *The Strange Story of the Second Amendment in the Federal Courts, and Why It Matters*, 60 WASH. U. J.L. & Pol'y 147 (2019); Darrell A. H. Miller, Owning Heller, 30 U. FLA. J.L. & PUB. POL'Y 153 (2020).

[2] *See, e.g.*, Evan D. Gumas, Munira Z. Gunja & Reginald D. Williams II, *The Health Costs of Gun Violence: How the U.S. Compares to Other Countries*, THE COMMONWEALTH FUND (Apr. 20, 2023), https://www.commonwealthfund.org/publications/2023/apr/health-costs-gun-violence-how-us-compares-other-countries (noting that the death rate from firearms-related causes in 2019 was around five times greater in the U.S. (10.4 deaths per 100,000 people) than in the high-income countries with the second- (France, 2.2) and third-highest rates (Switzerland, 2.1)); Chris Gilligan, *U.S. Remains an Outlier in Firearm Possession, Gun-Related Deaths*,

36a

Faced with this expanded Second Amendment reach and the corresponding wave of legal challenges to gun safety regulations, lower courts eventually "coalesced around a 'two-step' framework for analyzing Second Amendment challenges that combine[d] history with means-end scrutiny."[3] *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2125 (2022). In applying this framework, courts were attempting to balance *Heller*'s rejection, on originalist grounds, of the previously narrow focus on a militia interest in favor of an interest

---

U.S. NEWS & WORLD REP. (Jan. 30, 2023, 3:42 p.m.), https://www. usnews.com/news/best-countries/articles/2023-01-30/how-the-u-s-compares-to-the-world-on-guns; *see also* John Gramlich, *What the Data Says About Gun Deaths in the U.S.*, PEW RSCH. CTR. (Apr. 26, 2023), https://www.pewresearch.org/short-reads/2023/04/26/what-the-data-says-about-gun-deaths-in-the-u-s (reporting that 48,830 people died from gun-related injuries in 2021, just over half of which were suicides); Stefanie Dazio & Larry Fenn, *Six Months. 28 Mass Killings in the US. That's the Worst Yet, and All But One Case Involved Guns*, AP NEWS (July 13, 2023, 11:43 p.m.), https:// apnews.com/article/mass-killings-record-gun-violence-0174103c37 756fe4d247fd15cd3bc009; Kiara Alfonseca, *There Have Been More Mass Shootings Than Days in 2023, Database Shows*, ABC NEWS (May 8, 2023, 9:24 a.m.), https://abcnews.go.com/US/mass-shootings-days-2023-database-shows/story?id=96609874; John Gramlich, *Gun Deaths Among U.S. Children and Teens Rose 50% in Two Years*, PEW RSCH. CTR. (Apr. 6, 2023), https://www.pewresearch.org/short-reads/2023/04/06/gun-deaths-among-us-kids-rose-50-percent-in-two-years.

[3] Courts would first turn to text, history, and tradition to determine whether the challenged law or regulation burdens conduct protected by the Second Amendment, and then, if so, evaluate the law under a version of means-end scrutiny. *See* Mark Anthony Frassetto, *Judging History: How Judicial Discretion in Applying Originalist Methodology Affects the Outcome of Post-Heller Second Amendment Cases*, 29 WM. & MARY BILL RTS. J. 413, 418-19 (2020).

37a

in self-defense, with *Heller*'s recognition that the Second Amendment contains limiting principles and exceptions. Specifically, *Heller* acknowledged that the Second Amendment does not curtail the legislative power to regulate and restrict the carrying of "dangerous and unusual weapons," 554 U.S. at 627, nor does it undermine "longstanding prohibitions" on the carrying of firearms in sensitive places or by certain persons, or "laws imposing conditions and qualifications on the commercial sale of arms," *id.* at 626-27.

Thus, even as the politics of gun safety remained hotly contested, the law had somewhat settled. And under this framework, courts generally permitted Americans, through both state and federal elected officials, to enact, or opt not to enact, gun safety regulations to address the ongoing crisis of gun violence.[4]

Last year, however, the Supreme Court again revised Second Amendment doctrine in *Bruen*, declaring

---

[4] This is not to say that courts disregarded *Heller* and *McDonald*, or otherwise relegated the Second Amendment to the status of a "second class" right. Indeed, some firearms restrictions were struck down, *see, e.g.*, *Moore v. Madigan*, 702 F.3d 933, 942 (7th Cir. 2012) (finding Illinois's ban on the carrying of ready-to-use weapons unconstitutional), and, although it is difficult to precisely calculate rates of gun ownership, *see* Jennifer Mascia, *How Many Guns Are Circulating in the U.S.?*, THE TRACE (Mar. 6, 2023), https://www.thetrace.org/2023/03/guns-america-data-atf-total, there are significantly more firearms in circulation today than ever before, and this expansion has primarily occurred post-*Heller*, *see* Daniel De Visé, *Americans Bought Almost 60 Million Guns During the Pandemic*, THE HILL (Apr. 21, 2023, 6:00 a.m.), https://thehill.com/policy/national-security/3960527-americans-bought-almost-60-million-guns-during-the-pandemic, (noting that FBI firearm background checks more than doubled from 2005 to 2015, and then skyrocketed further between 2015 and 2020).

38a

that this "two-step" approach, which combined atten-
tiveness to history with a traditional judicial balancing
test, was "one step too many." *Id.* at 2127. Now, the
Court has written, if "the Second Amendment's plain
text covers an individual's conduct," then a gun regula-
tion is presumptively unlawful unless the government
can "justify its regulation by demonstrating that it is
consistent with the Nation's historical tradition of fire-
arm regulation."[5] *Id.* at 2126, 2129-30.

