No. 23-50312

# In the United States Court of Appeals for the Fifth Circuit

UNITED STATES OF AMERICA,
Plaintiff–Appellant,

v.

PAOLA CONNELLY,
Defendant–Appellee.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS

**OPENING BRIEF FOR THE UNITED STATES**

JAIME ESPARZA
United States Attorney
Western District of Texas

ZACHARY RICHTER
Deputy Appellate Chief
Western District of Texas

NICOLE M. ARGENTIERI
Acting Assistant Attorney General

LISA H. MILLER
Deputy Assistant Attorney General

MAHOGANE D. REED
Attorney, Appellate Section
Criminal Division
U.S. Department of Justice
950 Pennsylvania Ave., N.W.
Washington, DC 20530
(202) 615-1170
mahogane.reed@usdoj.gov

## STATEMENT REGARDING ORAL ARGUMENT[1]

The United States requests oral argument. This is a government appeal from a district court order holding two federal firearms statutes—18 U.S.C. § 922(g)(3) and (d)(3)—unconstitutional under the Second Amendment. Resolution of this appeal, which raises issues that overlap with this Court's recent decision in *United States v. Daniels*, 77 F.4th 337 (5th Cir. 2023), *petition for cert. filed*, No. 23-376 (Oct. 5, 2023), requires an accurate understanding of the facts giving rise to the underlying charges, a nuanced discussion of the governing case law, and a proper application of the relevant historical analysis. For these reasons, the government believes oral argument will assist the Court in resolving the questions presented.

---

[1] The government is aware of at least one additional pending appeal raising similar issues as this case. *United States v. Gil*, No. 23-50525 (government-appellee's brief due October 31, 2023).

# TABLE OF CONTENTS

STATEMENT REGARDING ORAL ARGUMENT ....................................i

TABLE OF AUTHORITIES ......................................................iv

INTRODUCTION ..................................................................1

JURISDICTIONAL STATEMENT ............................................2

STATEMENT OF THE ISSUES .................................................2

STATEMENT OF THE CASE ....................................................2

    I.    Alleged Offense Conduct .........................................3

    II.   Procedural History..................................................5

SUMMARY OF ARGUMENT ..................................................10

ARGUMENT ........................................................................12

    I.    The District Court Erred by Holding That Section 922(g)(3) is Unconstitutional on its Face and As Applied to Connelly.......12

        A.    Standard of Review..........................................13

        B.    Background: *Heller*, *Bruen*, and *Daniels* .............13

        C.    Contrary to *Daniels*'s Conclusion, Section 922(g)(3) is Constitutional in All its Applications. ..............16

        D.    Even Under *Daniels*, Section 922(g)(3) is Constitutional Both Facially and As Applied to Connelly. ......................17

            1.    Section 922(g)(3) is constitutional on its face because, at a minimum, it can be constitutionally applied to those presently under the influence, those continually impaired, and violent drug users. ..................17

2.  The district court erred by concluding that Section 922(g)(3) is unconstitutional on its face. ...... 26

3.  The alleged facts demonstrate that Section 922(g)(3) is constitutional as applied to Connelly because she continuously possessed firearms while she was actively intoxicated. ......................... 30

4.  If this Court disagrees, it should remand for further consideration of Connelly's as-applied challenge under *Daniels*. ........................................ 31

II. The District Court Erred by Holding That Section 922(d)(3) is Unconstitutional on its Face. ................................. 34

A.  The District Court Erred by Sustaining Connelly's Facial Challenge Before Deciding Her As-Applied Challenge. .................................................................... 35

B.  The Same Historical Tradition That Supports Section 922(g)(3)'s Facial Constitutionality Supports Section 922(d)(3)'s. .................................................................. 37

C.  Section 922(d)(3) is Constitutional As Applied in This Case. ........................................................................... 38

CONCLUSION ........................................................................ 40

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

## Cases

*Barrett v. United States,*
  423 U.S. 212 (1976) .................................................................. 12

*Buchanan v. Alexander,*
  919 F.3d 847 (5th Cir. 2019) ............................................35, 36

*Dickerson v. New Banner Institute, Inc.,*
  460 U.S. 103 (1983) .................................................................. 28

*District of Columbia v. Heller,*
  554 U.S. 570 (2008) ................................................. 8, 10, 13, 19

*Florence v. Board of Chosen Freeholders,*
  566 U.S. 318 (2012) .................................................................. 24

*Folajtar v. Attorney General,*
  980 F.3d 897 (3d Cir. 2020)...................................................... 24

*Fried v. Garland,*
  640 F. Supp. 3d 1252 (N.D. Fla. 2022) .................................... 37

*Harmelin v. Michigan,*
  501 U.S. 957 (1991) .................................................................. 24

*Kanter v. Barr,*
  919 F.3d 437 (7th Cir. 2019) ................................................... 23

*New York State Rifle & Pistol Association, Inc. v. Bruen,*
  142 S. Ct. 2111 (2022)..................................................... passim

*Range v. Attorney General,*
  69 F.4th 96 (3d Cir. 2023) (en banc) ....................................... 37

*Smith v. United States,*
  508 U.S. 223 (1993) .................................................................. 12

*State v. Shelby*,
   2 S.W. 468 (Mo. 1886) ................................................................ 21

*Teixeira v. Cnty. of Alameda*,
   873 F.3d 670 (9th Cir. 2017) (en banc) .................................... 38

*United States v. Carter*,
   750 F.3d 462 (4th Cir. 2014) .................................................... 24

*United States v. Daniels*,
   77 F.4th 337 (5th Cir. 2023) .......................................... passim

*United States v. May*,
   538 F. App'x 465 (5th Cir. 2013) .......................................... 3, 6

*United States v. McCowan*,
   469 F.3d 386 (5th Cir. 2006) .................................................... 28

*United States v. McGinnis*,
   956 F.3d 747 (5th Cir. 2020) ................................................35, 36

*United States v. Patterson*,
   431 F.3d 832 (5th Cir. 2005) .................................................. 3, 6

*United States v. Perez-Macias*,
   335 F.3d 421 (5th Cir. 2003) .................................................... 13

*United States v. Pope*,
   613 F.3d 1255 (10th Cir. 2010) ................................................ 32

*United States v. Rahimi*,
   61 F.4th 443 (5th Cir.) .................................................... passim

*United States v. Rodríguez-Rivera*,
   918 F.3d 32 (1st Cir. 2019) ...................................................... 32

*United States v. Salerno*,
   481 U.S. 739 (1987) .........................................................17, 36

*United States v. Yancey*,
   621 F.3d 681 (7th Cir. 2010) ................................................25, 28

*Washington State Grange v. Washington State Republican Party*,
  552 U.S. 442 (2008) ...............................................17, 18, 27, 28

*Wilson v. Lynch*,
  835 F.3d 1083 (9th Cir. 2016)................................................. 26

**Constitutional Provisions, Federal Statutes, and Rules**

U.S. Const. amend. II ...................................................... 10, 12, 13

18 U.S.C. § 922......................................................... passim

18 U.S.C. § 3231 ................................................................2

18 U.S.C. § 3731 ................................................................2

27 C.F.R. § 478.11 ........................................................27, 28

Fed. R. Crim. P. 12 ...........................................................32

Gun Control Act of 1968, Pub. L. No. 90-618, 82 Stat. 1213
  (codified at 18 U.S.C. § 922(g)(3)) ........................................ 12

**Historical Statutes**

1 George I, c.54 (1715) ........................................................22

1 W. & M. c.15, §§ 3-4 (1688) .................................................22

1 William Waller Hening, *Statutes at Large; Being a Collection of All the Laws of Virginia* (1823).............................................. 19

11 George I, c.26 (1724) .......................................................22

1689 English Bill of Wrights, 1 W. & M. c.2, § 6 .........................22

1692-1694 Mass. Acts 11-12 ..................................................22

1696-1701 N.H. Laws 15........................................................22

1775-1776 Mass. Acts 479 ....................................................22

1776-1777 N.J. Laws 90 ................................................................... 22