Bound by this interpretative sequence, we hold today
that 18 U.S.C. § 922(g)(3), a decades-old felony provision
of our federal firearms law, is unconstitutional as ap-
plied to Mr. Daniels. Although our decision is limited
in scope, it is hard for me to avoid the conclusion that
most, if not all, applications of § 922(g)(3) will likewise

---

[5] Although *Bruen* appears to contemplate a "one-step" test,
courts have correctly perceived it to require a new two-step analy-
sis wherein courts first determine whether the challenged regula-
tion or statute implicates the Second Amendment and then, if so,
analyze the relevant history and tradition to decide if such a re-
striction is justified. *See Range v. Att'y Gen. U.S.*, 69 F.4th 96,
101 (3d Cir. 2023) (en banc) ("After *Bruen*, we must first decide
whether the text of the Second Amendment applies to a person and
his proposed conduct. If it does, the government now bears the
burden of proof: it 'must affirmatively prove that its firearms
regulation is part of the historical tradition that delimits the outer
bounds of the right to keep and bear arms.'." (internal citations
omitted)); *United States v. Alaniz*, 69 F.4th 1124, 1128 (9th Cir.
2023) (describing *Bruen* as having adopted a "two-part test"); *At-
kinson v. Garland*, 70 F.4th 1018, 1020 (7th Cir. 2023) ("[W]hen the
Second Amendment's 'plain text' covers the regulated conduct, the
government has only one way to defend the regulation—by proving
that it is 'consistent with this Nation's historical tradition of fire-
arm regulation.'" (quoting *Bruen*, 142 S. Ct. at 2126)).

39a

be deficient.[6]  It is also important to acknowledge that other gun safety laws, especially longstanding status-based prohibitions previously understood to be constitutionally unassailable, have been recently struck down by courts across the country as they attempt to faithfully implement *Bruen*.[7]

---

[6] Reviewing our precedent, many offenders convicted under § 922(g)(3) were not intoxicated *when* they were found to possess or receive a firearm, but rather were generally users of a controlled substance.  *See, e.g.*, *United States v. Patterson*, 431 F.3d 832, 837 (5th Cir. 2005) (upholding the defendant's conviction where he admitted that he regularly used marijuana and where his urine sample tested positive for marijuana, which stays in the system of an occasional user for up to two weeks); *United States v. Edwards*, 182 F.3d 333, 335-36 (5th Cir. 1999) (rejecting the argument that the defendant's conduct did not constitute a violation of § 922(g)(3) because "he was not using drugs at the exact moment the police found him in possession of a firearm"); *cf. United States v. McCowan*, 469 F.3d 386, 392 (5th Cir. 2006) (finding that the defendant qualified as an "unlawful user" for the purposes of the Sentencing Guidelines because the evidence showed that he "followed a pattern of use over an extended period of time").

[7] In fact, there is already a circuit split on the constitutionality of § 922(g)(1), the federal felon-in-possession statute.  *Compare Range*, 69 F.4th at 98 (holding § 922(g)(1) unconstitutional as applied), *with United States v. Jackson*, 69 F.4th 495, 501-02 (8th Cir. 2023) (upholding the constitutionality of § 922(g)(1) as applied and concluding that "there is no need for felony-by-felony litigation regarding the constitutionality" of that provision).  Some courts, faced with *Bruen* challenges to multiple provisions of the federal criminal code, have upheld one provision while striking down another.  *E.g.*, *United States v. Price*, No. 22-cr-97, 635 F. Supp. 3d 455, 464, 467 (S.D.W. Va. Oct. 12, 2022) (finding 18 U.S.C. § 922(k), which makes it unlawful to possess a firearm with an obliterated serial number, unconstitutional while holding that § 922(g)(1) "accords with the Second Amendment").  Moreover, the effect of *Bruen* has been especially dramatic as to civil claims.  *See* Jake Charles,

40a

To be clear, I fully concur in the majority's reasoning
—albeit with the caveat that the Supreme Court has
granted *certiorari* in *United States v. Rahimi*, 61 F.4th
443 (5th Cir. 2023), *cert. granted*, No. 22-915, __ S. Ct.
__, 2023 WL 4278450, at *1 (June 30, 2023)—as I believe
that we have applied *Bruen* as well as possible in evalu-
ating the constitutionality of § 922(g)(3).    I write sepa-
rately to highlight what has become increasingly apparent
—that courts, operating in good faith, are struggling at
every stage of the *Bruen* inquiry.    Those struggles en-
compass numerous, often dispositive, difficult questions,
including, but not limited to the following. First, who,
and what conduct, is covered by the Second Amend-
ment?[8]    Second, how does the Government demon-

_____

*One Year of* Bruen*'s Reign:    An Updated Empirical Analysis*,
DUKE CTR. FOR FIREARMS LAW (July 7, 2023), https://firearmslaw.
duke.edu/2023/07/one-year-of-bruens-reign-an-updated-empirical-
analysis.

   [8]  For instance, courts are divided as to whether the Supreme
Court's description of the right as one belonging to "law-abiding, re-
sponsible citizens," *Bruen*, 142 S. Ct. at 2131 (quoting *Heller*, 554
U.S. at 635), is meant to exclude certain categories of citizens, such
as those convicted of a crime, from the protection of the Second
Amendment. *See United States v. Jackson*, No. 22-cr-141, 2023 WL
2499856, at *7 (D. Md. Mar. 13, 2023) (collecting cases in which
courts "rejected post-*Bruen* challenges to status-based gun laws on
the ground that the restricted people are not law-abiding, responsi-
ble citizens to whom the Second Amendment applies").    *Compare
also United States v. Charles*, 633 F. Supp. 3d 874, 887-88 (W.D. Tex.
2022) (concluding that there is a historical basis for excluding felons
under the Second Amendment), *and United States v. Hughes*, No.
22-cr-640, 2023 WL 4205226, at *5-8 (D.S.C. June 27, 2023) (discuss-
ing how several courts have concluded that "convicted felons have
traditionally been excluded from the political community" and are
therefore not part of "the people" protected by the Second Amend-
ment), *with Range*, 69 F.4th at 103 (" [W]e reject the Government's