1777 N.C. Sess. Laws 231 ............................................................... 22

1777 Pa. Laws 63 ............................................................................ 22

1837 Mass. Acts 273 ....................................................................... 20

1837 Me. Laws 424 ......................................................................... 20

1844 R.I. Pub. Laws 503 ................................................................. 20

1867 Kan. Sess. Laws 25 ................................................................. 20

1878 Miss. Laws 175-76 .................................................................. 20

1883 Wis. Sess. Laws 290 ............................................................... 20

19 George II, ch. 39 (1746) ............................................................. 22

1909 Idaho Sess. Laws 6 ................................................................. 20

3 Jac. I, c.5, §§ 16-18 (1605-06) ..................................................... 22

5 *Colonial Laws of New York* (1894) ............................................... 19

7 Will. III c.5 (1695) ........................................................................ 22

*Acts & Laws of the English Colony of Rhode-Island & Providence-Plantations*
    (Hall, 1767) ............................................................................... 19

Laws of Va., Feb., 1676–77, Va. Stat. at Large ............................. 38

Militia Act of 1662, 13 & 14 Car. 2, c.3, § 13 (1662) ..................... 22

Mo. Rev. Stat. § 1274 (1879) ........................................................ 20

Statute of Northampton, 2 Edw. 3, c.3 (1328) ............................... 21

*The Charters & General Laws of the Colony and Province of Massachusetts Bay*
    (1814) ....................................................................................... 18

## Other Authorities

1 *Records of Governor & Company of the Massachusetts Bay in New England* (Nathaniel B. Shurtleff ed., 1853) ........................................................... 22

1 Trumbull, Public Records of the Colony of Connecticut ............................ 38

15 *The Public Records of the Colony of Connecticut from May, 1775, to June, 1776, Inclusive* (Charles J. Hoadly ed., 1890) ........................................... 23

2 Arthur Vollmer, U.S. Selective Serv. Sys., *Military Obligation: The American Tradition* ..................................................................................... 19

2 Bernard Schwartz, *The Bill of Rights: A Documentary History* (1971) ............ 23

4 *Journals of the Continental Congress* (1906) .................................................... 22

6 Statutes at Large of Pennsylvania from 1682 to 1801 (1899) ...................... 38

9 William Waller Hening, *Statutes at Large; Being a Collection of All the Laws of Virginia* (1821) ................................................................................ 23

Albert Deutsch, *The Mentally Ill in America: A History of their Care and Treatment from Colonial Times* (1949) ......................................................... 25

Benjamin Rush, *An Inquiry into the Effects of Ardent Spirits Upon the Human Body and Mind* (1812) ............................................................................... 18

*Calendar of State Papers, Domestic: William III, 1700-1702* (Edward Bateson ed., 1937) ............................................................................................... 22

Carl Erik Fisher, *Urge: Our History of Addiction* (Penguin 2022) ...................... 26

Carlton F.W. Larson, *Four Exceptions in Search of a Theory: District of Columbia v. Heller and Judicial Ipse Dixit*, 60 Hastings L.J. 1371 (2009) ....... 25

Cong. Globe, 39th Cong., 1st Sess. 908-09 (1866) ....................................... 23

Henry Care, E*nglish Liberties, or the Free-Born Subject's Inheritance* (6th ed. 1774) .................................................................................................... 25

James Dunlop, *The General Laws of Pennsylvania* (2d ed. 1849) ...................... 19

Laws and Ordinances of New Netherland, 1638- 1674 (1868) ...................... 38

Mark Edward Lender & James Kirby Martin, *Drinking in America: A History* (1987) ......................... 20

Nat'l Archives, *Letter from Thomas Jefferson to Samuel Smith*, 3 May 1823 ....... 26

Randolph Roth, *"Why Guns Are and Are Not the Problem,"* in Jennifer Tucker, *et al.*, *A Right to Bear Arms?: The Contested Role of History in Contemporary Debates on the Second Amendment* (2019) ............................ 20

*Sir John Knight's Case*, 3 Mod. 117, 87 Eng. Rep. 75 (K.B. 1686) .................. 21

William Rawle, *A View of the Constitution of the United States of America* (2d ed. 1829) .............................................................................. 23

**INTRODUCTION**

Paola Connelly, a daily marijuana user who cultivated marijuana in a greenhouse inside her home and possessed other illegal drugs, owned nearly a dozen firearms, which were openly scattered throughout a house she shared with her husband. Hours after ingesting hallucinogenic mushrooms and using "crack cocaine," Connelly's husband threatened their neighbor with a machete and used Connelly's shotgun to shoot through their neighbor's front door. Connelly was charged under 18 U.S.C. § 922(g)(3) and (d)(3) for possessing firearms as, and providing firearms to, an illegal drug user. The district court found both statutes facially unconstitutional under *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), and found Section 922(g)(3) unconstitutional as applied to Connelly.

The district court erred. Sections 922(g)(3) and 922(d)(3) are constitutional in all their applications, and Congress may temporarily disarm unlawful users of illegal drugs during periods of active use. But even if not, Sections 922(g)(3) and 922(d)(3) are not unconstitutional in *all* their applications. This Nation's historical tradition of firearm regulation supports *some* limits on an intoxicated person's right to carry guns. The district court's contrary conclusion was wrong, as was its conclusion that Section 922(g)(3) was unconstitutional as applied to Connelly. This Court should reverse the district court's judgment.

## JURISDICTIONAL STATEMENT

The government appeals the district court's order dismissing all counts of the superseding indictment against defendant-appellee Paola Connelly. The district court had subject-matter jurisdiction under 18 U.S.C. § 3231. The court entered its order dismissing the indictment on April 6, 2023. ROA.215-246. The government filed a timely notice of appeal on April 14, 2023. ROA.247. This Court has jurisdiction under 18 U.S.C. § 3731. The Solicitor General has authorized this appeal.

## STATEMENT OF THE ISSUES

1.    Whether the district court erred by holding that 18 U.S.C. § 922(g)(3), which prohibits the possession of firearms by unlawful users of controlled substances, violates the Second Amendment on its face and as applied to Connelly.

2.    Whether the district court erred by holding that 18 U.S.C. § 922(d)(3), which prohibits providing firearms to any person who is an unlawful user of controlled substances, violates the Second Amendment on its face.

## STATEMENT OF THE CASE

In August 2022, a grand jury in the Western District of Texas returned a superseding indictment charging Connelly with (1) possessing firearms and ammunition as an unlawful user of controlled substances, in violation of 18

U.S.C. § 922(g)(3), and (2) providing firearms and ammunition to an unlawful user of controlled substances, in violation of 18 U.S.C. § 922(d)(3). ROA.79-82. Connelly moved to dismiss her indictment, arguing that both statutes violated the Second Amendment both facially and as applied to her. ROA.99-120. The district court initially denied Connelly's motion to dismiss her indictment, relying on this Courts prior decisions upholding Section 922(g)(3) under the Second Amendment in *United States v. May*, 538 F. App'x 465, 465-66 (5th Cir. 2013), and *United States v. Patterson*, 431 F.3d 832, 834-36 (5th Cir. 2005). ROA.181-189. After this Court decided *United States v. Rahimi*, 61 F.4th 443 (5th Cir.), *cert. granted*, 143 S. Ct. 2688 (2023), the district court granted Connelly's motion for reconsideration and dismissed both counts with prejudice. ROA.215-246.

## I.    Alleged Offense Conduct[2]

In late 2021, El Paso Police Department officers responded to an "emergency" report of "shots fired" at Connelly's home. ROA.15, 269. The emergency dispatcher told officers there was a conflict between Connelly's husband, John, and a neighbor. ROA.16, 256. The neighbor initially reported

---

[2] Because the district court dismissed the indictment before trial, the government recites the facts alleged in the affidavit supporting the criminal complaint, ROA.15-17, and testimony adduced at Connelly's pre-trial detention hearing, ROA.253-285.

that John was threatening him with a machete and "demanding" that he "apologize to" Connelly. ROA.16. Several minutes later, the neighbor called 9-1-1 again to report that John was at the neighbor's front door with a shotgun. ROA.66, 256.

When officers arrived, they heard several shots and saw John with a shotgun at his neighbor's front door. ROA.16. John was arrested, and during a pat-down search, officers found a second firearm in his waistband. ROA.16, 257, 267-268. The neighbor explained that John had ingested "mushrooms" the night before and had used cocaine three days prior. ROA.67.