41a

strate a regulatory "tradition"?   This inquiry impli-
cates questions about how many states must have his-
torically addressed an issue, or how many laws must
have been passed—or some combination of the two[9]—
for a historical practice to constitute a "tradition,"[10] *see*

_____

contention that only 'law-abiding, responsible citizens' are counted
among 'the people' protected by the Second Amendment.").   In
other cases, the debate as to what constitutes a "bearable arm" cov-
ered by the Second Amendment has revitalized relevance.   *See* ,
*e.g.*, Oral Argument at 1:10-2:10, *Bevis v. City of Naperville*, No. 23-
1353, (7th Cir. June 29, 2023) (state and local defendants arguing
that large-capacity magazines are not "arms" but "accessories that
are not necessary to the operation of any firearm"); *see also Ocean
State Tactical, LLC v. Rhode Island*, No. 22-cv-246, 2022 WL
17721175, at *11-13 (D.R.I. Dec. 14, 2022) (finding at the preliminary-
injunction stage that plaintiffs had not shown that large-capacity
magazines are "arms" within the "textual meaning of the Second
Amendment"); *Nat'l Assoc. for Gun Rights v. Lamont*, No. 22-cv-
1118, 2023 WL 4975979, at *26 (D. Conn. Aug. 3, 2023) (concluding
that plaintiffs had failed to carry their burden of showing that stat-
utorily defined assault weapons and large-capacity magazines are
covered by the Second Amendment).

[9] For example, is it enough if the historical record shows that one
state had passed and enforced numerous laws addressing a particu-
lar firearms issue, or must multiple states have taken action on an
issue?   *See Bruen*, 142 S. Ct. at 2154 ("[W]e will not stake our inter-
pretation of the Second Amendment upon a law, in effect in a single
State, or a single city, 'that contradicts the overwhelming weight of
other evidence regarding the right to keep and bear arms' in public
for self-defense." (quoting *Heller*, 554 U.S. at 632)).

[10] *See*, *e.g.*, *Hardaway v. Nigrelli*, No. 22-cv-771, 2022 WL
16646220, at *14-17 (W.D.N.Y. Nov. 3, 2022) (discussing the neces-
sary showing to establish a historical tradition before finding plain-
tiffs were likely to prevail on their claim that New York's "place of
worship" ban on firearms possession violates the Second Amend-
ment).   *Compare also United States v. Rowson*, No. 22-cr-310, 2023
WL 431037, at *19-24 (S.D.N.Y. Jan. 26, 2023) (finding § 922(n) con-
sistent with this nation's historical tradition of firearms regulations

42a

*Bruen*, 142 S. Ct. at 2142 ("[W]e doubt that *three* colonial regulations could suffice to show a tradition of public-carry regulation."), as well as the related issue of enforcement.[11]     Third, what is the operative time period for such regulations—1791 or 1868?—and to what extent does post-ratification practice count?   *See id.* at 2162-63 (Barrett, J., concurring).[12]     Fourth—but again, this list is not exhaustive—how are courts to differentiate between "general societal problem[s]" that have "persisted since the 18th century," and those that "implicat[e] unprecedented societal concerns or dramatic technological changes," *id.* at 2131-32, and, moreover,

---

on the basis of colonial laws disarming groups of persons perceived as dangerous and historical surety laws), *with United States v. Hicks*, 21-cr-60, 2023 WL 164170, at *3-7 (W.D. Tex. Jan. 9, 2023) (finding these same historical analogies to be insufficient and holding § 922(n) to be unconstitutional).

[11] *See Bruen*, 142 S. Ct. at 2149 ("[R]espondents offer little evidence that authorities ever enforced surety laws."); *see also United States v. Combs*, No. 22-cr-136, 2023 WL 1466614, at *12 (E.D. Ky. Feb. 2, 2023) (explaining that the *Bruen* plurality rejected surety laws as a suitable historical analogue not because of a lack of evidence that these laws were enforced, but because they did not impose a comparable burden on the right).

[12] *See, e.g.*, *Nat'l Rifle Ass'n v. Bondi*, 61 F.4th 1317, 1322-23 (11th Cir. 2023) (holding that because "[c]onstitutional rights are enshrined with the scope they were understood to have *when the people adopted them*," for purposes of a challenge to a *state* law, "the right's contours" turn on the understanding of the right "when the Fourteenth Amendment was ratified" (internal quotation marks and citations omitted)), *re'hg granted, vacated*, 72 F.4th 1346 (July 14, 2023); *Worth v. Harrington*, No. 21-cv-1348, 2023 WL 2745673, at *10-12 (D. Minn. Mar. 31, 2023) (noting that *Bondi* is "difficult to square with the Supreme Court's emphasis on applying the Bill of Rights against the states and federal government according to the same standards" and suggesting that 1791 would be the operative time period for defining the scope of the right).

43a

between "historical analogue[s]" as distinct from "historical twin[s]"? *Id.* at 2133.[13]

More foundationally, courts are laboring to give meaning to the Bruen requirement of "historical inquiry." Must the Government provide expert testimony to prevail, or could a district court independently seek such evidence?[14] And in the event such evidence

---

[13] *See, e.g., Alaniz*, 69 F.4th at 1129-30 (9th Cir. 2023) (describing "illegal drug trafficking" as "a largely modern crime" that is "not closely analogous to founding-era smuggling crimes" such that the Government's proposed analogues needed to be only "relevantly similar," in upholding the application of a sentencing enhancement pursuant to U.S.S.G. § 2D1.1(b)(1)"); *Range*, 69 F.4th at 120 (Krause, J., dissenting) (asserting that § 922(g)(1) implicates "unprecedented societal concerns" or dramatic technological changes" due to "the lethality of today's weaponry, the ubiquity of gun violence, the size and anonymity of the population, and the extent of interstate travel [which] were unknown at the Founding"); *see also Protecting Public Safety After* New York State Rifle & Pistol Association v. Bruen, *Hearing Before the Senate Comm. On the Judiciary*, 118th Cong. (Mar. 15, 2023) (written testimony of Eric Ruben, Assistant Professor of Law, SMU Dedman School of Law, at 9-12).