Officers conducted a safety sweep of John's home, which he shared with Connelly. ROA.16. When they walked inside, officers smelled the strong odor of marijuana and saw what appeared to be a homemade marijuana greenhouse inside one of the rooms. ROA.16.

The house was "in disarray" with firearms, ammunition, and other weapons scattered throughout the bedroom, living room, and dining area. ROA.16, 260. Officers found "at least five firearms in the bedroom, one of which was a pistol that was between the bed and [Connelly's] nightstand." ROA.260. There were also drugs, including marijuana and "THC edibles," on the nightstand, and marijuana in a box underneath Connelly's side of the bed. ROA.260, 273. In all, officers found 1.2 grams of marijuana, 27.74 grams of

THC edibles, and 37.74 grams of psylocibin (hallucinogenic mushrooms). ROA.16-17. They also found drug paraphernalia, including rolling papers, "baggies," jars, vape pens, a glass pipe, water bongs, and a grinder, all with marijuana residue. ROA.16.

Officers spoke with Connelly outside her home. ROA.16. She said that John and their neighbor had been "smoking crack" together the night before and John had been using "'crack' recently." ROA.16. Connelly also later told investigators that she used marijuana on a "regular basis to sleep" and "to help her with anxiety." ROA.16, 216.

## II. Procedural History

A grand jury in the Western District of Texas returned a superseding indictment charging Connelly with (1) possessing firearms and ammunition as an unlawful user of a controlled substance, in violation of 18 U.S.C. § 922(g)(3), and (2) providing firearms and ammunition to an unlawful user of a controlled substance, in violation of 18 U.S.C. § 922(d)(3). ROA.79-82.[3] The indictment contained forfeiture allegations, which listed a total of nine guns plus ammunition as involved in Connelly's offense. ROA.81-82.

---

[3] The original indictment charged both Connelly and John with violations of 18 U.S.C. § 922(g)(3), ROA.36-39, but after the district court granted Connelly's motion to sever, *see* ROA.6, the government superseded the original indictment, ROA.79-82.

After the Supreme Court's decision in *Bruen*, Connelly moved to dismiss the indictment, arguing that Sections 922(g)(3) and 922(d)(3) violated the Second Amendment both facially and as applied to her. ROA.122-143.[4] The district court denied Connelly's motion based on pre-*Bruen* Fifth Circuit precedent holding that Section 922(g)(3) was constitutional under "the historical analysis that *Bruen* requires." ROA.181-189; *see also* ROA.186 (citing *May*, 538 F. App'x at 465-66, and *Patterson*, 431 F.3d at 834-36). And the court explained that, although these precedents only interpreted the constitutionality of Section 922(g)(3), their reasoning applied "with even more force to § 922(d)(3) because [that provision] implicates the ability to furnish arms to others," conduct that the court characterized as "further from the core of the Second Amendment right." ROA.186 n.7.

After the court denied Connelly's motion to dismiss, this Court held that 18 U.S.C. § 922(g)(8), which prohibits individuals subject to domestic-violence protective orders from possessing firearms, violates the Second Amendment on its face. *Rahimi*, 61 F.4th 443. In reaching this conclusion, this Court explained that, in its view, "*Bruen* clearly 'fundamentally change[d]'" this Court's analysis

---

[4] Connelly also argued that Sections 922(g)(3) and 922(d)(3) were unconstitutionally vague under the Fifth Amendment's Due Process Clause. ROA.122-143. The district court concluded that Connelly's argument was foreclosed by binding precedent and rejected her argument. ROA.187-189.

of laws under the Second Amendment, rendering certain prior precedent "obsolete." *Id.* at 450-51.

Based on *Rahimi*, Connelly asked the district court to reconsider its order denying her motion to dismiss. ROA.195-196. She argued that, under *Rahimi*, the district court was "no longer bound by the pre-*Bruen* precedent upon which it relied" to reject Connelly's Second Amendment challenge to Sections 922(g)(3) and 922(d)(3), and she re-urged the arguments she made in her original motion to dismiss. ROA.196.

The district court granted Connelly's motion and held that Sections 922(g)(3) and 922(d)(3) violated the Second Amendment on their face, and that Section 922(g)(3) violated the Second Amendment as applied to Connelly. ROA.215-246.

The district court first concluded that Connelly's reconsideration motion was appropriate for pretrial resolution. ROA.218-219. The court acknowledged that "[n]either party ha[d] conceded the extent to which Connelly or her husband used various controlled substances," and the court "decline[d] to make a factual finding on the extent of Connelly's drug use." ROA.218. But the court concluded that "even if Connelly and her husband used controlled substances to the extent alleged by the Government," the court would find Sections 922(g)(3) and 922(d)(3) unconstitutional. ROA.219. The court thus "assume[d] without

deciding" that the government's drug-use allegations were true and resolved the "factual dispute[]" about Connelly's drug use in the government's favor to consider the motion. ROA.219.

Turning to the merits of Connelly's motion, the district court rejected the government's argument that the Second Amendment extends only to "law-abiding, responsible citizens." ROA.221; *see District of Columbia v. Heller*, 554 U.S. 570, 580 (2008). The court concluded that, notwithstanding her unlawful drug use, Connelly was entitled to the Second Amendment's protections. ROA.221-223; *see also* ROA.223 (observing that "if Rahimi can claim the Second Amendment's protection, then Connelly can as well").

The district court next concluded that the government had not met its burden of establishing that Section 922(g)(3) is consistent with America's historical tradition of firearm regulation. ROA.224-239. The court rejected the government's analogy to historical laws prohibiting firearm possession or carry by intoxicated individuals, explaining its view that Section 922(g)(3) "breaks with" those laws "by prohibiting not just firearm use by those who are actively intoxicated but also firearm possession by those who use controlled substances, even somewhat irregularly." ROA.239; *see also* ROA.226-232. The district court also rejected the government's analogy to laws disarming those deemed dangerous, explaining that those laws "differed slightly in their justifications

from § 922(g)(3)" and "differed from § 922(g)(3) in how they disarmed individuals." ROA.237. And even assuming history broadly supports disarming dangerous people, the court concluded that "there is little evidence that Connelly herself is dangerous." ROA.238.

Finally, the district court held that Section 922(d)(3) did not withstand Second Amendment scrutiny "for much the same reasons that § 922(g)(3) does not." ROA.245. The court explained that Connelly had standing to challenge Section 922(d)(3) even though the statute did not directly burden her individual Second Amendment right to possess firearms. ROA.243-244. The court acknowledged that, based on John's alleged conduct, he "appear[ed] to be the type of dangerous individual that historical authorities may have disarmed, weakening Connelly's as-applied challenge to § 922(d)(3)." ROA.244. Even so, the court concluded that, because Section 922(d)(3) "also effectively disarms individuals who do not pose the same kind of threat" and "does not tie its restrictions on gun use to intoxication or public safety in the way that historical gun regulations did," that provision was unconstitutional on its face. ROA.244-245. The district court observed that "'if a statute is inconsistent with the Second Amendment's text and historical understanding, then it falls under any circumstances,' and a court must sustain a facial challenge to the law." ROA.244 (quoting *Rahimi*, 61 F.4th at 453).

## SUMMARY OF ARGUMENT

I.    The district court erred by holding that Section 922(g)(3) is unconstitutional on its face and as applied to Connelly. The Second Amendment protects "the right of the people to keep and bear Arms," U.S. Const. amend. II, but that right "is not unlimited," *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008). And the Amendment's text and history establish that it does not protect the right of unlawful users of illegal drugs to possess firearms during periods of active, ongoing use.

This Court recently held in *United States v. Daniels*, 77 F.4th 337, 340 (5th Cir. 2023), *petition for cert. filed*, No. 23-376 (Oct. 5, 2023), that Section 922(g)(3) was unconstitutional as applied to a defendant who admitted to using marijuana "approximately fourteen days out of a month." The government maintains that *Daniels* was wrongly decided and that Section 922(g)(3) is constitutional in all its applications, as explained in its recently filed petition for a writ of certiorari.