[14] *See Miller v. Bonta*, No. 19-cv-1537, Tr. of Proceedings at 9-10, ECF 162 (S.D. Cal., Dec. 12, 2022) (statement by the district court, at a hearing, that it does not have the staff nor the resources to create a historical survey of relevant laws and statutes in a timely fashion); *id.* Min. Entry, ECF 161 (Dec. 15, 2022) (ordering the state defendants to confer with the plaintiffs and to create a "survey or spreadsheet of relevant statutes, laws, or regulations in chronological order" that began at the time of the adoption of the Second Amendment and continued until twenty years past the adoption of the Fourteenth Amendment, and which contained specific directions as to the information that should be included); *see also United States v. Bullock*, No. 18-cr-165, 2022 WL 16649175 (S.D. Miss. Oct. 27, 2022) (ordering briefing as to whether the court should appoint a consulting historian to aid in evaluating the defendant's motion to dismiss his indictment under § 922(g)(1)); *United States v. Sims*, No.

44a

is lacking in the record below, may courts of appeal collect their own history and make up for a party's earlier failing?[15]    Going even further, should courts undertake discovery and evidentiary testing of historical evidence to perceive the existence of a sufficient regulatory tradition?[16]    And, in making that conclusion, does the con-

---

22-cr-30081, 2023 WL 4461997, at *2 (C.D. Ill. July 11, 2023) (suggesting that both the government and the defendant "should freely cast a wider net and provide more detail about whatever history they rely on" and "freely employ the expert services of historians and historiographers" in briefing a motion to dismiss an indictment brought under § 922(g)(1) and § 922(d)) (internal quotation and citation omitted).

[15] Although the Supreme Court in *Heller*, *McDonald*, and *Bruen* received numerous unsolicited amici briefs from historians and other interested parties, as an inferior court, we rarely receive that amount of independent interest in our cases.    Accordingly, in this case, we found it helpful to publish a court directive "invit[ing] briefs from amici curiae who wish to supply relevant information regarding the history and tradition of the issues presented in this case."    *See also Alaniz*, 69 F.4th at 1129, n.2 (citing to a 113-page compilation of historical state firearms and weapons regulations which neither party had cited to in their briefing).

[16] *See, e.g.*, *Atkinson v. Garland*, 70 F.4th 1018, 1022-24 (7th Cir. 2023) (remanding to the district court for a "proper, fulsome analysis of the historical tradition" and identifying specific questions to help focus that analysis as the district court's ruling occurred pre-*Bruen* and thus the parties had not yet developed that record); *Oregon Firearms Fed.'n v. Kotek*, Nos. 2:22-cv-01815, 22-cv-01859, 22-cv-01862, 22-cv-01869, 2023 WL 3687404, *5 (D. Or. May 26, 2023) (denying cross-motions for summary judgment, noting that "the threshold question of whether [the challenged restrictions] involve conduct covered by the plain text of the Second Amendment" is a disputed fact); *id.*, 2023 WL 4541027, at *3 (D. Or. July 14, 2023) (findings of fact and conclusions of law followed from a weeklong bench trial involving "testimony from twenty witnesses" and "more than 100 exhibits").    *Compare Teter v. Lopez*, No. 20-15948, 2023 WL 5008203, at *6 (9th Cir. Aug. 7, 2023) (denying a request for a remand so that

stitutionality of any given provision rise or fall with the strength of the historical record as to a specific case, or will rulings be treated as establishing a single historical truth?

The majority in *Bruen*, responding to unworkability concerns identified by the dissent and echoed by courts over the past year, may have intimated answers. Specifically, the majority insisted that, as in other legal disputes, "historical evidence" is predicated on our "adversarial system of adjudication," in which courts must "decide [the] case based on the historical record compiled by the parties." *Id.* at 2130, n.6. In my view, this suggests that *Bruen* requires that an evidentiary inquiry first be conducted in courts of original jurisdiction, subject to party presentation principles, aided by discovery and cross-examination and with authority to solicit expert opinion.[17]

In granting *certiorari* in *Rahimi*, the Supreme Court likely will resolve some of these questions. Of course, in the meantime, it is our job as an inferior court to apply

---

the district court, which had issued its ruling pre-*Bruen*, could conduct further factual development on the basis that "the historical research required under *Bruen* involves issues of so-called 'legislative facts' . . . rather than 'adjudicative facts'" such that no additional inquiry from the district court was required).

[17] This reading of *Bruen* seems to me to be supported by the single authority cited in the majority's answer to the dissent, which frames its discussion of originalist methodology with reference to a title dispute in which the court was required to trace a chain of title, that is, develop and decide adjudicative facts, and where the court simply had to determine whether prior precedent had been overruled. William Baude & Stephen E. Sachs, *Originalism and the Law of the Past*, 37 L. & HIST. REV. 809, 809-10 (2019). Notably, in *Bruen*, the Supreme Court speaks of historical "evidence" over fifty times.