But even under *Daniels*, Section 922(g)(3) is constitutional in many of its applications. This Court characterized its decision in *Daniels* as "narrow[]," limited to evidence of Daniels's marijuana use. *Daniels*, 77 F.4th at 355. And it declined to "invalidate the statute in all its applications." *Id. Daniels* instead confirmed that, at a minimum, this Nation's historical tradition of firearm regulation supports some limits on an intoxicated person's right to carry a

firearm, including where someone possesses firearms while "*presently* under the influence" of illegal drugs, *id*. at 348, while otherwise impaired because of "regular" and "heavy" drug use, *id*. at 350, or has a history of violent behavior, *id*. at 354. That tradition was enough to sustain Section 922(g)(3) against Connelly's facial challenge.

Section 922(g)(3) is also constitutional as applied to Connelly, whose admitted "regular" marijuana use supports the common-sense inference that she possessed firearms when she was "presently" intoxicated. *Daniels*, 77 F.4th at 348 (emphasis omitted). To the extent this Court disagrees, the Court should remand this case for further factual development of the nature and extent of Connelly's drug use, and to allow the district court to apply *Daniels* in the first instance.

II.    The district court likewise erred by holding that Section 922(d)(3) violates the Second Amendment on its face. The court's threshold error was reaching the merits of Connelly's facial challenge at all, where it could have (and should have) addressed and rejected her as-applied challenge first. In any event, Section 922(d)(3) comports with the Second Amendment. The same historical tradition that supports disarming, at a minimum, some unlawful users of controlled substances, supports disarming the transfer of firearms to those same people. And, as the district court acknowledged, that historical tradition

certainly justifies prohibiting the transfer of firearms here, where John, a regular user of crack cocaine and marijuana, had recently ingested cocaine and hallucinogenic mushrooms when he threatened his neighbor with a machete and a shotgun. This court should vacate the district court's judgment.

## ARGUMENT

### I. The District Court Erred by Holding That Section 922(g)(3) is Unconstitutional on its Face and As Applied to Connelly.

"[D]rugs and guns are a dangerous combination." *Smith v. United States*, 508 U.S. 223, 240 (1993). That is why for more than fifty years, Congress has restricted the possession or transportation of firearms by unlawful users of controlled substances. 18 U.S.C. § 922(g)(3), (d)(3); *see* Gun Control Act of 1968, Pub. L. No. 90-618, 82 Stat. 1213, 1220-21. Congress adopted these disqualifications to "keep firearms away from the persons [it] classified as potentially irresponsible and dangerous." *Barrett v. United States*, 423 U.S. 212, 218 (1976). Sections 922(g)(3)'s and 922(d)(3)'s temporary restriction on the possession of firearms by, and transfer of firearms to, people who are actively engaged in unlawful drug use is consistent with "the right of the people to keep and bear Arms." U.S. Const. amend. II. The district court erred by concluding otherwise.

A.    Standard of Review

This Court reviews constitutional questions de novo. *United States v. Perez-Macias*, 335 F.3d 421, 425 (5th Cir. 2003).

B.    Background: *Heller, Bruen*, and *Daniels*

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *District of Columbia v. Heller*, the Supreme Court held that the Second Amendment protects the right of "law-abiding, responsible citizens" to keep firearms in their homes for self-defense. 554 U.S. 570, 635 (2008). *Heller* clarified that, "[l]ike most rights, the right secured by the Second Amendment is not unlimited." *Id.* at 626. And it said that "nothing in [its] opinion should be taken to cast doubt" on certain "presumptively lawful regulatory measures," such as "longstanding prohibitions on the possession of firearms by felons and the mentally ill." *Id.* at 626-27 & n.26.

In *Bruen*, the Supreme Court held that the Second Amendment protects the right of "ordinary, law-abiding citizens" to "carry a handgun for self-defense outside the home." 142 S. Ct. at 2122. *Bruen* struck down a New York law that required residents to demonstrate "proper cause" to obtain a license to carry a handgun outside the home because that law "prevent[ed] law-abiding citizens

with ordinary self-defense needs from exercising their right to keep and bear arms." *Id.* at 2122, 2156.

*Bruen* explained that judicial review of gun laws should focus on the Second Amendment's text and historical tradition. A law complies with the Second Amendment if it regulates conduct that falls outside the Amendment's "plain text" or comports with "this Nation's historical tradition of firearm regulation." 142 S. Ct. at 2126. "[C]ases implicating unprecedented societal concerns or dramatic technological changes" require an especially "nuanced approach," and the government need only "identify a well-established and representative historical *analogue*, not a historical *twin*." *Id.* at 2132-33 (emphasis in original). Analogical reasoning under the Second Amendment thus is not "a regulatory straitjacket," and a modern law can satisfy *Bruen*'s historical standard even if it is not "a dead ringer for historical precursors." *Id.* at 2133.

In *United States v. Daniels*, a panel of this Court applied *Bruen*'s framework to hold that Section 922(g)(3) was unconstitutional as applied to a defendant who admitted to using marijuana "approximately fourteen days out of a month." 77 F.4th 337, 340 (5th Cir. 2023), *petition for cert. filed*, No. 23-376 (Oct. 5, 2023). The Court held that Daniels was one of "the people" under the Second Amendment, "[e]ven as a marihuana user." *Id.* at 342. The Court acknowledged *Heller*'s description of the Second Amendment as applying to "'law-abiding,

responsible citizens,'" and *Bruen*'s use of the phrase "'law-abiding' fourteen times," but opined that adhering to the Court's characterizations of its prior holdings would be "read[ing] too much into the Supreme Court's chosen epithet." *Id*. at 342-43.

The Court also held that "Daniels's § 922(g)(3) conviction is inconsistent with our 'history and tradition' of gun regulation." 77 F.4th at 355. The Court first discounted the government's reliance on Founding-era and Reconstruction laws limiting gun possession by intoxicated individuals. *Id*. at 344-48. The Court acknowledged that "there was little regulation of drugs (related to guns or otherwise) until the late-19th century." *Id*. at 344-45. But it nevertheless concluded that the government's historical support did not sufficiently "approximate § 922(g)(3)," *id*. at 345, and that "[a]s applied to Daniels, § 922(g)(3) is a significantly greater restriction" than historical intoxication laws, *id*. at 347, though those laws support "a ban on gun possession while an individual is *presently* under the influence," *id*. at 348 (emphasis in original). *Daniels* next gave little credence to the government's reliance on historical laws disarming the mentally ill, concluding that, although those laws "could justify disarming a citizen . . . while he is in a state comparable to lunacy," they did not support "disarming a sober citizen who is not currently under an impairing influence." *Id*. at 349. Finally, the Court rejected the government's reliance on

15

Founding-era laws disarming those deemed dangerous to the public. *Id*. at 350-55. The Court agreed that "some historical evidence" supports disarming individuals the government deems dangerous. *Id*. at 350. But the Court nevertheless concluded that "the historical examples of danger-based disarmament to not justify § 922(g)(3)'s application here." *Id*. at 350.

Because "the government presented no evidence that [Daniels] was intoxicated at the time of arrest," failed to "identify when he last had used marihuana," and failed to establish that he had a drug-related violent history, the Court concluded that Section 922(g)(3) was unconstitutional as applied to him. 77 F.4th at 339, 355. But the court "emphasiz[ed] the narrowness of [its] holding": the Court did not "invalidate the statute in all its applications, but, importantly, only as applied to Daniels." *Id*. at 355.

C.  Contrary to *Daniels*'s Conclusion, Section 922(g)(3) is Constitutional in All its Applications.

Although *Daniels* is binding on a panel of this Court, the government preserves for further review the argument that *Daniels* was wrongly decided and that Section 922(g)(3)'s categorical prohibition on the possession of firearms by unlawful users of illegal controlled substances is constitutional in all its applications. As explained more fully in the United States's petition for a writ of certiorari in *United States v. Daniels*, No. 23-376 (Oct. 5, 2023), *Daniels* is inconsistent with the Second Amendment's text and history, and its conclusion

that Section 922(g)(3) is unconstitutional as applied to Daniels has significant and dangerous practical consequences beyond that case.