46a

the Supreme Court's mandates and aid the development of this field of law.    But the uncertainty and upheaval resulting from best efforts to apply *Bruen* now extend far beyond our dockets.    Myriad and obvious public safety laws, some over a century old, face inconsistent invalidation.    The impact of these challenges, outside of the evident yet indescribable tragedies of victims of gun violence, will fall heavily on states, which exercise most police power and must assure public safety.    *See Teter v. Lopez*, No. 20-15948, 2023 WL 5008203 (9th Cir. Aug. 7, 2023) (striking down Hawaii's ban on butterfly knives as unconstitutional under *Bruen*).    Already, as courts work through the impact of *Bruen*, defendants guilty of a gun crime in one jurisdiction are presently innocent of it in another.[18]

In attempting to navigate this new landscape, it is prudent to first return to the text of the Second Amend-

---

[18] Our holding today conflicts with decisions from district courts across the country upholding the constitutionality of § 922(g)(3). *See United States v. Seiwert*, No. 20-cr-443, 2022 WL 4534605 (N.D. Ill. Sept. 28, 2022); *United States v. Posey*, No. 22-cr-83, 2023 WL 1869095 (N.D. Ind. Feb. 9, 2023); *United States v. Randall*, No. 22-cr-99, 2023 WL 3171609 (S.D. Iowa Feb. 14, 2023); *United States v. Stennerson*, No. 22-cr-139, 2023 WL 2214351 (D. Mont. Feb. 24, 2023); *United States v. Cleveland-McMichael*, No. 21-cr-119, 2023 WL 2613548 (D. Alaska Mar. 23, 2023); *United States v. Le*, No. 23-cr-14, 2023 WL 3016297 (S.D. Iowa Apr. 11, 2023); *United States v. Costianes*, No. 21-cr-0458, 2023 WL 3550972 (D. Md. May 18, 2023); *United States v. Hart*, No. 22-cr-114, 2023 WL 4144834 (W.D. Mo. June 6, 2023) (report and recommendation), *adopted by* 2023 WL 4141044 (W.D. Mo. June 22, 2023); *United States v. Ray*, No. 21-cr-57, 2023 WL 4378152 (W.D. Va. July 6, 2023); *United States v. Lewis*, No. 22-cr-222, 2023 WL 4604563 (S.D. Ala. July 18, 2023); *United States v. Beaty*, No. 22-cr-95, 2023 WL 4662247 (M.D. Fla. July 20, 2023).

ment, which states, in full: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II. Just as the doctrine corrected in *Heller* was held to have over-emphasized the first third of the text ("[a] self regulated Militia"), it is possible that inferior judicial officers such as myself are misinterpreting *Bruen* by pressing too much on the last ("the right . . . to keep and bear Arms"). It may be that the Supreme Court will remind us of the Second Amendment's middle, where the Framers stated explicitly that they were fashioning a right "necessary to the security of a free State." In this sense, unlike the textually unbounded pledges assuring freedom of speech and conscience, "the right of the people to keep and bear Arms" is less about the antithesis of liberty and control, and is more designed to assure "domestic Tranquility [and] . . . the general Welfare." U.S. CONST. pmbl. Put another way, the Second Amendment is not only a right to have, but is especially a right to have to protect the state. That right to protect, as both *Heller*, *McDonald*, and *Bruen* affirmatively acknowledged, incorporates significant public safety exceptions.[19]

Importantly, the Supreme Court in *Bruen* saw itself as continuing with, rather than breaking from, *Heller*, which recognized that "[l]ike most rights, the right secured by the Second Amendment is not unlimited." *Heller*, 554 U.S. at 626. Thus, although in *dicta*, the

---

[19] Indeed, the *Bruen* majority was careful to emphasize that its opinion was not meant to "suggest the unconstitutionality" of all licensing regimes and specifically highlighted that "shall-issue" licensing regimes, "which often require applicants to undergo a background check or pass a firearms safety course," are unlikely to pose a constitutional problem. *Bruen*, 142 S. Ct. at 2138, n.9.

48a

*Heller* majority was confident that, though never conceived of by the Framers and hence never subject to public safety regulation, certain "dangerous and unusual weapons" could properly be banned. *Id.* at 624, 627. Similarly, the majority assured that "nothing in our opinion should be taken to cast doubt on" some of the most critical tools for combatting gun violence, including both people- and place-based restrictions. *Id.* at 626-27; *see also McDonald*, 561 U.S. at 786 (plurality) ("We repeat [*Heller's*] reassurances here."); *Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., joined by Roberts, CJ., concurring). These assurances are a recognition that the Second Amendment, explicitly and unlike the other original ten amendments in our Bill of Rights, ties to the "security" of our country. The Second Amendment assured a vigilant, armed citizenry and it did so for an explicit purpose, i.e. "being necessary to the security of a free State. . . . " To read the Second Amendment as providing an ever-expanding individual right, without limits, therefore, runs counter to both its text and the Framers' own understanding.

As should be evident, I am appreciative that the court that speaks the final word has agreed to provide more guidance on an issue of such national importance. I cannot help but fear that, absent some reconciliation of the Second Amendment's *several* values, any further reductionism of *Bruen* will mean systematic, albeit inconsistent, judicial dismantling of the laws that have served to protect our country for generations. Furthermore, such decisions will constrain the ability of our state and federal political branches to address gun violence across the country, which every day cuts short the lives of our citizens. This state of affairs will be nothing less than

49a

a Second Amendment caricature, a right turned inside out, against freedom and security in our State.

## APPENDIX B

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

———

Case No. 1:22-cr-58-LG-RHWR-1

UNITED STATES OF AMERICA

*v.*

PATRICK DARNELL DANIELS, JR.

———

Filed:    July 8, 2022

———

## MEMORANDUM OPINION AND ORDER DENYING DEFENDANT'S MOTION TO DISMISS

———

**BEFORE THE COURT** is the [24] Motion to Dismiss filed by Defendant, Patrick Darnell Daniels, Jr.   The Government filed a [27] Response, to which Defendant [28] replied.   This Defendant is under indictment for knowingly possessing a firearm while an unlawful user of a controlled substance, in violation of 18 U.S.C. § 922(g)(3).   Defendant has filed the instant [24] Motion to Dismiss the indictment, arguing that 18 U.S.C. § 922(g)(3), is unconstitutional under the Second Amendment and pursuant to the Supreme Court's recent decision in *New York State Rifle & Pistol Assoc., Inc. v. Bruen*, --- S. Ct. ---, 2022 WL 2251305 (June 23, 2022).   The Court has conducted a hearing on the matter and after due consideration of the arguments of

51a

counsel, the record, and the applicable law, finds that
the Motion should be denied.