D.    Even Under *Daniels*, Section 922(g)(3) is Constitutional Both Facially and As Applied to Connelly.

Even applying *Daniels*, the district court erred by holding that Section 922(g)(3) is unconstitutional on its face and as applied to Connelly. *Daniels* emphasized that it was not "invalidat[ing] the statute in all its applications, but, importantly, only as applied to Daniels." 77 F.4th at 355. And *Daniels* recognized that, notwithstanding its conclusion that the government failed to establish that Section 922(g)(3) was constitutional as applied to Daniels, history and tradition support *some* applications of Section 922(g)(3) to unlawful drug users. The district court erred in concluding otherwise.

1.    Section 922(g)(3) is constitutional on its face because, at a minimum, it can be constitutionally applied to those presently under the influence, those continually impaired, and violent drug users.

As the Supreme Court has explained, a law is not facially unconstitutional unless "'no set of circumstances exists under which the Act would be valid,' *i.e.,* . . . the law is unconstitutional in *all of its applications.*" *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008) (emphasis added) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). As explained in *Daniels*, our Nation's historical tradition establishes that Section 922(g)(3) may be

constitutional as applied to those who are "*presently* under the influence," 77 F.4th at 348, those whose drug use is "so regular and so heavy" that they are "continually impaired," *id*. at 350, and those whose drug use "predisposes [them] to armed conflict" or who have "a history of drug-related violence," *id*. at 354. Because this historical tradition supports Section 922(g)(3)'s application in some circumstances, the district court erred by holding that Section 922(g)(3) is unconstitutional on its face. *Wash. State Grange*, 552 U.S. at 449.

*Intoxication Laws.* Historical laws regulating firearm possession and use by those under the influence of alcohol support Congress's authority, at a minimum, to disarm those presently under the influence of controlled substances. *Daniels*, 77 F.4th at 348.

The Founding generation recognized that those who regularly became intoxicated threatened the social and political order. *See, e.g.*, Benjamin Rush, *An Inquiry into the Effects of Ardent Spirits Upon the Human Body and Mind* 6 (1812) (describing drunkenness as a "temporary fit of madness"). A 1658 Massachusetts law, for example, allowed constables to apprehend those "overtaken with drink" and keep them "in close custody" until brought before a magistrate. *The Charters & General Laws of the Colony and Province of Massachusetts Bay* 82 (1814). Founding-era legislatures also adopted specific measures to separate firearms and alcohol, including regulating firearm use by individuals

deemed likely to become intoxicated. A 1655 Virginia law prohibited "shoot[ing] any gunns at drinkeing [events]," regardless of whether attendees became intoxicated. 1 William Waller Hening, *Statutes at Large; Being a Collection of All the Laws of Virginia* 401-02 (1823). A 1771 New York law similarly barred firing guns during the New Year's holiday, a restriction that "was aimed at preventing the 'great Damages . . . frequently done on [those days] by persons . . . being often intoxicated with Liquor." *Heller*, 554 U.S. at 632 (quoting 5 *Colonial Laws of New York* 244-46 (1894)). And a 1731 Rhode Island law forbade firing guns or pistols in any tavern at night. *See Acts & Laws of the English Colony of Rhode-Island & Providence-Plantations* 120 (Hall, 1767).

Militia laws from the 1700s likewise reflect early legislatures' judgments about the dangers of allowing intoxicated individuals to carry firearms. New Jersey, Pennsylvania, and South Carolina disarmed or authorized the confinement of intoxicated militia members. *See* 2 Arthur Vollmer, U.S. Selective Serv. Sys., *Military Obligation: The American Tradition*, pt. 8, New Jersey, at 25-26 (1947) (1746 law disarming those who appeared "in [a]rms disguised in [l]iquor"); *id.* pt. 11, Pennsylvania, at 97 (1780 law disarming those "found drunk"); *id.* pt. 13, South Carolina, at 96 (1782 law allowing officers to be cashiered or "confined till sober"). Similar laws persisted into the 1800s, *see, e.g.*, James Dunlop, *The General Laws of Pennsylvania* 405-06 (2d ed. 1849) (1822

law)—by which time at least three states outright excluded "common drunkards" from the militia, *see* 1844 R.I. Pub. Laws 503; 1837 Me. Laws 424; 1837 Mass. Acts 273.

During the 19th century, as social norms surrounding, and attitudes about, alcohol changed, and as firearms became less cumbersome, *see, e.g.*, Randolph Roth, *"Why Guns Are and Are Not the Problem,"* in Jennifer Tucker, *et al.*, *A Right to Bear Arms?: The Contested Role of History in Contemporary Debates on the Second Amendment* 116-17 (2019); Mark Edward Lender & James Kirby Martin, *Drinking in America: A History* 14-16 (1987), limits (including criminal penalties) on the carry, use, and receipt of firearms or pistols by intoxicated individuals proliferated to cover the general public. Lender, *Drinking in America*, at 45-46. Multiple states passed laws prohibiting members of the general public from carrying firearms while drunk. *See, e.g.*, 1867 Kan. Sess. Laws 25 (prohibiting those "under the influence of intoxicating drink" from carrying a pistol or other deadly weapon); 1878 Miss. Laws 175-76 (prohibiting selling weapons to a "person intoxicated"); Mo. Rev. Stat. § 1274 (1879) (prohibiting carrying "any kind of firearms" "when intoxicated or under the influence of intoxicating drinks"); 1883 Wis. Sess. Laws 290 (prohibiting person in "state of intoxication" from going "armed with any pistol or revolver"); 1909 Idaho Sess. Laws 6 (prohibiting "hav[ing] or carry[ing]" any "deadly or dangerous weapon"

when "intoxicated, or under the influence of intoxicating drinks"). Such statutes were considered "in perfect harmony with the constitution" and "a reasonable regulation of the use of such arms" even where state constitutions were understood to secure an individual's right to bear arms. *State v. Shelby*, 2 S.W. 468, 469 (Mo. 1886).

These historical laws show a clear and longstanding tradition of limiting firearm possession and use during periods of intoxication—when people are least likely to use firearms responsibly. *Daniels,* 77 F.4th at 345-48. And they support modern-day application of Section 922(g)(3) to do the same. *See id*. at 348.

***Laws Disarming Those Deemed Dangerous.*** Section's 922(g)(3)'s facial constitutionality is further justified by historical laws and practices of disarming those who would pose a threat to the safety of others if armed. At a minimum, these laws support disarming illegal drug users who have a history of drug-related violence. *Daniels*, 77 F.4th at 354-55.

English common law established the government's authority to disarm those who posed a threat to the safety of others. The Statute of Northampton codified the common-law prohibition on "go[ing] armed to terrify the King's subjects." *Sir John Knight's Case*, 3 Mod. 117, 87 Eng. Rep. 75, 76 (K.B. 1686); Statute of Northampton, 2 Edw. 3, c.3 (1328). The Militia Act of 1662 later

authorized crown officers to seize the arms of those "judge[d] dangerous to the Peace of the Kingdom.'" 13 & 14 Car. 2, c.3, § 13 (1662). The 1689 English Bill of Rights declared subjects' right to possess arms, but limited the right to Protestant subjects, 1 W. & M. c.2, § 6, and did not purport to repeal the Militia Act, which was employed into the 18th century, *see, e.g.*, *Calendar of State Papers, Domestic: William III, 1700-1702*, at 233-34 (Edward Bateson ed., 1937). Before, contemporaneous with, and after the Bill of Rights' enactment, Parliament also enacted statues disarming Catholics in England and Ireland. 3 Jac. I, c.5, §§ 16-18 (1605-06); 1 W. & M. c.15, §§ 3-4 (1688); 7 Will. III c.5 (1695) (Ireland). And in the early 1700s, statutes disarmed Scottish individuals believed to be loyal to James II. *See, e.g.*, 1 George I, c.54 (1715); 11 George I, c.26 (1724); 19 George II, ch. 39 (1746).

The tradition continued in early American legislatures. Some laws disarmed those who carried arms in a manner that spread fear or terror. *See* 1692-1694 Mass. Acts 11-12; 1696-1701 N.H. Laws 15. Others disarmed entire groups deemed dangerous or untrustworthy, including those who refused to swear allegiance to the colony[5] or the Revolution's cause.[6] Precursors to the Second

---

[5] 1 *Records of Governor & Company of the Massachusetts Bay in New England* 211-12 (Nathaniel B. Shurtleff ed., 1853) (1637 order disarming Anne Hutchinson's followers).