DISCUSSION

## I.   Second Amendment Framework

Defendant argues that this case must be dismissed
because section 922(g)(3) is unconstitutional under the
Second Amendment to the United States Constitution.
Therefore, to rule of this Motion, the Court must ana-
lyze and apply Second Amendment jurisprudence as ar-
ticulated by the Supreme Court.

The Second Amendment provides:   "A well regu-
lated Militia, being necessary to the security of a free
State, the right of the people to keep and bear Arms,
shall not be infringed."   U.S. Const. amend. II.   In
*District of Columbia v. Heller*, 554 U.S. 570 (2008), the
Supreme Court concluded, after thorough textual and
historical analysis, that the Second Amendment confers
"an individual right to keep and bear arms."   *Id.* at 595.
The Court was quick to note that "[l]ike most rights, the
right secured by the Second Amendment is not unlim-
ited."   *Id.* at 626.   Relevant here, the Court stated
that "nothing in our opinion should be taken to cast
doubt on longstanding prohibitions on the possession of
firearms by felons and the mentally ill."   *Id.*   In a foot-
note, the Supreme Court classified these traditional re-
strictions on firearm possession as a non-exhaustive list
of "presumptively lawful regulatory measures."   *Id.* at
627 n.26.   The Supreme Court went on to strike down a
law in the District of Columbia which "totally bans hand-
gun possession in the home."   *Id.* at 628.   In doing so,
the Supreme Court conducted a historical analysis of
handgun restrictions in the United States and found the

52a

D.C. restriction to be novel in its severity, targeting "the quintessential self-defense weapon." *Id.* at 629.

In *New York State Rifle & Pistol Assoc., Inc. v. Bruen*, --- S. Ct. ---, 2022 WL 2251305 (June 23, 2022), the Supreme Court again considered the contours of the Second Amendment right to bear arms. The Court characterized its earlier decisions as "recogniz[ing] . . . the right of an ordinary, law-abiding citizen to possess a handgun in the home for self-defense." *Id.* at 5. The Court was called upon to assess the constitutionality of a New York licensing scheme which allowed authorities to deny concealed-carry permits even where an applicant met certain threshold criteria. *Id.* at 5-6. In doing so, the Court clarified and explained the methodology to be used in addressing Second Amendment claims. The Court rejected "a 'two-step' framework" involving "means-end scrutiny" in use by various appellate courts and instead clarified that the appropriate methodology centers "on constitutional text and history." *Id.* at 7-10. Hence, to answer Second Amendment questions, courts must "assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding." *Id.* at 12. In other words:

> In keeping with *Heller*, we hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with

this Nation's historical tradition may a court con-
clude that the individual's conduct falls outside the
Second Amendment's "unqualified command."

*Id.* (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36,
50, n. 10 (1961)).

On the second prong of the *Bruen* test, the Court
said: "'historical analysis can be difficult; it sometimes
requires resolving threshold questions, and making nu-
anced judgments about which evidence to consult and
how to interpret it.'" *Id.* at 11 (quoting *McDonald v.
City of Chicago*, 561 U.S. 742, 803-04 (2010) (Scalia, J.,
concurring)). This analysis will often require the use
of "historical analogies," whether because of "unprece-
dented societal concerns or dramatic technological
changes." *Bruen*, 2022 WL 2251305, at 12. Thus,
"[w]hen confronting such present-day firearm regula-
tions, this historical inquiry that courts must conduct
will often involve reasoning by analogy." *Id.* at 13.
"[E]ven if a modern-day regulation is not a dead ringer
for historical precursors, it still may be analogous
enough to pass constitutional muster." *Id.*[1]

---

[1] The opinion gives an example of analogical reasoning in the case
of location-based firearm restrictions. Because there are historical
analogues to modern "laws forbidding the carrying of firearms in
sensitive places such as schools and government buildings," *Heller*,
554 U.S. at 626, even though such analogues may have protected
relatively few "sensitive places," still, "courts can use analogies to
those historical regulations of 'sensitive places' to determine that
modern regulations prohibiting the carry of firearms in *new* and
analogous sensitive places are constitutionally permissible." *Bruen*,
2022 WL 2251305, at 14.

54a

## II.  Application to Section 922(g)(3)

The Court now applies the Second Amendment framework outlined in *Bruen* to the criminal statute at issue.   Section 922(g)(3) provides that "[i]t shall be unlawful for any person   .  .  .   (3) who is an unlawful user of or addicted to any controlled substance   .  .  .   [to] possess in or affecting commerce, any firearm or ammunition."   18 U.S.C. § 922(g)(3).

### 1.   Textual Analysis

The Court begins with the textual coverage of the Second Amendment.   On this subject the Supreme Court has read "the Amendment's operative clause," that "'the right of the people to keep and bear Arms shall not be infringed,'" to mean that "'guarantees the individual right to possess and carry weapons in case of confrontation' that does not depend on service in the militia."   *Bruen*, 2022 WL 2251305, at 9 (quoting *Heller*, 554 U.S. at 592).   Because section 922(g)(3) restricts the "possess[ion]" of "any firearm or ammunition," the Court concludes that section 922(g)(3) regulates conduct which is facially covered by the plain text of the Second Amendment.   *See* 18 U.S.C. § 922(g)(3).