[6] *See, e.g.*, 4 *Journals of the Continental Congress* 201-06 (1906) (1776

Amendment proposed in state ratifying conventions likewise confirmed that legislatures may disarm certain categories of individuals, including for "real danger of public injury." 2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 665 (1971) (discussing Pennsylvania proposal). Accordingly, as one early scholar wrote, the government may restrict a person's right to carry firearms when there is "just reason to fear that he purposes to make an unlawful use of them." William Rawle, *A View of the Constitution of the United States of America* 126 (2d ed. 1829). That understanding persisted after the Civil War. In 1866, for example, a federal Reconstruction order applicable to South Carolina provided that, although the "rights of all loyal and well-disposed inhabitants to bear arms will not be infringed," "no disorderly person, vagrant, or disturber of the peace, shall be allowed to bear arms." Cong. Globe, 39th Cong., 1st Sess. 908-09 (1866).

These historical sources "support the proposition that the state can take the right to bear arms away from a category of people that it deems dangerous," *Kanter v. Barr*, 919 F.3d 437, 464 (7th Cir. 2019) (Barrett, J., dissenting),

---

resolution); 1775-1776 Mass. Acts 479; 1777 Pa. Laws 63; 1777 N.C. Sess. Laws 231; 1776-1777 N.J. Laws 90; 9 William Waller Hening, *Statutes at Large; Being a Collection of All the Laws of Virginia* 281-83 (1821) (1777 Va. law); 15 *The Public Records of the Colony of Connecticut from May, 1775, to June, 1776, Inclusive* 193 (Charles J. Hoadly ed., 1890) (1775 law).

including unlawful users of illegal drugs during periods of active use. The reasons are clear: common sense establishes a clear link between drug use and dangerous firearm misuse. For example, drug users may mishandle firearms—or use firearms to commit crimes—because of "drug-induced changes in physiological functions, cognitive ability, and mood." *Harmelin v. Michigan*, 501 U.S. 957, 1002 (1991) (Kennedy, J., concurring in part and concurring in the judgment); *see Florence v. Board of Chosen Freeholders*, 566 U.S. 318, 332 (2012) ("The use of drugs can embolden [individuals] in aggression."). Illegal drug users may also use firearms to "commit crime in order to obtain money to buy drugs," *Harmelin*, 501 U.S. at 1002 (Kennedy, J., concurring in part and concurring in the judgment), or to commit "violent crime" that "may occur as part of the drug business or culture," *id*. And because of the *unlawful* nature of their activities, armed drug users are more likely to have dangerous confrontations with law enforcement officers. *United States v. Carter*, 750 F.3d 462, 469 (4th Cir. 2014). It thus is no surprise that judges have observed that "drug dealing" is "dangerous because [it] often lead[s] to violence." *See, e.g.*, *Folajtar v. Att'y Gen.*, 980 F.3d 897, 922 (3d Cir. 2020) (Bibas, J., dissenting).

*Daniels* likewise recognized that historical precursors to Section 922(g)(3) establish "an undeniable throughline" of taking "guns away from persons perceived to be dangerous." *Daniels*, 77 F.4th at 352; *see id*. at 353 (explaining

24

that "[t]ogether," these historical sources "suggest a public understanding that when a class of individuals was thought to pose a grave danger to public peace, it could be disarmed"). That historical tradition supports disarming, at a minimum, drug users whose drug use "predisposes [them] to armed conflict" or who have a "history of violent behavior." *Id.* at 354.

***Limitation on the Mentally Ill.*** As *Daniels* recognized, limitations historically imposed on the mentally ill also justify disarming some unlawful drug users under Section 922(g)(3). At the Founding "those afflicted with mental diseases were generally treated as though they had been stripped of all . . . their rights and privileges." Albert Deutsch, *The Mentally Ill in America: A History of their Care and Treatment from Colonial Times* 41 (1949). Indeed, "'in eighteenth-century America, justices of the peace were authorized to "lock up" "lunatics" who were "dangerous to be permitted to go abroad."'" *United States v. Yancey*, 621 F.3d 681, 685 (7th Cir. 2010) (per curiam) (quoting Carlton F.W. Larson, *Four Exceptions in Search of a Theory*: *District of Columbia v. Heller and Judicial Ipse Dixit*, 60 Hastings L.J. 1371, 1377 (2009), in turn quoting Henry Care, E*nglish Liberties, or the Free-Born Subject's Inheritance* 329 (6th ed. 1774)).

The Second Amendment's ratifiers understood that just as mental illness could deprive individuals of reason, so could intoxicating substances. Indeed, Benjamin Rush, a signatory of the Declaration of Independence and a

prominent physician, equated drunkenness with a "temporary fit of madness." Rush, *supra*, at 6; *see also* Carl Erik Fisher, *Urge: Our History of Addiction* 47 (Penguin 2022) (noting that "eighteenth-century writers" understood "habitual drinking" as a form of "insanity"). And Thomas Jefferson placed "drunkards" in the same category as "infants," "maniacs" and others who "cannot take care of themselves." Nat'l Archives, *Letter from Thomas Jefferson to Samuel Smith*, 3 May 1823, https://perma.cc/2CJB-N7RS.

It is "beyond dispute that illegal drug users," like those with mental illnesses, "are likely . . . to experience altered or impaired mental states that affect their judgment and that can lead to irrational or unpredictable behavior." *Wilson v. Lynch*, 835 F.3d 1083, 1094 (9th Cir. 2016). Consequently, *Daniels* recognized that, at a minimum, history justifies disarming unlawful users who have used drugs "so powerful that anyone who uses them is permanently impaired in a way that is comparable to ongoing mental illness," or whose "drug use [is] so regular and so heavy that he was continually impaired." *Daniels*, 77 F.4th at 350.

> 2.  The district court erred by concluding that Section 922(g)(3) is unconstitutional on its face.

In light of the historical record just discussed, this Court in *Daniels* declined to hold that Section 922(g)(3) is unconstitutional in all of its

applications. 77 F.4th at 355. The district court made a series of errors in reaching a contrary conclusion.

a.    The district court concluded that because historical intoxication laws have a different "how" and "why" than Section 922(g)(3), those laws are not "relevantly similar" under *Bruen*, and thus are not entitled to *any* weight. ROA.225-229; *Bruen*, 142 S. Ct. at 2132. But as this Court concluded in *Daniels*, any difference between the scope of historical laws' disarmament of intoxicated individuals and Section 922(g)(3) does not render those historical sources meaningless. 77 F.4th at 347. Nor does it render Section 922(g)(3) unconstitutional *on its face*. *See id*. at 355. Although this Court in *Daniels* did not view disarming *all* unlawful drug users as "consonant with the limits the Founding generation understood to be permissible," *id.* at 355, at a minimum, banning gun possession while an individual is "*presently* under the influence" is consistent with the Second Amendment's historical understanding. *Id*. at 348. Thus, even under *Daniels*'s narrower view of historical intoxication laws, Section 922(g)(3) is facially constitutional. *Wash. State Grange,* 552 U.S. at 449.

b.    The district court also concluded that Section 922(g)(3) is facially unconstitutional because in some instances it "[p]rohibit[s] individuals who have used drugs sometime in the last year from owning and keeping a firearm." ROA.227 (discussing 27 C.F.R. § 478.11). But Section 922(g)(3)'s text makes it

unlawful for a person to possess a firearm if he "*is* an unlawful user" of any controlled substance. 18 U.S.C. § 922(g)(3) (emphasis added). This Court has construed the word "user" to refer to someone who engages in the regular use of a controlled substance. *United States v. McCowan*, 469 F.3d 386, 392 (5th Cir. 2006); *see also Dickerson v. New Banner Institute, Inc.*, 460 U.S. 103, 116 (1983) (discussing the significance of the verb tenses in Section 922(g)). The disqualification thus applies "only so long as [a person] abuses drugs." *Yancey*, 621 F.3d at 686-87. The district court thus gave undue weight to the implementing regulation in defining the scope of Section 922(g)(3).