The Court notes for the purpose of comprehensiveness that *Bruen* describes "ordinary, law-abiding, adult citizens" as indisputably "part of 'the people' whom the Second Amendment protects."   *Id.* at 14; *see also id.* at 12 ("The Second Amendment   .  .  .   'surely elevates above all other interests the right of law-abiding, responsible citizens to use arms' for self-defense.") (quoting *Heller*, 554 U.S. at 635).   In fact, the Court specifically limited its decision to "may-issue" licensing regimes; it did not "suggest the unconstitutionality" of the "shall-issue" licensing regimes in use by 43 states,

which "are designed to ensure only that those bearing arms in the jurisdiction are, in fact 'law-abiding, responsible citizens.'" *Bruen*, 2022 WL 2251305, at 18 n.9. Because it is concerned with "unlawful" drug users and addicts, there is some doubt that section 922(g)(3) is textually covered by the Second Amendment, insofar as it has been interpreted to guarantee the right to keep and bear arms to ordinary, law-abiding, responsible citizens concerned with self-defense. *See Roberge v. United States*, No. 1:04CR70, 1:10CV273, 2013 WL 4052926, at *17 (E.D. Tenn. Aug. 12, 2013) ("Persons like Roberge, who unlawfully use controlled substances, are not law abiding, responsible citizens. Roberge can be lawfully prohibited from possessing firearms while he is engaging in criminal conduct by using methamphetamine."); *see also United States v. Campbell*, No. 4:18CR23, 2020 WL 699821, at *4 (E.D. Tenn. Feb. 11, 2020).

## 2. Historical Analysis

To be certain, the Court will review historical research into statutes in the American legal tradition which are analogous to § 922(g)(3). *Heller* explicitly cautioned readers not to "doubt . . . longstanding prohibitions on the possession of firearms by felons and the mentally ill." *Heller*, 554 U.S. at 626. Such regulatory measures are "presumptively lawful." *See id.* at 627 n. 26. The Supreme Court echoed this in *McDonald v. Chicago*, 561 U.S. 742, 786 (2010) ("We repeat those assurances here," namely, "that our holding did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons and the mentally ill.'") (quoting *Heller*, 554 U.S. at 626). "In addition, *Heller* demonstrates that a regulation can be deemed 'longstanding' even if it cannot

56a

boast a precise founding-era analogue." *Nat'l Rifle Ass'n of Am. v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 700 F.3d 185, 196 (5th Cir. 2012) (citing *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010)).

In a pre-*Heller* case, the Fifth Circuit characterized § 922(g)(3) as a "'limited, narrowly tailored specific exception'" to the Second Amendment right which is "not inconsistent with the right of Americans generally to individually keep and bear their private arms as historically understood in this country." *United States v. Patterson*, 431 F.3d 832, 835-36 (5th Cir. 2005) (quoting *United States v. Emerson*, 270 F.3d 203, 261 (5th Cir. 2001)).[2]   The Fifth Circuit tethered its holding to the high-risk nature of drug abusers—"Congress may prohibit those who pose a risk to society, like felons, from exercising the right to bear arms," and "unlawful users of controlled substances pose a risk to society if permitted to bear arms." *Patterson*, 431 F.3d at 835-836.   In an earlier decision, the Fifth Circuit had drawn upon numerous law review articles and other secondary sources to establish that § 922(g)'s restriction on possession of firearms by felons—another high-risk class—has a long and established history in English and American common law. *Emerson*, 270 F.3d at 226 n.21.[3]   The Fifth Circuit reaffirmed this holding in a post-*Heller* decision in 2013. *See United States v. May*, 538 F. App'x 465,

---

[2] *See also United States v. Roach*, 201 F. App'x 969, 974 (5th Cir. 2006) (repeating this holding).

[3] *See also Nat'l Rifle Ass'n*, 700 F.3d at 200-04 (discussing the historical foundations of modern firearm restrictions and noting "revolutionary and founding-era gun regulations . . . that targeted particular groups for public safety reasons").

57a

466 (5th Cir. 2013) (citing *Patterson*, 431 F.3d at 836); *see also United States v. Moreno*, 811 F. App'x 219, 223 (5th Cir. 2020) (upholding Sentencing Guideline § 2D1.1(b)(1), which "increases a base offense level by two levels 'if a dangerous weapon (including a firearm) was *possessed*' in the course of an offense involving drugs," because "drug traffickers pose a risk to society that is enhanced by their possession firearms" and the enhancement "harmonizes with historical traditions regarding the Second Amendment") (emphasis in original). District courts in the Fifth Circuit have also upheld the constitutionality of § 922(g)(3) since *Heller*.[4]

Other circuit courts have likewise upheld the constitutionality of § 922(g)(3) under *Heller*'s standards of history and tradition. For instance, the Eighth Circuit collected various cases which found that § 922(g)(3) fell within *Heller*'s presumptively lawful category of historically attested firearm restrictions. *See United States v. Seay*, 620 F.3d 919, 924-25 (8th Cir. 2010) (holding that "§ 922(g)(3) has the same historical pedigree as other portions of § 922(g) which are repeatedly upheld by numerous courts since *Heller*"); *see also United States v. Dugan*, 657 F.3d 998, 999 (9th Cir. 2011) (adopting the reasoning of *Seay* and *Yancey*, discussed *infra*, that § 922(g)(3) "embodies a long-standing prohibition of conduct similar to the examples listed in *Heller*"); *United States v. Richard*, 350 F. App'x 252, 260 (10th Cir. 2009) (upholding § 922(g)(3) as one of the "'presumptively lawful regulatory measures'" mentioned in *Heller*).

---

[4] *See, e.g., Piscitello v. Bragg*, No. EP-08-CA-266-KC, 2009 WL 536898, at *3 (W.D. Tex. Feb. 18, 2009).