The district court also misinterpreted the relevant regulation, which does not conclusively establish a defendant's status as an unlawful drug user if they fail a drug test "'within the past year.'" ROA.227. To the contrary, the regulation makes clear that, although a failed test may support "[a]n inference of current use," such an inference can be rebutted by evidence showing that the defendant is no longer "actively engaged" in the unlawful use of controlled substances. 27 C.F.R. § 478.11; *see also Daniels*, 77 F.4th at 348 n.20 (explaining that 27 C.F.R. § 478.11 creates an "inference of 'current use'").

In any event, that the statute may cover some unlawful drug users whom the district court believed retained a Second Amendment right to possess firearms was no basis for holding the statute facially unconstitutional. A law is

not facially unconstitutional unless "'no set of circumstances exists under which the Act would be valid,' *i.e.*, that the law is unconstitutional in all of its applications." *Wash. State Grange,* 552 U.S. at 449. This Court has already held that, although Section 922(g)(3) may be unconstitutional as applied to some unlawful drug users, the law may be constitutionally applied to others. *Daniels*, 77 F.4th at 340. The district court erred by holding otherwise.

    c.    Finally, the district court concluded that because Section 922(g)(3) dispossesses unlawful drug users who lack a criminal history without some pre-deprivation process, the statute is unconstitutional on its face. ROA.235-236. In reaching this conclusion, the district court relied on *Rahimi*, which the court believed "stressed the importance of this pre-deprivation process." ROA.235 (citing *United States v. Rahimi*, 61 F.4th 443, 455 n.7 (5th Cir.), *cert. granted*, 143 S. Ct. 2688 (2023)). But *Rahimi* was not so broad; it concluded only that Section 922(g)(8) was unconstitutional in part because it prohibited firearm possession by individuals "when the underlying proceeding [was] merely civil in nature." *Rahimi*, 61 F.4th at 455; *see also id.* at 455 n.7 (explaining that "[i]t is . . . significant that § 922(g)(8) works to eliminate the Second Amendment right of individuals subject merely to *civil* process") (emphasis added); *id.* at 465 (Ho, J., concurring) (explaining that "disarmament based on civil protective orders should give [the Court] pause"). It did not suggest that the government may only

prohibit firearm possession by those who have undergone some "pre-deprivation" criminal process. Indeed, this Court in *Daniels* did not rely on that defendant's lack of criminal history to support its holding. Nor did it otherwise suggest that an unlawful user must have a criminal record or have received some criminal process before the government may temporarily prohibit them from possessing firearms. And legal sources from the 17th, 18th, and 19th centuries recognized the government's power to disarm irresponsible individuals regardless of their criminal records or whether they received any pre-deprivation process. *See supra* pp. 18-26. The district court thus erred in concluding that Section 922(g)(3) required such process before the government could prohibit firearm possession by illegal drug users.

> 3.   The alleged facts demonstrate that Section 922(g)(3) is constitutional as applied to Connelly because she continuously possessed firearms while she was actively intoxicated.

Section 922(g)(3) is also constitutional as applied to Connelly. Section 922(g)(3)'s application to Connelly is consistent with the historical tradition of disarming those presently under the influence. *Daniels*, 77 F.4th at 348.

Connelly, who admitted to using marijuana on a "regular basis," had drugs and drug paraphernalia—including a marijuana greenhouse—inside her home. ROA.16-17, 256. These drugs were alongside nearly a dozen firearms that were openly scattered throughout her house. ROA.16-17. These facts

support the reasonable inference that Connelly possessed the multiple firearms she owned while "*presently* under the influence" of unlawful controlled substances. *Daniels*, 77 F.4th at 348; *see also id*. at 345-48 (explaining that historical laws justify disarming individuals during periods of active intoxication).

In reaching a contrary conclusion, the district court discounted the extent of Connelly's drug use. While purporting to adopt the government's allegations that Connelly admitted to using marijuana on a "regular basis" and "every day," *see* ROA.16, 218-219, 279, the district court characterized Connelly's drug use as merely "on occasion," ROA.223; *see also* ROA.101 (Connelly characterizing her own marijuana used as "occasional but regular"). This was error that undermines the district court's reasoning. Under *Daniels*, a more accurate accounting of Connelly's "every day," continued drug use supports disarming her. ROA.279; *cf. Daniels*, 77 F.4th at 340 (holding Section 922(g)(3) unconstitutional where Daniels used marijuana fourteen days out of the month and there was no evidence of his prior drug use).

        4.     If this Court disagrees, it should remand for further consideration of Connelly's as-applied challenge under *Daniels*.

If this Court is unsure whether Connelly falls within any category of individuals that *Daniels* recognizes may be disarmed, it should vacate the district

court's order and remand for additional proceedings. The district court's pre-trial resolution of Connelly's as-applied challenge was premature in this case, where further development of material facts about the extent of Connelly's drug use would aid in resolving Connelly's as-applied challenge.

A motion to dismiss may be resolved pretrial only where it presents claims that "can be determined without a trial on the merits." Fed. R. Crim. P. 12(b)(3). The rule does not permit pre-trial resolution of individualized, offender-specific facts. *United States v. Rodríguez-Rivera*, 918 F.3d 32, 35 (1st Cir. 2019); *see also United States v. Pope*, 613 F.3d 1255, 1261-63 (10th Cir. 2010) (as-applied Second Amendment challenge could not be considered pretrial where, to prevail, "disputed facts outside the indictment must be found in [defendant's] favor").

Here, the district court granted Connelly's pre-trial motion to dismiss before the government could adduce at trial evidence of the full extent of Connelly's drug use. *See* ROA.218-219. True, the district court purported to adopt the government's allegations of Connelly's drug use to resolve Connelly's as-applied challenge, *see* ROA.218-219 (though it did not do so faithfully, *see supra* p. 31). The government maintains that those allegations support disarming Connelly under Section 922(g)(3). *See supra* pp. 30-31. But to the extent this Court disagrees, a remand is appropriate for additional proceedings, including

32

to permit the district court to decide the as-applied question in light of *Daniels* in the first instance.

Further proceedings in the district court would be probative of at least three issues relevant to Connelly's as-applied challenge. *First*, additional proceedings would permit further development of whether Connelly possessed firearms while under the influence of controlled substances. *See Daniels*, 77 F.4th at 340, 345. Drug users who possess firearms are apt to retain possession while under the influence; they are unlikely to put their guns away before using drugs and to retrieve them only after regaining sobriety. Given Connelly's admitted use of marijuana on a "regular basis," it is reasonable to conclude that Connelly possessed her firearms—which were strewn about her house, including between her bed and nightstand, *see* ROA.260—while under the influence of illegal drugs. *Second*, additional proceedings would permit further development of the extent and nature of Connelly's drug use. *See Daniels*, 77 F.4th at 347. Although Connelly admitted to using marijuana on a "regular basis," there were other illegal drugs in her home. *See* ROA.16. And at Connelly's detention hearing, an agent with the Bureau of Alcohol, Tobacco, Firearms & Explosives testified that the agency had collected drug samples from Connelly's home but that those substances were still undergoing testing. ROA.259-260 (plants in marijuana greenhouse were "collected for testing"); ROA.261 (hallucinogenic mushrooms

found in kitchen were "still being tested," as were substances in "vape pens" that were found "throughout the residence"). Results from those tests, as well as evidence about the full extent of Connelly's drug use, are probative of whether Connelly used "heavy" drugs "regular[ly]" enough to render her continually impaired. *Daniels*, 77 F.4th at 350. *Third*, additional proceedings would permit further development of the question whether Connelly has a "history of drug-related violence." *Id.* at 354. The district court concluded that she did not. ROA.238. But an agent testified at her detention hearing that she had been arrested and charged in May 2021 after officers were dispatched for an "issue between neighbors or a domestic dispute." ROA.259. Further investigation of the nature of the dispute that led to Connelly's arrest, and the nature of her involvement in it, will confirm the extent of Connelly's history of drug-related "violence." *Daniels*, 77 F.4th at 347.