58a

Perhaps the most robust discussion of the historicity of § 922(g)(3) is contained in *United States v. Yancey*, 621 F.3d 681 (7th Cir. 2010). In that case, the Seventh Circuit began by noting that "[i]t was not until 1968 that Congress barred the mentally ill from possessing guns, and it was in that same legislation that habitual drug users were prohibited from having guns." *Id.* at 683 (citing Gun Control Act of 1968, Pub. L. 90-618, § 102, 82 Stat. 1213, 1220). However, Congress's disarmament of drug abusers did not occur in a vacuum; rather, "many states" had theretofore "restricted the right of habitual drug abusers or alcoholics to possess or carry firearms." *Yancey*, 621 F.3d at 684. "These statutes demonstrate that Congress was not alone in concluding that habitual drug abusers are unfit to possess firearms." *Id.* And these prohibitions "are merely the latest incarnation of the states' unbroken history of regulating the possession and use of firearms dating back to the time of the amendment's ratification." *Id.*

The Seventh Circuit analogized disarmament of drug abusers to disarmament of felons, though it noted a debate in legal scholarship as to the extent to which felons were disarmed in American legal tradition. *Id.* at 684. The Court cited cases from the nineteenth century upholding statutes which disarmed "tramps," *see State v. Hogan*, 58 N.E. 572 (Ohio 1900), and "intoxicated persons," *see State v. Shelby*, 2 S.W. 468 (Mo. 1886). The Seventh Circuit ultimately concluded: "Whatever the pedigree of the rule against even nonviolent felons possessing weapons . . . most scholars of the Second Amendment agree that the right to bear arms was tied to the concept of a virtuous citizenry and that, accordingly, the government could disarm 'unvirtuous citizens.'" *Id.* at 684-85 (citing *United States v. Vongxay*,

59a

594 F.3d 1111, 1118 (9th Cir. 2010)).[5]   With the histori-
cal conclusion that dangerous or unvirtuous citizens
could be disarmed, the Seventh Circuit produced sources
corroborating Congress's finding that drug abusers are
more likely to engage in gun violence and more likely to
exhibit a dangerous lack of self-control.   *Id.,* the Court
found § 922(g)(3) constitutional.

## CONCLUSION

The Court finds that the analysis in *Yancey* demon-
strates the historical attestation demanded by the
*Bruen* framework.   The appellate courts observe that
"Congress enacted the exclusions in § 922(g) to keep
guns out of the hands of presumptively risky people,"
*Yancey,* 621 F.3d at 683, and enumerated unlawful drug
users and addicts amongst other similar classes.   The
Court need not repeat the Seventh Circuit's historical
analysis in *Yancey*; it suffices to show that analogous
statutes which purport to disarm persons considered a

---

[5]   *See also Nat'l Rifle Ass'n*, 700 F.3d at 201, where, while sum-
marizing the historical evidence relating to disarmament of dan-
gerous persons, the Fifth Circuit said:   "[t]hese categorical re-
strictions may have been animated by a classical republican notion
that only those with adequate civic 'virtue' could claim the right to
arms."   *Id.*   "Scholars have proposed that at the time of the found-
ing, 'the right to arms was inextricably and multifariously linked to
that of civic virtu[e] (i.e., the virtuous citizenry),' and that 'one im-
plication of this emphasis on the virtuous citizen is that the right to
arms does not preclude laws disarming the unvirtuous citizens (i.e.,
criminals) or those who, like children or the mentally imbalanced,
are deemed incapable of virtue."   *Id.* (citing Don B. Kates & Clay-
ton E. Cramer, *Second Amendment Limitations and Criminolog-
ical Considerations*, 60 HASTINGS L. J. 1339, 1359 (2009)).   This
observation comports with the Supreme Court's statements that
the Second Amendment, as a threshold matter, covers only ordi-
nary and responsible law-abiding citizens.

60a

risk to society—whether felons or alcoholics—were known to the American legal tradition. *See, e.g., United States v. Carter*, 669 F.3d 411, 415 (4th Cir. 2012) ("Placed in the wrong hands, firearms present a grave threat to public safety, and for this reason, the Anglo-American right to bear arms has always recognized and accommodated limitations for persons perceived to be dangerous."). The Court therefore finds that 18 U.S.C. § 922(g)(3) passes constitutional muster under the legal framework articulated in *Heller* and *Bruen*.

**IT IS THEREFORE ORDERED AND ADJUDGED** that the [24] Motion to Dismiss filed by Defendant, Patrick Darnell Daniels, Jr. is **DENIED**.

**SO ORDERED AND ADJUDGED** this the 8th day of July, 2022.

/s/   LOUIS GUIROLA, JR.
   Louis Guirola, Jr.
   United States District Judge

61a

**APPENDIX C**

1.   U.S. Const. Amend. II provides:

A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.

2.   18 U.S.C. 922(g)(3) provides:

**Unlawful Acts**

(g)   It shall be unlawful for any person—

(3)   who is an unlawful user of or addicted to any controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802));   *  *  *

to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

3.   21 U.S.C. 802(6) provides:

**Definitions**

As used in this subchapter:

(6)   The term "controlled substance" means a drug or other substance, or immediate precursor, included in schedule I, II, III, IV, or V of part B of this subchapter. The term does not include distilled spirits, wine, malt beverages, or tobacco, as those terms are defined or used in subtitle E of the Internal Revenue Code of 1986.

4.   21 U.S.C. 812(c), Schedule I(c)(10) provides:

**Schedules of controlled substances**

**(c)   Initial schedules of controlled substances**

Schedules I, II, III, IV, and V shall, unless and until amended pursuant to  section 811 of this title, consist of the following drugs or other substances,[1] by whatever official name, common or usual name, chemical name, or brand name designated:

SCHEDULE I

(c)   Unless specifically excepted or unless listed in another schedule, any material, compound, mixture, or preparation, which contains any quantity of the following hallucinogenic substances, or which contains any of their salts, isomers, and salts of isomers whenever the existence of such salts, isomers, and salts of isomers is possible within the specific chemical designation:

(10)  Marihuana.

---

[1]  See Amendment of Schedules of Controlled Substances note below.