## II. The District Court Erred by Holding That Section 922(d)(3) is Unconstitutional on its Face.

Finally, the district court erred by concluding that Section 922(d)(3), which prohibits the transfer of firearms to unlawful users of controlled substances, violates the Second Amendment on its face. ROA.239-245. The district court's first error was reaching Connelly's facial challenge to Section 922(d)(3) at all. In any event, Section 922(d)(3) is facially constitutional for the

same reasons as Section 922(g)(3). And Section 922(d)(3) is constitutional as applied in this case.

A. **The District Court Erred by Sustaining Connelly's Facial Challenge Before Deciding Her As-Applied Challenge.**

The district court erred in ruling on Connelly's facial challenge before addressing her as-applied challenge. This Court has held that facial challenges "should be granted sparingly and only as a last resort." *United States v. McGinnis*, 956 F.3d 747, 752-53 (5th Cir. 2020) (internal quotation marks omitted). Thus, "[w]hen a litigant brings both as-applied and facial challenges," courts should "generally decide the as-applied challenge first because it is the narrower consideration." *Buchanan v. Alexander*, 919 F.3d 847, 852 (5th Cir. 2019).

The district court inverted this approach. It observed that Connelly had raised both facial and as-applied challenges to Section 922(d)(3). *See* ROA.242-245. And it started to resolve her as-applied challenge. *See* ROA.243-244. The court acknowledged that John's alleged acts—which included ingesting "crack cocaine" and "mushrooms" before using a shotgun to shoot through his neighbor's front door, ROA.16, 67, 266—were more egregious than Connelly's and that John "appear[ed] to be the type of dangerous individual that historical authorities may have disarmed." ROA.244. The court also said that John's actions "weak[ened]" Connelly's as-applied challenge to Section 922(d)(3). ROA.244. The court nevertheless explained that because "Connelly also raises

a facial challenge to § 922(d)(3)," and because, "as written," Section 922(d)(3) disarms individuals "who do not pose the same kind of threat" as John, the statute was unconstitutional on its face. ROA.244-245. This was a clear misapplication of this Court's precedents. *See McGinnis*, 956 F.3d at 752-53 (explaining that courts should rule on facial challenges "only as a last resort") (internal quotation marks omitted); *Buchanan*, 919 F.3d at 852 (courts should decide as-applied challenges before facial challenges).

To justify its approach, the district court relied on *Rahimi*, which explained that "if a statute is inconsistent with the Second Amendment's text and historical understanding, then it falls under any circumstances." ROA.244 (quoting *Rahimi*, 61 F.4th at 453). But the Supreme Court's longstanding standard for resolving facial constitutional challenges to federal statutes—that a challenger must show "that no set of circumstances exists under which the Act would be valid," *Salerno*, 481 U.S. at 745—establishes otherwise. And this Court, including in *Daniels*, and other courts have granted as-applied *Bruen* challenges without opining on the facial constitutionality of a challenged statute, reaffirming that even where courts believe that a statute's application to a particular defendant may be inconsistent with the historical tradition of firearms regulation, the statute may still be facially constitutional. *See Daniels*, 77 F.4th at 355 (holding that Section 922(g)(3) is unconstitutional as applied to Daniels but

emphasizing the "narrowness" of its decision and declining to find Section 922(g)(3) unconstitutional in all its applications); *see also Range v. Att'y Gen.*, 69 F.4th 96, 98 (3d Cir. 2023) (en banc) (finding that the government failed to establish a historical tradition for disarming Range under 18 U.S.C. § 922(g)(1), but limiting its "narrow" decision to Range and his circumstances), *petition for cert. filed*, No. 23-374 (Oct. 5, 2023). To the extent *Rahimi* purported to alter the longstanding principles governing facial challenges in the Second Amendment context, as the district court suggests, the government preserves the argument that *Rahimi* is wrong.

B.    The Same Historical Tradition That Supports Section 922(g)(3)'s Facial Constitutionality Supports Section 922(d)(3)'s.

In any event, Section 922(d)(3) is constitutional on its face. For the same reasons that Congress can lawfully prohibit the possession of firearms by unlawful drug users during periods of intoxication or impairment, or where they pose a threat of danger to the public, *see supra* pp. 18-26, Congress may lawfully regulate the *transfer* of firearms to unlawful users of controlled substances. *See Fried v. Garland*, 640 F. Supp. 3d 1252, 1262 (N.D. Fla. 2022) (explaining that the same historical tradition justifies disarming unlawful users under Sections 922(g)(3) and 922(d)(3)); *cf.* ROA.242-243 (explaining that because Section 922(d)(3) "would impose nearly the same restrictions on firearm use as

§ 922(g)(3), it follows that the same historical evidence cannot justify either law").[7]

C.     Section 922(d)(3) is Constitutional As Applied in This Case.

Finally, Section 922(d)(3) is constitutional as applied to Connelly.[8] The government alleges that John—after using "crack cocaine" and ingesting "mushrooms"—threatened his neighbor with a shotgun and shot through his neighbor's front door. ROA.16; *see also* ROA.266 (ATF agent testifying about damage to property and injury to neighbor's eye). As alleged, John's actions

---

[7] The district court did not question Congress's authority to regulate the transfer of firearms generally. Indeed, that authority, too, is supported by our Nation's historical tradition of firearm regulation. *Bruen*, 142 S. Ct. at 2126-27. Since the colonial era, governments have "substantially controlled the firearms trade." *Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 685 (9th Cir. 2017) (en banc). "At least two colonies" controlled "where colonial settlers could transport or sell guns." *Id.* "Connecticut banned the sale of firearms by its residents outside the colony." *Id.* (citing 1 Trumbull, Public Records of the Colony of Connecticut, 138–39, 145–46). Virginia law provided that residents were at "'liberty to sell armes and ammunition to any of his majesties loyall subjects inhabiting this colony.'" *Id.* at 685 n.18 (emphasis added) (quoting Laws of Va., Feb., 1676–77, Va. Stat. at Large). And at least six colonies made it a crime (with severe penalties) to sell or provide firearms or ammunition to Native Americans. *Id.* at 685 (citing 17th-century laws from Massachusetts, Connecticut, Maryland, and Virginia); *see also* 6 Statutes at Large of Pennsylvania from 1682 to 1801 at 319-320 (1899) (1763 law); Laws and Ordinances of New Netherland, 1638- 1674 (1868) at 18-19 (1639 ordinance), 47 (1645 ordinance), 278 (1656 ordinance).

[8] The government does not dispute the district court's conclusion that Connelly has standing to assert her husband's Second Amendment as a defense to Section 922(d)(3). ROA.243.

were undoubtedly dangerous under any standard, and disarming him would comport with the Second Amendment. *See Daniels*, 77 F.4th at 354-55 (explaining that the government could disarm drug users with a history of violent behavior). The district court seemed to agree. *See* ROA.244 (characterizing Connelly's as-applied challenge to Section 922(d)(3) as "weak[]"). It thus erred by granting Connelly's as-applied challenge to Section 922(d)(3).

## CONCLUSION

This Court should reverse the district court's judgment or, alternatively, vacate and remand for additional proceedings.

Respectfully submitted,

JAIME ESPARZA
United States Attorney
Western District of Texas

ZACHARY RICHTER
Deputy Appellate Chief
Western District of Texas

NICOLE M. ARGENTIERI
Acting Assistant Attorney General

LISA H. MILLER
Deputy Assistant Attorney General

/s/ Mahogane D. Reed
MAHOGANE D. REED
Attorney, Appellate Section
Criminal Division
U.S. Department of Justice
950 Pennsylvania Ave., N.W.
Washington, DC 20530
(202) 615-1170
mahogane.reed@usdoj.gov

October 20, 2023

## CERTIFICATE OF SERVICE

Under Federal Rule of Appellate Procedure 25(d), undersigned counsel certifies that the foregoing Opening Brief for the United States was this day served on counsel for the appellee by notice of electronic filing with the Fifth Circuit CM/ECF system.

/s/ Mahogane D. Reed
MAHOGANE D. REED

# CERTIFICATE OF COMPLIANCE

1.     This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 8,635 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2.     This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Calisto MT 14-point font.

/s/ Mahogane D. Reed
MAHOGANE D. REED